**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>SURE WINNER FOODS,<br><br>Debtor. | Chapter 11<br>Case No. 19-20226 |

**MOTION FOR AN ORDER: (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING; (B) GRANTING POST-PETITION SENIOR SECURITY INTERESTS TO KEYBANK, N.A. AND PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTION 364(c) TO KEYBANK; (C) MODIFYING THE STAY; (D) AUTHORIZING THE USE OF CASH COLLATERAL; (E) GRANTING ADEQUATE PROTECTION TO KEYBANK PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE, INCLUDING REPLACEMENT LIENS; AND (F) PRESCRIBING THE FORM AND MANNER OF NOTICE FOR THE FINAL HEARING**

Sure Winner Foods, the debtor and debtor-in-possession in the above-captioned chapter 11 case ("SWF," or the "Debtor"), by and through its attorneys, and pursuant to, *inter alia,* 11 U.S.C. §§ 105, 361, 363, and 364, Fed. R. Bankr. P. 2002, 4001, 9006, 9007, 9013, and 9014 and D. Me. LBR 4001-2, 9013-1, and 9014-1, moves this Court for an order (A) Authorizing the Debtor to Obtain Post-Petition Financing; (B) Granting Post-Petition Senior Security Interests to KeyBank and Priority Administrative Expense Status Pursuant to Section 364(c) to KeyBank; (C) Modifying the Stay; (D) Authorizing the Use of Cash Collateral; (E) Granting Adequate Protection to KeyBank Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code, Including Replacement Liens; and (F) Prescribing the Form and Manner of Notice for the Final Hearing (the "Motion") and, in support of the Motion, the Debtor states as follows:

## CONCISE STATEMENT OF RELIEF REQUESTED[1]

1. By this Motion, the Debtor seeks authority to obtain financing (the "DIP Loan") from KeyBank National Association ("KeyBank") substantially upon the terms set forth in the Amended and Restated Loan and Security Agreement (All Assets) (Debtor in Possession Financing) (the "DIP Loan Agreement"), a copy of which is attached hereto as **Exhibit A**. A summary of the proposed DIP Loan Agreement[2] and the proposed form of order follows: [3][4]

   a. As described more fully herein, KeyBank entered into prepetition loan agreements with the Debtor pursuant to which KeyBank provided the Debtor with a revolving line of credit with a credit limit of the lesser of (i) 80% of the unpaid face amounts of qualifying accounts receivable plus 50% of qualifying inventory, or (ii) $20,000,000. As of the Petition Date, $5,188,282 is due and payable under the line of credit note (the "Original Loan"). The Debtor has requested that KeyBank agree to advance, on an interim basis, an additional amount post-petition of up to $7,000,000 (the "DIP Loan") in order to fund, pending a final hearing on the Motion, the expenses identified on the Debtor's Budget, a copy of which is attached hereto as **Exhibit B** (the "Budget") and in accordance with any of the Bankruptcy Court filings.

   b. The interest rate applicable to the DIP Loan is fixed at not to exceed 5.75% above LIBOR or 4% above prime as the case may be per annum on any amounts advanced under the DIP Loan. The default rate shall be 4% above the otherwise applicable rate of interest. The commitment fee for the DIP Loan shall be not greater than 3% of the loan commitment amount.

---

[1] Capitalized terms used but not defined in this Concise Statement of Relief Requested shall have the meanings ascribed to such terms in Exhibit A.

[2] As used herein, the term "DIP Loan Agreement" shall be construed to mean the DIP loan agreement that the Debtor has proposed to KeyBank. Moreover, any statement that KeyBank has "agreed" to any loan or loan term should be construed to mean that "the Debtor has requested that KeyBank agree." Required internal approvals at KeyBank have not been granted and may not be inferred. Although the Debtor is optimistic that internal approvals at KeyBank will be obtained and that the DIP loan will be made, KeyBank is currently under no commitment to make the requested loan.

[3] Necessary internal approvals at KeyBank have not been given as of the filing of this Motion. Certain terms, such as the DIP loan commitment fee and the applicable interest rate, have not yet been determined.

