**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| In re: | |
| SURE WINNER FOODS, | Chapter 11<br>Case No. 19-20226 |
| Debtor. | |

**DECLARATION OF KEITH BENOIT IN SUPPORT OF**
**CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS**

I, KEITH BENOIT, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1.    I am the Chief Executive Officer ("CEO") of Sure Winner Foods ("SWF" or the "Company"). I have been SWF's CEO since 2013, after serving as President for three years and General Manager for 17 years before that. I am familiar with SWF's day-to-day operations, business and financial affairs. I am authorized to submit this Declaration in support of SWF's chapter 11 petition and the first day pleadings described herein.

2.    On May 7, 2019 (the "Petition Date"), SWF filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"). The same day, the following pleadings were filed on behalf of SWF (collectively, the "First Day Motions"):

      (a)    *Motion for an Order (A) Authorizing the Debtor to Obtain Post-Petition Financing; (B) Granting Post-Petition Senior Security Interests to KeyBank, N.A. and Priority Administrative Expense Status Pursuant to Section 364(c) to KeyBank; (C) Modifying the Stay; (D) Authorizing the Use of Cash Collateral; (E) Granting Adequate Protection to KeyBank Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code, Including Replacement Liens; and (F) Prescribing the Form and Manner of Notice for the Final Hearing* ("the Borrowing Motion");

1

(b)    *Motion for Authority to (A) Pay Pre-Petition Employee Wages, Salaries and Related Payroll Obligations; (B) Make Payments for Which Payroll Deductions are Made; (C) Continue Employee Benefits Programs and Related Administrative Obligations in the Ordinary Course; and (D) Direct All Financial Institutions to Honor All Related Payment Requests* (the "<u>Payroll Motion</u>");

(c)    *Motion for Entry of an Order Authorizing the Maintenance of the Debtor's Bank Account and Continued Use of Existing Business Forms and Checks* (the "<u>Cash Management Motion</u>");

(d)    *Motion for Entry of an Order Authorizing the Debtor to (A) Maintain Existing Insurance Programs and Pay All Obligations Arising Therefrom; and (B) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies* (the "<u>Insurance Motion</u>");

(e)    *Motion for Order, Pursuant to Rule 1007(a) of the Federal Rules of Bankruptcy Procedure Extending Time to File Schedules and Statement of Financial Affairs* (the "<u>Schedules Extension Motion</u>");

(f)    *Debtor's Motion for Entry of An Order Authorizing the Debtor to File Under Seal Unredacted Versions of Certain Filings that May Contain Confidential Information* (the "<u>Motion to Seal</u>"); and

(g)    *Motion for Emergency Hearing and Approval of Shortened Objection Period with Respect to Certain First Day Motions* (the "<u>Emergency Hearing Motion</u>").

3.    This Declaration is submitted in support of these First Day Motions, which are described in greater detail below.

4.    All facts set forth herein are based on my personal knowledge, on information supplied to me by others within SWF's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of SWF's operations, financial condition and present liquidity needs.  If I were called to testify, I could and would testify competently to the facts set forth herein.

5.    Part I of this Declaration describes the business operations and background of SWF and Part II sets forth facts relevant to each of the First Day Motions.

2

**I.**   **Description of SWF's Business and Background**

**A.**   *SWF's Business*

6.     SWF is one of the largest food distributors in the Northeastern United States and employs approximately 260 people.  Originally founded in 1979 to deliver ice cream in northern Maine, SWF has grown into a leading distributor of frozen food, ice cream, and novelties offering over 2,000 stock keeping units ("SKU") from over 40 different manufacturers.

7.     SWF's common stock is owned by three individuals: Mark Irving, the Company's founder and current Chairman of the Board, following over 30 years as the Company's CEO; Paul Godin, Director of Sales; and myself.

**B.**   *The Agreement with NDIC*

8.     SWF maintains numerous strong supplier relationships, including a ███████ contract with Nestlé Dreyer's Ice Cream Company ("NDIC") ████████ ████████████████████████████████████████████ ████████████████████████████████  SWF and NDIC entered into that certain Distribution Agreement by and between NDIC and SWF effective September 7, 2014, as amended by that First Amendment effective September 7, 2014 (collectively, the "2014 Agreement"), attached as **Exhibit A**, and that certain Distribution Agreement by and between NDIC and SWF effective January 1, 2019, as amended by that First Amendment effective January 1, 2019 ("collectively, the "2019 Agreement"), attached as **Exhibit B** (the 2014 Agreement and the 2019 Agreement sometimes, collectively, the "Agreement").  I believe the 2019 Agreement to be controlling and fully enforceable, but, on information and belief, expect

3

that NDIC may take the position that the 2014 Agreement remains in effect and is controlling. For the purposes of the First Day Motions, that choice is irrelevant and the material terms are identical.