[4] The description of the terms and conditions of the DIP Loan and the DIP Orders set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries are qualified in their entirety by the relevant documents. In the event there is a conflict between this Motion and the relevant documents, the relevant documents, as applicable, shall control in all respects.

    c. The maturity date for the DIP Loan shall be June 6, 2021. Interest shall be payable monthly in relation to both the Original Loan and the DIP Loan, and the DIP Loan shall be repaid from excess operating revenue as reflected in the Budgets. The maturity date for the Original Loan shall also be extended to June 6, 2021.

    d. The DIP Loan shall be secured by all of the collateral securing the Original Loan, which collateral generally consists of first position liens on all assets of the Debtor. In addition, the DIP Loan shall be secured by a mortgage on real property located in Saco, Maine, otherwise known as the "freezer facility" and by the proceeds of certain commercial tort claims against Nestlé as further defined and described below.

    e. Closing of the DIP Loan is contingent on certain conditions being satisfied, including, but not limited to: (i) internal approvals (ii) entry of an order by the Bankruptcy Court approving the DIP Loan; and (iii) the Debtor's execution of the Amended and Restated Loan and Security Agreement (All Assets) ( Debtor in Possession Financing)

    f. In consideration for KeyBank making the DIP Loan, the Debtor has agreed not to seek a modification of the terms of the Original Loan pursuant to a plan of reorganization or otherwise, other than the modification set forth herein.

    g. The DIP Loan provides for customary events of default, as set forth in the loan documents securing the Original Loan.

    h. In consideration for KeyBank making the DIP Loan, the Debtor has agreed

        i. that the new post-petition debt shall constitute an allowed post-petition super-priority claim pursuant to bankruptcy code sections 364(c)(1) and 507(b),

        ii. to the validity, enforceability, and amount of the Original Loan and the DIP Loan, and the priority of the DIP Loan,

        iii. to release and waive all claims against KeyBank,

        iv. to a hearing on shortened notice on any motion brought by KeyBank for relief from the stay based on an alleged event of default or event of termination,

        v. that in a hearing on a motion for relief from stay it will assert no defense other than lack or absence of an event of default or termination,

3

      vi. to waive all rights of surcharge under 11 U.S.C. §506(c).

  i. The terms of the DIP Loan do not contain any of the provisions listed in Bankruptcy Rule 4001(c)(1)(B) (v), (vi), (vii), or (xi).

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

2. The United States District Court for the District of Maine (the "District Court") has original, but not exclusive, jurisdiction over the Debtor's Chapter 11 case pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this proceeding to this Court.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and this Court has constitutional authority to enter final judgment in this proceeding.

4. Venue over this Chapter 11 case is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

5. The predicates for relief sought herein are Bankruptcy Code §§ 105, 361, 363, 364, and 552, Fed. R. Bankr. P. 2002, 4001, 9006, 9007, 9013, and 9014 and D. Me. LBR 4001-2, 9013-1, and 9014-1

## BACKGROUND

### A. The Chapter 11 Case

6. On May 7, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. As of the date hereof, no trustee or examiner has been sought or appointed in the case, and no official committee has been appointed.

7. Additional background information regarding the Debtor and the relief sought by this Motion and relating to the marketing, reasonableness and necessity of the DIP Loan is set forth in the Declaration of Keith Benoit in Support of Chapter 11 Petition and Various First Day Motions (the "Benoit Decl.") and the Declaration of Mark Stickney of Spinglass Management Group, LLC in Support of Debtor's Motion For Authority to Incur Post-Petition Debt and Related Relief (the "Stickney Decl."), both of which were filed on the Petition Date and which are incorporated by reference herein.

B.    **The Debtor's Existing Secured Debt**

8. Prior to the filing of the Chapter 11 case, the Debtor's operations were financed pursuant to secured financing arrangements with KeyBank, including a term loan and a secured revolving line of credit. KeyBank has a security interest in all personal property of the Debtor. The KeyBank loan facility is described in detail below.

9. On or about May 16, 2014, SWF and KeyBank entered into a Loan and Security Agreement (the "Loan Agreement") pursuant to which KeyBank provided to the Debtor a revolving line of credit (the "LOC Note") and a $5,000,000 term note (the "Term Note"). A copy of the Loan Agreement, and the Eighth Amendment to the Loan Agreement, is attached hereto as **Exhibit C**. Pursuant to the Loan Agreement, the Debtor's obligations to KeyBank were secured by all assets of the Debtor, including the Saco Real Estate. In accordance with the terms of the Loan Agreement, KeyBank discharged its mortgage on the Saco Real Estate when the balance of the Term Note was reduced by more than 50% of the original amount.