11.     Supermarkets comprise the dominant portion of the Company's sales and include both large chains and smaller concepts. Supermarkets are a significant user of SWF's large format direct store delivery.  Over 90% of SWF-serviced supermarkets use its full-service direct store delivery ("DSD") distribution strategy.  Mass retailers, including Walmart and Target, are also DSD service users.

12.     On the vendor side, SWF does business with various purveyors of frozen foods.

4

████████████████████████████████████████████

████████████████████████████ Walmart and Tops Friendly Markets were the

second and third largest customers. SWF has a nearly-25 year, multi-million dollar investment

in the growth, development and retention of its roster of customers, all of whom have been major

customers of the company for decades. SWF's customers are loyal to SWF because of its high

service level and comprehensive knowledge of their businesses and needs.

### C.    Facilities and Technology

13.    SWF is headquartered in Saco, Maine. In April 2012, SWF transferred the Saco

headquarters and facilities to an affiliated real estate entity, K&M Realty LLC. Effective May 1,

2017, the lease rates became $195,000 annually. I believe the current rate to have been

appropriate in the market when agreed to. This real estate comprises 15,600 square feet of

warehouse space, 5,000 square feet of office space, and what is known as the "Rabuin

Property."[1]

14.    SWF also owns a 43,280 square foot cold storage warehouse located at 12 Lund

Road, Saco, Maine. The facility was appraised by Maine Valuation Company as of October 12,

2015 at $4.0 million Value in Use of the Fee Simple Interest, and $2.2 million Market Value.

15.    SWF leases an additional distribution center in Syracuse, New York, from an

unrelated entity that has a 50,000 square foot freezer and 1,500 square feet of office space. This

lease has a five-year term with base annual rent of $486,000. The Company uses cross-dock

facilities located throughout the Northeast. SWF employs state-of-the-art technology in

---

[1] The Rabuin Property refers to a small piece of SWF's larger lot. A small building that had been used for storage was demolished in 2017. As of the Petition Date, a portion of the land is used for short-term parking of the Company's vehicles.

distributing and monitoring deliveries that enables route profitability tracking and increases operational efficiency.

### D.      The Debtor's Prepetition Secured Debt Structure

16.     Prior to the filing of the chapter 11 case, SWF's operations were financed pursuant to secured financing arrangements with KeyBank National Association ("KeyBank"), including a term loan and a secured revolving line of credit. KeyBank has a security interest in all personal property of SWF.

17.     On or about May 16, 2014, SWF and KeyBank entered into a Loan and Security Agreement (the "Loan Agreement") pursuant to which KeyBank provided to SWF a revolving line of credit (the "LOC Note") and a $5,000,000 term note (the "Term Note"). Pursuant to the Loan Agreement, the SWF's obligations to KeyBank were secured by all assets of SWF, including the Saco real estate. In accordance with the terms of the Loan Agreement, KeyBank discharged its mortgage on the Saco real estate when the balance of the Term Note was reduced by more than 50% of the original amount.

18.     As of May 6, 2019, SWF owed approximately $400,000.20 to KeyBank pursuant to the Term Note.

19.     Pursuant to the Eighth Amendment to the Loan Agreement dated January 25, 2019, as of the Petition Date, the LOC Note has a credit limit of the lesser of (i) 80% of the unpaid face amounts of qualifying accounts receivable plus 50% of qualifying inventory, or (ii) $20,000,000 (and together with the amount owed pursuant to the Term Note and all Obligations under and as defined in the Loan Agreement, the "Prepetition Indebtedness"). As of May 6, 2019, SWF owed approximately $5,188,282 to KeyBank pursuant to the LOC Note.

6

20.     Under that Loan Agreement, SWF granted KeyBank a security interest in certain collateral, including SWF's accounts, inventory, general intangibles, and equipment (among other personal property) (the "Collateral").