10. As of May 6, 2019, SWF owed approximately $400,000.20 to KeyBank pursuant to the Term Note. A true and correct copy of the Term Note is attached hereto as **Exhibit D**.

11. Pursuant to the Eighth Amendment to the Loan Agreement dated January 25, 2019, as of the Petition Date, the LOC Note has a credit limit of the lesser of (i) 80% of the unpaid face amounts of qualifying accounts receivable plus 50% of qualifying inventory, or (ii) $20,000,000 (and together with the amount owed pursuant to the Term Note and all Obligations under and as defined in the Loan Agreement, the "Prepetition Indebtedness"). As of May 6, 2019, SWF owed approximately $5,188,282.00 to KeyBank pursuant to the LOC Note. A true and correct copy of the LOC Note, as amended, is attached hereto as **Exhibit E**.

12. Under that Loan Agreement, SWF granted KeyBank a security interest in certain collateral, including SWF's accounts, inventory, general intangibles, and equipment (among other personal property) (the "Collateral"). The Debtor acknowledges that KeyBank possesses a valid, binding, and perfected security interest in the Collateral and that KeyBank's lien on its personal property under the Loan Agreement is a first priority lien.[5]

13. On or about May 16, 2014, KeyBank filed a UCC-1 financing statement with the Maine Secretary of State and a UCC continuation amendment on November 20, 2018 (collectively, the "Financing Statement"). A true and correct copy of the Financing Statement is attached hereto as **Exhibit F**.

14. The following entities (collectively, the "Lessors") filed financing statements purporting to have either a leasehold or purchase money security interest in certain equipment of SWF:[6]

---

[5] Pursuant to Local Rule 4001-1(c)(1), the Debtor's acknowledgement of the validity, amount, perfection, priority, extent and enforceability is subject to a sixty (60) day objection period after the earlier of (i) the court's approval of the retention of counsel to the creditor's committee, or (ii) an order authorizing the appointment of a trustee, during which period parties may challenge the secured claim on any basis.

[6] The Lessors have filed financing statements in regard to their respective equipment leases. The Debtor reserves all rights to argue that such leases are actually disguised financings and that the allegedly leased equipment is property of the Debtor's estate. Additionally, except to the extent prohibited by the terms hereof, the Debtor reserves the right to contest the validity and priority of any and all liens, claims and encumbrances against the Debtor's assets.

      (a)    Crown Equipment Corporation;

      (b)    HYG Financial Services, Inc.;

      (c)    MRK Leasing, LTD.;

      (d)    Budget Document Technology.

**C.**    **The Proposed Loan**

15. The Debtor and KeyBank have reached an agreement under which, *inter alia*, the Debtor, in essence, continues its pre-bankruptcy credit relationship with KeyBank substantially in conformity with the terms and conditions of the continued borrowing pursuant to the DIP Loan Agreement.

16. Closing of the DIP Loan is contingent on certain conditions being satisfied, including, but not limited to: (i) the grant of all required internal approvals by the Bank, which approvals have not been granted as of the filing of this Motion (ii) entry of an order by the Bankruptcy Court approving the DIP Loan; and (iii) the Debtor's execution of an Amended and Restated Loan and Security Agreement (All Assets) (Debtor in Possession Financing) which will reflect the terms of the DIP Loan.

17. The Debtor has provided KeyBank with its cash flow projection and budget (outlining the usual and necessary expenses of the Debtor, as well as expected revenues, on a cash basis, assuming the continued use of the loan) in the attached Budget. Subject to the terms and conditions of the DIP Loan Agreement, KeyBank will advance the balance of the loan, upon the entry of the Interim Order and any subsequent final order, up to $7,000,000, which amount should be sufficient to cover the Debtor's cash needs as set forth on the Budget and pay certain fees imposed by KeyBank.

18. Pursuant to § 364(d)(1) of the Bankruptcy Code, indebtedness for the loan will be secured by a first priority lien on all assets of the Debtor, including without limitation, in the

following collateral, whether owned, acquired or generated by the Debtor prepetition or post petition.