21.     On or about May 16, 2014, KeyBank filed a UCC-1 financing statement with the Maine Secretary of State and a UCC continuation amendment on November 20, 2018 (collectively, the "Financing Statement").

22.     The following entities (collectively, the "Lessors") have filed financing statements purporting to have either a leasehold or purchase money security interest in certain equipment of SWF:[2]

    (a)     Crown Equipment Corporation;

    (b)     HYG Financial Services, Inc.;

    (c)     MRK Leasing, LTD.;

    (d)     Budget Document Technology.

**E.     *Events Leading Up to the Chapter 11 Filing***

23.     ███████████████████████████

████████████████████████████████

████████████ *See* Ex. A., 2014 Agreement, at ¶ 1. ████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

_____

[2] The Lessors have filed financing statements in regard to their respective equipment leases. SWF reserves all rights to argue that such leases are actually disguised financings and that the allegedly leased equipment is property of SWF's estate. Additionally, except to the extent prohibited by the terms hereof, SWF reserves the right to contest the validity and priority of any and all liens, claims and encumbrances against SWF's assets.



I immediately began an analysis of the impact that [redacted] would have on SWF's ability to operate long term as a going concern.  Although SWF was profitable and fully solvent when operating under the Agreement, [redacted] I knew that the ramifications of [redacted] would be dire.  On the advice of counsel, I engaged Mark Stickney at Spinglass Management ("Spinglass"), a turnaround management firm, to assist in that analysis.

24.     After consulting counsel, [redacted] The damage calculation was prepared by Spinglass, informed by information I provided.





28.     Accordingly, I, on behalf of SWF, began planning to take all action afforded to SWF under applicable law to protect SWF's assets, including the Agreement. After consultation with SWF's other officers, members of the board and SWF's advisors, SWF determined that availing itself of the protections afforded by chapter 11 was the best way to protect the value of SWF's assets in order to best preserve its ability to continue operating as a going concern.

## II.    The First Day Motions[3]

29.     I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is necessary if SWF is to successfully exit from chapter 11 protection. Ultimately, the First Day Motions will be critical to SWF's ability to maximize the value of its enterprise for the benefit of all stakeholders.

### A.     Borrowing Motion

30.     During the months preceding the Petition Date, SWF and its advisors began to engage in discussions with certain potential postpetition lenders regarding the contours of a postpetition financing facility. In total, SWF contacted at least three potential lenders in addition

---

[3] Capitalized terms used but not defined in this First Day Motions section shall have the meanings ascribed to such terms in their respective First Day Motions.

10

to KeyBank in an effort to obtain postpetition financing on terms most favorable to SWF.  Those potential lenders were unwilling to lend to SWF on a priming basis, let alone on an unsecured or junior secured basis.  Like the other financing institutions contacted, KeyBank was not willing to lend on an unsecured or junior basis, but was willing to lend on terms that were fair and reasonable, and in an amount sufficient to sustain SWF's operations while in chapter 11, as described in the Borrowing Motion.  KeyBank is SWF's only secured party (other than certain holders of PMSIs), and thus its lending on a senior basis will not impact other secured parties.

31.     Without the DIP Loan, and the inability to use cash collateral, SWF would become unable to pay general operating expenses immediately, including, without limitation, employee payroll and other benefits, rent, utilities and the various other items reflected in the Budget.  Upon SWF's inability to pay its general operating expenses, SWF would have to immediately liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of SWF's creditors.  The credit provided under the DIP Loan will enable SWF to pay its employees and otherwise operate its business during the pendency of this case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.

32.     The interim borrowing proposed by KeyBank, on the other hand, will permit SWF to operate as a going concern in order to preserve the value of its assets to maximize value for constituents and meet its obligations as a debtor in possession.  Moreover, the various fees and charges required by KeyBank under the DIP Loan Agreement are on reasonable, market terms, and appropriate in light of the facts of the case.

33.     Finally, KeyBank negotiated in good faith with SWF in the weeks leading up to the Petition Date, and at all times acted constructively and cooperatively with SWF and its counsel in an attempt to facilitate a smooth entry into and—ultimately—an efficient and

successful exit from chapter 11, on terms that I believe to be fair and reasonable, even for borrowers not on the eve of a chapter 11 filing.