(a) all inventory, including all goods, merchandise, raw materials and work in process, finished goods, and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in borrower's business (all hereinafter called the "<u>Inventory</u>");

(b) all accounts as defined in Article 9 of the Uniform Commercial Code, (hereinafter "<u>Accounts</u>"), contracts, contract rights, notes, bills, drafts, acceptances, general intangibles (including without limitation registered and unregistered tradenames, copyrights, customer lists, goodwill, computer programs, computer records, computer software, computer data, trade secrets, servicemarks, trademarks, patents, ledger sheets, files, records, data processing records relating to any accounts and all tax refunds of every kind and nature to which borrower is now or hereafter may become entitled to, no matter how arising), instruments, documents, chattel paper (whether tangible or electronic) deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, security entitlements, security accounts, investment property, supporting obligations, choses in action, commercial tort claims, and all other debts, obligations and liabilities in whatever form, owing to borrower from any person, firm or corporation or any other legal entity, whether now existing or hereafter arising, now or hereafter received by or belonging or owing to borrower, for goods sold by it or for services rendered by it, or however otherwise same may have been established or created, all guarantees and securities therefor, all right, title and interest of borrower in the merchandise or services which gave rise thereto, including the rights of reclamation and stoppage in transit, all rights to replevy goods, and all rights of an unpaid seller of merchandise or services;

(c) all machinery, equipment, fixtures and other similar goods (as defined in article 9 of the uniform commercial code) whether now owned or hereafter acquired by the borrower and wherever located, all replacements and substitutions therefor or accessions thereto and all proceeds thereof (all hereinafter called the "<u>Equipment</u>");

(d) all moneys, securities and other property (and the proceeds thereof) now or hereafter held or received by, or in transit to bank, from or for it, whether for safekeeping, pledge, custody, transmission, collection or otherwise and all credits and balances of it, with bank at any time existing;

8

  (e)  all goods, machinery, equipment and all of borrower's other tangible personal property (to the extent not included within inventory or equipment), now owned or hereafter acquired and wherever located, as well as all of borrower's right, title and interest in and to any such goods as may be now or hereafter held or used by borrower under any lease, lease-purchase, conditional sales, use or other agreements under which borrower is or may become entitled to the use and possession thereof, with any and all other rights and benefits flowing from or under such agreements, all as may be used, useful or bought for use in connection with the ownership and/or operation of borrower's business, and any operations incidental to or associated with the same, or otherwise, and all service contracts relating to any of the foregoing, all whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all additions and accessions thereto;

  (f)  all right, title and interest of borrower in any master swap agreement between borrower and bank that may be entered into in the future, and each transaction entered into thereunder including, without limitation, all amounts payable or deliverable thereunder and the benefit of any guarantee or other credit support in connection therewith;

  (g)  the proceeds of any commercial tort claim arising out of or relating to Borrower's dispute with Nestlé S.A. and any of its affiliates, including without limitation Nestlé Dreyer's Ice Cream Company (collectively, "**Nestlé**" and such dispute being referred to as the "**Nestlé Dispute**"); and

  (h)  all proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (all of the assets described in this section 1, together with any other property or interests that are now or hereafter subject to the security documents (defined below), are sometimes hereinafter referred to as the "Collateral").

  19.  Pursuant to § 364(d)(1) of the Bankruptcy Code, indebtedness for the DIP Loan will be further secured by a first mortgage upon the Saco Real Estate, including, without limitation, any and all leasehold interests and rights to rents or profits but subject to the Professional Fee Carveout, as defined and described in paragraph 24, below.

9

20. In further consideration of the new loan, further adequate protection is to be provided to KeyBank by granting it super-priority claims under § 364(c)(1) for the amount of the unpaid balance under the DIP Loan, subject, however, to the same exclusions as are set forth herein and provided, further, that such claims and liens of KeyBank of shall not be prior to allowed administrative claims for costs imposed by the court, and fees payable to the office of the United States Trustee.

21. The Debtor notes that the proposed order attached hereto as <u>Exhibit B</u> contains a provision waiving the Debtor's rights to challenge the extent, validity, perfection and enforceability of KeyBank's interest in the collateral. In accordance with the Maine Bankruptcy Rules, the proposed order contains the following conspicuous notice: **[Note: because the provisions of this paragraph constitute a waiver of defenses by the debtor, they vary from the standard set forth in Local Bankruptcy Rule 4001-2(c)(2) and are hereby disclosed conspicuously, as required by D. Me. LBR 4001-2, and are nonetheless approved as reasonable under the facts and circumstances of this case. The court further finds that the provisions of this paragraph comply with the standards set forth in d. Me. LBR 4001-1(c)(1).]**

22. The Debtor's desire and need to obtain and use the proposed post-filing financing in order to meet payroll during the next several weeks, and in order to preserve, protect, and maintain their assets. Further, the Debtor is unable to obtain unsecured credit (other than ordinary trade debt) sufficient to operate or reorganize its business by providing an administrative expense claim or secured debt on any basis more favorable to the Debtor than is set forth herein, and in the Interim Order. The financing terms are reasonable in light of the risks involved and the collateral offered.