34.     Authorization to access funding pursuant to the DIP Loan is necessary within the first week of the Petition Date in order to avoid immediate and irreparable harm to SWF. Absent immediate access to funding in accordance with the Budget, SWF would become unable to pay its employees and other essential operational costs within a very short time. As set forth above, the failure of SWF to make any of these payments would result in an inability to continue operations as a going concern and would result in an immediate need to liquidate SWF's assets. Interim access to the DIP Loan will, on the other hand, permit SWF to operate as a going concern in order to preserve the value of its assets to maximize value for constituents and meet its obligations as a debtor in possession.

### B.     *Payroll Motion*

35.     SWF has accrued payroll expenses as a result of regular business activity prior to the Petition Date. I understand that by the Payroll Motion, SWF seeks authorization to pay certain accrued wages, salaries and specified payroll-related expenses, and to direct all applicable banks or financial institutions to receive, process, honor and pay any and all checks drawn on SWF's accounts in relation to the amounts authorized to be paid under the Payroll Motion.

36.     Based on the immediately prior period's payroll, the Prepetition Compensation attributable to the period from April 28, 2019 through the Petition Date for the Employees will be approximately $315,586.01, and the service fee payable to ADP for such pay period is approximately $5,000.00.

37.     In addition, for the benefit of eligible Employees, SWF maintains a 401(k) plan and other Employee Benefits. Any delay in paying these obligations will damage SWF's

relations with its Employees and will irreparably harm morale. Without authority to pay the Employee Obligations, the Employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations.

### C.      Cash Management Motion

38.      I understand that by the Cash Management Motion, SWF seeks authority to continue its prepetition cash management system (the "Cash Management System") and to use its prepetition bank account and business forms. I believe this relief is critical to avoid disruption to SWF's operations. The Cash Management System consists of an operations account at KeyBank, which is listed on the United States Trustee's list of authorized depositories. This account is funded by draws on the Line of Credit and is used to fund accounts at ADP, SWF's payroll processor, which in turn is used to fund SWF's payroll and payroll related obligations. Through the use of this account for receipts and disbursement, SWF is able to effectively manage its cash needs and process payroll for its employees. Importantly, the account allows SWF to comply with the terms of the Line of Credits and KeyBank will rely upon the same account structure in the event the DIP Motion is approved.

### D.      Insurance Motion

39.      I understand that by the Insurance Motion, SWF seeks authority to pay certain insurance premiums that are due post-petition, but cover both a pre-petition and post-petition period. The insurance premiums are for various liability, property, workers' compensation, and other insurance programs that SWF maintains in the ordinary course of its business. Some of the relevant insurance programs which SWF seeks to pay are required by certain regulations, laws,

and contracts that govern SWF's commercial activities.  Immediate payment of the insurance premiums is essential to preserve the value of SWF's business, properties, and assets.

### E.    Schedules Extension Motion

40.    I understand that SWF seeks authority to extend the time to file its schedules and statement of financial affairs.  Because of the complexity of SWF's business operations, completing the Schedules and Statements will require SWF and its employees and advisors to spend considerable time to assemble the necessary information.  Before the Petition Date, SWF focused primarily on preparing the necessary pleadings to commence the case and engaging in negotiations with its lenders and other parties in interest.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands upon SWF's personnel to address critical operational matters during the initial postpetition period, SWF requires additional time to accurately prepare the Schedules and Statements.

### F.    Motion to Seal

41.    I understand SWF seeks authority to file certain documents under seal.  This declaration along with certain other documents that SWF will be filing may contain information that is subject to confidentiality provisions and non-disclosure clauses.

### G.    Emergency Hearing Motion

42.    Due to the nature of the relief sought by certain of the First Day Motions, as more particularly described in each motion, and as noted above, SWF seeks hearings on the First Day Motions as soon as possible after the Petition Date.  The ability to operate is essential to SWF's ability to preserve its value as a going concern.  Without the ability to fund its obligations as a debtor in possession, pay for goods and services necessary to its operations, and pay other postpetition amounts owed in the ordinary course, SWF will simply be unable to operate.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: May __7__, 2019

_____
Keith Benoit

*[SIGNATURE PAGE FOR DECLARATION OF KEITH BENOIT IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS]*

# EXHIBIT A

# 2014 AGREEMENT

# FILED UNDER SEAL

# EXHIBIT B

# 2019 AGREEMENT

# FILED UNDER SEAL

# EXHIBIT C

# FILED UNDER SEAL