23. The Debtor's assets, to the extent they existed prepetition, are encumbered only by liens of KeyBank and, to the extent of valid PMSIs, the Lessors. To the extent the Lessor's lease interests are determined to be a security interest, KeyBank is not seeking to prime the pre-existing pre-petition liens, to the extent the Lessors properly perfected a PMSI in certain equipment pre-petition.

24. The Debtor has requested that the Bank agree to a carveout from the Saco Real Estate in the amount of up to but not exceeding the aggregate amount of $200,000 to be used to pay court approved administrative fees of court approved professionals of the Debtor (the "Professional Fee Carveout"). The Professional Fee Carveout shall be in addition to and not in lieu of the amount of administrative fees and expenses of the professionals that are specifically provided for in the Budget, shall be released by Bank and paid to those professionals only in such amounts, if any, as may be authorized and determined by separate order of the Court, and subject further to entry of any final order approving the retention of such professionals, and only in the event that, and to the extent that, such amounts remain unpaid in the event of the conversion or dismissal of this chapter 11 case. To the extent that the Professional Fee Carveout is insufficient to pay such amounts in full, the Professional Fee Carveout shall be distributed to such professionals on a pro rata basis, determined by relative amounts of fees and expenses allowed on a final basis by the Court and that remain unpaid upon such conversion or dismissal. Such amounts shall be paid to the professionals so retained, with Court approval, in this chapter 11 case without regard to section 726(b) of the Bankruptcy Code, and the Professional Fee Carveout shall not be subject to such section 726(b). Subject to the Court's final approval and authorization of amounts paid to the professionals from the Professional Fee Carveout, the Bank's lien and security interest shall continue to extend to the Professional Fee Carveout (but the Bank's

lien and security interest in such Professional Fee Carveout shall be subordinate to the interests of the professionals to whom such amounts are to be paid, to the extent of the allowed fees of such professionals), and any remaining proceeds not utilized in accordance with this paragraph shall be returned to the Bank for application against the Post-Petition Debt.  The Bank shall have no rights or claims with respect to the Professional Fee Carveout other than as set forth in this Paragraph 24.

25.     Pending final hearing on the post-petition financing, the Debtor anticipates, as set forth on the Budget, the need to borrow up to $7,000,000 (the "Interim Amount") during the period from an entry of an interim order through the entry of a final order (the "Interim Period"). This amount is necessary to avoid immediate and irreparable harm to the estate and the Debtor because weekly payrolls and certain critical expenses must be paid and the Debtor will have insufficient funds to pay such payrolls and certain other critical expenses unless such advances are made.

E.     **The DIP Loan Marketing Process**

26.     During the months preceding the Petition Date, the Debtor, through Mark Stickney of Spinglass Management, began to engage in discussions with certain potential post-petition lenders regarding the contours of a post-petition financing facility.  The Debtor provided information to and engaged in discussions with at least three potential lenders in addition to KeyBank in an effort to obtain post-petition financing on terms most favorable to the Debtor. The potential lenders were unwilling to lend on more favorable terms to the Debtor on a priming basis, and were unwilling to lend at all on an unsecured, administrative claim, equal secured claim or junior secured basis.

27. Like the other financing institutions contacted, KeyBank, the Debtor's existing secured lender, was not willing to lend on a junior lien, administrative or unsecured basis but was willing to lend as a first-priority secured lender (its existing status) on terms that were fair and reasonable, and in an amount sufficient to sustain the Debtor's operations while in chapter 11. KeyBank is the Debtor's only secured party (other than possibly some or all of the Lessors holding properly-perfected PMSI's, to which KeyBank may be subordinate), and thus its lending on a senior basis will not impact other secured parties.

28. The Debtor was unable to obtain alternative debtor-in-possession financing through credit allowable as an administrative expense or secured by equal or junior liens on the Debtor's encumbered assets or on any other terms.

## RELIEF REQUESTED

29. By this Motion, the Debtor seeks authority to: (a) obtain post-petition financing in accordance with the terms of the Term Sheet, (b) grant post-petition security interests to KeyBank, (c) to use of cash collateral in accordance with the Budget and in the ordinary course of the its business, (d) grant adequate protection to KeyBank pursuant to §§ 105, 361, and 363 of the Bankruptcy Code including interim payments and replacement liens

30. The Debtor requests that the Court first conduct an emergency preliminary hearing (the "Interim Hearing") authorizing the Debtor to borrow an amount up to $7,000,000 during the Interim Period, in accordance with the terms of a proposed Interim Order. The Debtor further requests that the Court schedule a final hearing to occur no later than 21 days after the Petition Date to consider entry of a final order, authorizing the Debtor to borrow on a permanent

basis on terms substantially similar to those set forth in the Interim Order (as amended by the terms of a Final Order).[7]

## BASIS FOR RELIEF

31. Section 364 of the Bankruptcy Code permits the Court to authorize post-petition borrowing by a debtor in possession and provides that the Court may authorize the grant of security interests in property of the estate in connection with such borrowing. See 11 U.S.C. § 364(c). Pursuant to § 364(d)(1), a debtor may incur a debt secured by a senior lien on property of the estate that is subject to a lien if more favorable financing is not available and the holder of the existing lien on the property on which the senior lien is to be granted consents or is otherwise adequately protected. See 11 U.S.C. § 364(d)(1). Additionally, section 105(a) authorizes the Court to issue any order that is necessary or appropriate to carry out the provisions of Title 11. See 11 U.S.C. § 105(a).

32. As noted above, the Debtor's inventory and accounts receivable as such collateral existed on the Petition Date are subject to the liens of KeyBank. Accordingly, the proceeds of such collateral constitute the Lenders' cash collateral under 11 U.S.C. § 363(a).

33. The Debtor seeks authority, pursuant to 11 U.S.C. § 363(c)(1), (c)(2)(A), and (c)(2)(B) and Fed. R. Bankr. P. 4001(b)(2), and D. Me. LBR 4001-2, to use the amounts in its existing bank accounts (the "Cash Collateral") in the ordinary course of its business, including the payment of items shown in Exhibit B and consistent with the terms of the DIP Loan and the Proposed Order.

34. As adequate protection of KeyBank's interest in the Cash Collateral, the Debtor seeks authority, pursuant to 11 U.S.C. § 552(b)(1), to grant KeyBank a continuing, post-petition

---

[7] The Debtor will file a form of Final Order approving this Motion in advance of the Final Hearing.

14

security interest in the Cash Collateral attributable to the Debtor and the proceeds thereof, to the same nature and extent as the pre-petition lien held by KeyBank in the Cash Collateral.

35. The use of the Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

36. In determining to enter into the DIP Loan, the Debtor conducted arm's length, good-faith negotiations with KeyBank. The Debtor decided, together with its advisors, that the proposal for post-petition financing advanced by KeyBank are the most favorable under the circumstances and are reasonable, market terms. The Debtor, therefore, respectfully submits that in negotiating and extending the DIP Loan, KeyBank's conduct was characterized by "honesty in fact." See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987) (finding "honesty in fact" in the conduct constituted good faith). Accordingly, KeyBank is a "good faith" lender and thus should be afforded the protections of Bankruptcy Code section 364(e).

## NOTICE

37. Notice of this Motion was served on the following parties on the date on which the Motion was filed by CM/ECF, e-mail, facsimile, or overnight mail: (i) the United States Trustee; (ii) KeyBank; (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate; (iv) all parties known to the Debtor who hold any liens or security interest in the Debtor's assets who have filed UCC-1 financing statements against the Debtor; (v) the Internal Revenue Service and all relevant taxing authorities of Maine; and (vi) certain other parties identified in the certificates of service filed with the Court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order: (a) authorizing the Debtor to obtain post-petition financing, (b) granting post-petition security interests to KeyBank, (c) authorizing the use of cash collateral, (d) prescribing the form and manner of notice for the final hearing, and (e) providing such other and further relief as is just and appropriate.

Dated: May 7, 2019

**SURE WINNER FOODS**

By its proposed attorneys:

*/s/ Robert J. Keach*
Robert J. Keach, Esq.
Lindsay Zahradka Milne, Esq.
Roma N. Desai, Esq.
Kaitlyn M. Husar, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
Tel: (207) 774-1200