## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

In re:

SURE WINNER FOODS,

Debtor.

Chapter 11
Case No. 19-20226

### INTERIM ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING; (B) GRANTING POST-PETITION SENIOR SECURITY INTERESTS TO KEYBANK, N.A. AND PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTION 364(c) TO KEYBANK, N.A.; (C) MODIFYING THE STAY, (D) AUTHORIZING THE USE OF CASH COLLATERAL; (E) GRANTING ADEQUATE PROTECTION TO KEYBANK, N.A. PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE INCLUDING REPLACEMENT LIENS; AND (F) PRESCRIBINGTHE FORM AND MANNER OF NOTICE FOR THE FINAL HEARING

This matter having come before the Court on the Motion For Order (A) authorizing the Debtor to obtain post-petition financing; (B) granting post-petition security interests to KeyBank National Association ("KeyBank" or the "Bank") and Priority Administrative Expense Status Pursuant to Section 364(c) to KeyBank; (C) Modifying the Stay; (D) Authorizing the Use of Cash Collateral; (E) Granting Adequate Protection to the Bank Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code Including Replacement Liens; and (F) Prescribing the Form and Manner of Notice for the Final Hearing (the "Motion") pursuant to Sections 105, 361, 363, and 364 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and D.Me. LBR 4001-2, 3 and 4, filed by Sure Winner Foods (the "Debtor") requesting, inter alia, entry of an order:

      (i)        authorizing Debtor, pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code, Rules 4001 and 9014 of the Bankruptcy Rules to obtain post-

petition loans, advances and other financial accommodations on an interim basis from the Bank, in accordance with the Budget (as hereinafter defined) and other terms and conditions set forth in the Loan Agreements (as hereinafter defined), as amended by this Interim Order and secured by security interests in and liens[1] upon all of the Collateral (as hereinafter defined) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(ii)    affording adequate protection to the Bank;

(iii)    modifying the automatic stay to the extent hereinafter set forth;

(iv)    giving notice of a final hearing pursuant to Bankruptcy Rule 4001(c)(2) and Local Bankruptcy Rules 2001 and 4001-2; and

(v)    granting to the Bank super-priority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.

Upon such notice as the Court determined to be appropriate in the circumstances, and upon the record of the hearing held on May 8, 2019, (the "Hearing") and good and sufficient cause appearing therefore, and this Court having considered the Motion, Exhibits, and Declarations attached thereto; no objection having been made by any party in interest, and good and sufficient cause appearing therefore;

**THE COURT HEREBY FINDS:**

A.    On May 7, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor has retained possession of its property and is authorized thereby, as debtor-in-possession, to continue the operation and management of its business. No

---

[1] As used in this Interim Order, the term "lien" or "liens" shall be construed in the broadest possible sense, and shall include, without limitation, all consensual and non consensual liens, mortgages and security interests. Capitalized terms not defined herein shall have the same definitions as set forth in the Motion.

request has been made for appointment of a trustee or examiner.

B.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and

1334.  This is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are §§ 105, 361, 362, 363 and 364 of the Bankruptcy Code

and Bankruptcy Rules 2002, 4001, 9006, 9007, 9013, and 9014 and D. Me. LBR4001-2, 9013-1,

and 9014-1. Venue of the Debtor's chapter 11 case and the Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The material factual allegations contained in the Motion are true and correct and

are incorporated herein by reference as if fully set forth herein.

D.     The financing approved herein has been negotiated in good faith, at arm's length,

and any loan made hereunder pursuant to this Order and the executed lending documents shall be

deemed to have been made in good faith and KeyBank is entitled to the protections of 11 U.S.C.

§ 364(c).

E.     The terms of the financing are fair and reasonable under the circumstances, and the

financing is being obtained as a result of the Debtor's exercise of prudent business judgment

consistent with its fiduciary duties, and the grant of the first priority lien against the collateral is

supported by reasonably equivalent value and fair consideration.

F.     The post-petition financing is necessary to avoid immediate and irreparable harm

to the Debtor and its estate and this order is in the best interests of the Debtor and the estate.

G.     Subject to paragraph 10 below, the Debtor has stipulated and agreed that the

stipulations set forth in paragraphs H and I below are without prejudice to the right of any official

committee of unsecured creditors (the "Creditors' Committee") appointed in these cases, to

challenge or dispute the statements and characterizations set forth therein.

H.     The Debtor acknowledges, agrees and stipulates that:

(i)     As of May 7, 2019, the Debtor is indebted to the Bank in the amounts set forth below pursuant to the documents and agreements described in <u>Exhibit A</u> annexed hereto, (hereinafter collectively, together with all agreements, documents, mortgages, assignments, guarantees, notes and instruments delivered or created  in connection therewith, referred to as the "<u>Pre-Petition Loan Documents</u>," and together with the DIP Loan Agreement, the "<u>Loan Documents</u>"), which amounts are unconditionally owing by the Debtor to the Bank, together with interest accrued and accruing thereon, in each case together with costs, expenses and fees (including without limitation reasonable attorneys' and paralegal fees and disbursements) and all other charges now or hereafter owed by Debtor to the Bank (collectively, the "<u>Pre-Petition Debt</u>"): (a) $400,000.20 on the term note;  (b) $5,188,282 on the revolving line of credit; and (c) $26,692 on a commercial purchase card.

(ii)     The Pre-Petition Debt arose in connection with a revolving loan, and a term loan made by the Bank to Debtor pursuant to the Loan Documents.

(iii)     All Pre-Petition Debt is unconditionally due and owing to the Bank, without defense, counterclaim or offset of any kind, and constitutes allowable claims against the Debtor and its estate and is valid, enforceable and non-avoidable in the amount of the Pre-Petition Debt, and the Debtor will not assert against the Bank any claims, counterclaims, setoffs or defenses of any kind or nature.  Without limiting the generality of the forgoing sentence, the Debtor, will not assert against the Bank any claims, counterclaims, setoffs or defenses that would in any way affect the validity, enforceability and nonavoidability of any Pre-Petition Debt and the Bank's security interests in and liens upon the Pre-Petition

4

Collateral (as defined in Exhibit A), or that would in any way reduce or affect the absolute

and unconditional obligation of the Debtor to pay to the Bank in full all Pre-Petition Debt.

I.        The Debtor further acknowledges, agrees and stipulates, and this Court finds, subject

to any challenge asserted by the Committee or a trustee in a complaint filed during the Challenge

Period, all as described in paragraph 10 of this Order, that, (i) as collateral security for the payment of

all Pre-Petition Debt, Debtor granted to the Bank, pursuant to the Loan Documents first priority

mortgages, liens, and security interests in all of the Debtor's assets, as described in the Loan Documents,

including without limitation the security agreements identified on Exhibit A (collectively, together with

any other property of Debtor's estate in which a security interest or lien has been granted to or for the

benefit of the Bank prior to the Petition Date, the "Pre-Petition Collateral"), (ii) other than the real

property located in at 12 Lund Road in Saco, Maine (the "Saco Real Estate") (the mortgage upon which

was discharged prepetition in accordance with the terms of the Loan Agreement), the Bank holds valid

and perfected liens in and to the Pre-Petition Collateral evidenced by various Uniform Commercial

Code filings and other filings and recordings, including without limitation those filings and recordings

described in Exhibit A hereto, and (iii) the Loan Documents and the liens, security interests and

mortgages granted to or for the benefit of the Bank pursuant thereto are valid, enforceable, duly

perfected, non-avoidable and first priority security interests in and liens upon the Pre-Petition

Collateral.

J.        An immediate need exists for the Debtor to obtain financing in order to preserve

the value of its business and assets as debtor-in-possession under Chapter 11 of the Bankruptcy

Code.  The Debtor wishes to finance its continued operations which will permit the Debtor to, *inter
alia*, purchase inventory and service its customers.  The Debtor has been unable to obtain financing

(i) in the form of unsecured credit or allowable under Section 503(b)(1) of the Bankruptcy Code as an

administrative expense, (ii) solely in exchange for the grant of a super-priority administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, or (iii) in the form of credit secured by liens that are junior to existing liens on property of Debtor's estate pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.  The Debtor is also unable to obtain credit on a priming basis or on a first priority lien basis, replacing KeyBank's existing financing, on terms that are more favorable than are currently being offered by KeyBank. Good cause has been shown for the entry of this Interim Order.  The relief granted by this Court pursuant to this Interim Order is necessary to avoid immediate and irreparable harm and injury to Debtor's estate, and adequate and sufficient cause has been shown to justify the granting of the interim relief requested herein, and the immediate entry of this Interim Order.  The Debtor has represented that the terms of the financing authorized by this Interim Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

K.      The Debtor has prepared a budget (the "Budget"), a copy of which is attached to this Interim Order as Exhibit B , setting forth, inter alia, Debtor's projected cash expenditures and receipts on a weekly basis for the upcoming thirteen (13) weeks beginning on May 7, 2019.  The Budget was prepared by the Debtor and its management and advisors and is being relied upon by the Bank in entering into post-petition financing with the Debtors.

L.      The Debtor has requested that the Bank extend credit to be used for the purposes set forth in the Budget, and the Bank is willing to provide such credit, upon the terms and conditions set forth in the Loan Documents as ratified and amended by the terms of this Interim Order.  The Bank's willingness to extend post-petition credit to the Debtor is conditioned upon, among other things, the Debtor obtaining the authority of this Court to apply the proceeds of the Pre-Petition Collateral (such as accounts receivable) received by Debtor or the Bank on or after the Petition Date to the Pre-Petition Debt.

M.      Based on the record before the Court, all loans and other extensions of credit made by the Bank to Debtor pursuant to this Interim Order and any extension hereof or any final order on the Motion, shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

N.      To the extent that the Bank holds valid and duly perfected security interests in the Pre-Petition Collateral, such security interests are entitled to the protections afforded pursuant to the terms of this Interim Order.

O.      The Debtor represents, and it appears, that the post-petition financing and senior liens and adequate protection arrangements authorized hereunder have been negotiated in good faith and at arm's length, and the terms of such adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

P.      The Debtor has requested prompt entry of this Interim Order pursuant to Bankruptcy Rules 4001(b) and (c).

Q.      The permission granted herein to enter into the post-petition financing and adequate protection arrangements set forth herein is vital to avoid irreparable harm to the Debtor and its estate.

R.      The Court concludes that entry of this Interim Order is in the best interests of the Debtor and its estate and creditors as its implementation will, among other things, allow for the preservation of the value of assets of the Debtor's estate.

S.      The Debtor has certified that a copy of the Motion, this Interim Order and notice of the Interim Hearing have been served by electronic mail, telecopy transmission, hand delivery or

overnight courier upon the United States Trustee; the 20 largest unsecured creditors of the Debtors, and all known secured parties, including, without limitation, the Lessors. The Court finds that notice of the Motion, as it relates to this Interim Order, is, under the circumstances, sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1.    Motion Granted. The Motion is granted with respect to the limited borrowing authority covered by this Interim Order.

2.    DIP Loan Agreement. The Debtor is hereby authorized and directed (a) to execute and deliver the Amended and Restated Loan and Security Agreement (All Assets) (Debtor in Possession Financing) (the "DIP Loan Agreement") in the Form attached hereto as Exhibit C and any and all documents that are reasonably requested by the Bank, and not inconsistent with the terms of this Interim Order, in order to give effect to this Interim Order; (b) to obtain a post-petition loan from the Bank pursuant to the terms set forth in the DIP Loan Agreement and this Interim Order (such loan made by the Bank shall be referred to herein as the "DIP Loan"); (c) to pay and perform all obligations, covenants and agreements in accordance with the terms of the Loan Documents, as modified hereby and (d) in addition to all other amounts owed under the DIP Loan Agreement, to pay the Bank a DIP Loan origination fee of $140,000.00.

3.    Use of DIP Loan Proceeds.   The Bank shall not have any obligation or responsibility to monitor the Debtor's use of the DIP Loan, and the Bank may rely on any of the Debtor's representations that the amount of the DIP Loan requested at any time, and the use thereof, is in accordance with this Interim Order. Without limiting the generality of any of the forgoing, the Bank may advance under the DIP Loan to provide overdraft protection, including without limitation approximately $325,000 of overdrafts that occurred on May 8, 2019.

4.    <u>Security for Post-Petition Debt</u>.    The DIP Loan, together with all interest, fees (including reasonable attorneys' and paralegal fees), expenses and other sums and charges at any time payable by Debtor in connection therewith (collectively, the "<u>Post-Petition Debt</u>"), is hereby secured by:

(a)    valid, binding and enforceable mortgages, security interests in and liens upon the Pre-Petition Collateral, which security interests, mortgages and liens shall be senior and prior to all other liens, security interests and claims; and by

(b)    valid, binding and enforceable mortgages, security interests in and liens upon all assets of the Debtor and the Debtor's estate, which security interests, mortgages and liens shall be senior and prior to all other liens, security interests and claims, including without limitation all of the interests of the Debtor and the Estate in the following, whether now existing or hereafter arising, wherever located:

(i)    Personal Property; Accounts; Chattel Paper; Deposit Accounts; Documents; Equipment; General Intangibles; Goods; Inventory; Instruments; Investment Property; Letter of Credit Rights and the proceeds of any commercial tort claim arising out of or relating to Borrower's dispute with Nestlé S.A. and any of its affiliates, including without limitation Nestlé Dreyer's Ice Cream Company (collectively, "**Nestlé**" and such dispute being referred to as the "**Nestlé Dispute**"), as all of the foregoing capitalized terms are used in the Uniform Commercial Code; and

(ii)    The Saco Real Estate.

(collectively, the "<u>Post-Petition Collateral</u>" and together with the Pre-Petition Collateral, sometimes collectively referred to herein as the "<u>Collateral</u>").

(c)       Notwithstanding the above, the Post-Petition Collateral shall not include any claims or causes of action arising under Chapter 5 of the Bankruptcy Code or any proceeds of or any recoveries with respect to the same, other than claims and causes of action against Nestlé, which claims and causes of action shall be part of the Post-Petition Collateral, whether or not they arise under Chapter 5.

5.       Property of Debtor.   Whenever in this Interim Order reference is made to any property or assets of Debtor (including, without limitation, any of the Collateral), such reference shall be understood to include all property of the estate of Debtor created pursuant to Section 541 of the Bankruptcy Code.

6.       Limited Use of Cash Collateral.   The Debtor is authorized to use cash collateral in existing accounts as of the date of this Order, including any funds transferred to ADP (its payroll servicer), in a manner consistent with the Budget. As adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for any diminution in value arising out of Debtor's use, sale or other disposition of any of the Pre-Petition Collateral, including cash collateral, to the extent authorized by the Bank:

(a)       The Bank is hereby granted a replacement lien in and to all of the Post-Petition Collateral for Debtor's use, sale or other disposition of any of the Pre-Petition Collateral.

(b)       All products and proceeds of the Pre-Petition Collateral in which the Bank has a first priority valid, duly perfected, enforceable and unavoidable security interest, including, without limitation, all payments by account debtors indebted to Debtor with respect to transactions entered into or concluded prior to the Petition Date, shall be remitted directly to the Bank and applied by the Bank to the Pre-Petition Debt until the Pre-Petition Debt is repaid in full and thereafter turned over to the Bank for application to the Post-Petition Debt.

10

(c)      If any proceeds of Collateral are not clearly attributable solely to Pre-Petition Collateral or Post-Petition Collateral, such proceeds shall be deemed to constitute proceeds of Pre-Petition Collateral until final and indefeasible payment of the Pre-Petition Debt, and shall thereafter constitute proceeds of Post-Petition Collateral that shall be applied to the Post-Petition Debt until all of the Post-Petition Debt has been paid in full.

7.      <u>Adequate Protection For Use of Collateral</u>.  Without limiting any of the other adequate protection afforded the Bank under this Interim Order, the Debtor shall, as adequate protection for the use of the Collateral, make all regular payments of principal and interest as required under the Loan Documents.   In accordance with Sections 361, 363(c) and 552(b) of the Bankruptcy Code, the value, if any, in the Collateral, in excess of the amount of the obligations secured by such Collateral after satisfaction of the Post-Petition Debt of Debtor to the Bank, shall constitute additional security for the diminution in the value of the Collateral existing on the Petition Date.

8.      <u>Carveout For Professional Fees</u>.  Notwithstanding anything herein to the contrary, including, without limitation, sections 4, 7 and 9 hereof, Bank has agreed to a carveout from the Saco Real Estate in the amount of up to but not exceeding the aggregate amount of $200,000 to be used to pay court approved administrative fees of court approved professionals of the Debtor (the "<u>Professional Fee Carveout</u>").  The Professional Fee Carveout shall be in addition to and not in lieu of the amount of administrative fees and expenses of the professionals that are specifically provided for in the Budget attached hereto, shall be released by Bank and paid to those professionals only in such amounts, if any, as may be authorized and determined by separate order of the Court, and subject further to entry of any final order approving the retention of such professionals, and only in the event that, and to the extent that, such amounts remain unpaid in the event of the conversion or dismissal of this chapter 11 case. To the extent that the Professional Fee

Carveout is insufficient to pay such amounts in full, the Professional Fee Carveout shall be distributed to such professionals on a pro rata basis, determined by relative amounts of fees and expenses allowed on a final basis by the Court and that remain unpaid upon such conversion or dismissal. Such amounts shall be paid to the professionals so retained, with Court approval, in this chapter 11 case without regard to section 726(b) of the Bankruptcy Code, and the Professional Fee Carveout shall not be subject to such section 726(b). Subject to the Court's final approval and authorization of amounts paid to the professionals from the Professional Fee Carveout, Bank's lien and security interest shall continue to extend to the Professional Fee Carveout (but Bank's lien and security interest in such Professional Fee Carveout shall be subordinate to the interests of the professionals to whom such amounts are to be paid, to the extent of the allowed fees of such professionals), and any remaining proceeds not utilized in accordance with this paragraph shall be returned to Bank for application against the Post-Petition Debt. Bank shall have no rights or claims with respect to the Professional Fee Carveout other than as set forth in this Paragraph 8.

9.      Super-Priority Administrative Claim; Section 507(b).    In accordance with Bankruptcy Code Sections 364(c)(1) and 507(b), the Post-Petition Debt shall be allowed claims (the "Super-Priority Claims"), subordinate only to the statutory fees assessed under 28 U.S.C. Section 1930, and shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 546(c), and shall be senior at all times to the rights of the Debtor, and any successor trustee or any other creditor in the Bankruptcy Case or any subsequent proceeds under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if the Debtor's case is converted to a case under chapter 7 of the Bankruptcy Code. Subject only to the statutory fees described above, no

cost or expense of administration under Bankruptcy Code Sections 105, 364(c)(1), 503(b), 506(c), 507(b) or any other applicable provision of bankruptcy or non-bankruptcy law, shall be senior to, equal to, or pari passu with, the Super-Priority Claims of the Bank.

10.     Challenge Period.  The extent, validity, perfection and enforceability of the Pre-Petition Debt and the Pre-Petition Collateral are for all purposes subject only to the rights of any official committee appointed in the Debtor's Cases (the "Committee") or, if applicable, a trustee that is appointed in this or any successor chapter 7 case  to file a complaint, before the expiration of the "Challenge Period" (as defined below), pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate or otherwise challenge the Pre-Petition Debt and/or the Bank's pre-petition liens upon and security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code.  Any claims against the Bank by or on behalf of the Estate will be forever barred unless set forth in a complaint filed during the Challenge Period pursuant to Bankruptcy Rule 7001.  For purposes of this Interim Order, the "Challenge Period" shall expire sixty (60) days after the earlier of the (i) the Court's approval of the retention of counsel for the Committee, or (ii) an order authorizing the appointment of a trustee.  If such complaint is not timely filed before the expiration of the Challenge Period, then (a) the Pre-Petition Debt shall be an allowed secured claim and the Bank's security interests in and liens upon the Pre-Petition Collateral shall for all purposes be recognized and allowed as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens upon and claims against the Pre-Petition Collateral, and (b) the Bank and its respective agents, officers, directors and employees shall be deemed *released and discharged* from all claims and causes of action arising out of or related to the Loan Documents and the transactions undertaken thereunder.  **[NOTE: because the provisions of this paragraph constitute a waiver of defenses by the Debtor, they vary from the standard set forth in Local Bankruptcy Rule**

**4001-2(c)(2) and are hereby disclosed conspicuously, as required by D. Me. LBR 4001-2, and are nonetheless approved as reasonable under the facts and circumstances of this case. The Court further finds that the provisions of this paragraph comply with the standards set forth in D. Me. LBR 4001-1(c)(1).]**

11.     <u>Turnover of Proceeds, Rents, Etc.</u>  The Debtor shall take all appropriate steps to cause all proceeds, products, profits and rents of or from the Collateral to be paid directly to the Bank by any buyer, account debtor or other payor.  In the event the Debtor comes into possession or control of any proceeds, products, profits or rents, they shall be deemed held in trust for the Bank and immediately turned over to the Bank.  All proceeds, product, profits and rent of or from the Collateral shall be applied first to the Pre-Petition Debt until fully paid, then to the Post-Petition Debt until fully paid. In no event shall Debtor be authorized to use any proceeds, products, profits or rents of or from either Pre-Petition Collateral or Post-Petition Collateral, unless all of the Pre-Petition Debt and Post-Petition Debt have been paid in full or the Bank consents, in writing, to such use.  The term "proceeds" as used in this Paragraph shall include, without limitation, insurance proceeds.

12.     <u>Further Cooperation and Documents</u>.  Debtor shall concurrently herewith or hereafter, as requested by the Bank, execute and deliver to the Bank all such documents as the Bank may request to effectuate, evidence, confirm, validate or perfect the Bank's liens on and security interests in the Collateral as provided for or recited herein or granted pursuant to this Interim Order.  Such documents may include, without limitation, UCC-1 financing statements, mortgages, continuation statements, amendments, lock box and blocked account agreements.  The Bank shall not be required to file any mortgages, UCC-1 financing statements, or any other document, or take any other action (including possession of any of the Pre-Petition Collateral or Post-Petition Collateral) in order to validate or perfect the liens and security interests granted to the Bank under this Interim Order, as all such liens and

security interests shall be deemed automatically granted and perfected by and upon entry of this Interim Order.  If the Bank shall choose, in its discretion, to file such mortgages, UCC-1 financing statements (or amendments to or continuations of any existing financing statements) and otherwise confirm perfection of such liens and security interests, all such mortgages, financing statements or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.  The Bank may, in its discretion, file a certified copy of this Interim Order and any subsequent financing order in any filing or recording office in any appropriate jurisdiction, including without limitation any jurisdiction in which Debtor has or maintain any Pre-Petition Collateral or Post-Petition Collateral or an office.

13.     <u>Bank's Professional Fees</u>.  All reasonable costs and expenses incurred by the Bank in connection with the negotiation and drafting of this Interim Order or any amendments thereto, the preservation, protection and enforcement of the Bank's rights under the Loan Documents or this Interim Order or in the collection of the Post-Petition Debt or the Pre-Petition Debt, including, without limitation, all filing and recording fees and reasonable attorneys' fees incurred in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the Post-Petition Debt or the Pre-Petition Debt, as the case may be, without any further order of the Court and shall be paid by Debtor in accordance with the terms of this Interim Order.

14.     <u>Minor Modifications</u>.  Debtor and the Bank are hereby authorized to implement after the entry of this Interim Order, any amendments to and modifications of this Interim Order without further order of the Court on the following conditions: the amendment or modification does not constitute a material change to the terms of this Interim Order and copies of the amendment or modification must be served upon counsel for the Committee appointed in the Case and the U.S. Trustee.  The term "<u>material change</u>" as used in the preceding sentence shall mean a change that operates

15

to increase the rate of interest other than as currently provided in this Interim Order, add specific events of default, increase the aggregate amount of the commitments or enlarge the nature and extent of default remedies available to the Bank following an event of default. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court.

15. <u>Termination Events</u>. (a) Each of the following shall constitute a "Termination Event" for the purposes of this Interim Order, unless waived by the Bank and the Debtor:

(i) the earlier to occur of (1) expiration of this Interim Order upon conclusion of the final hearing on the Motion without a final order authorizing the DIP Loan with all of the same protections as are granted in this Interim Order having been entered by the Court, or (2) the occurrence of the termination date or maturity date under any of the Loan Documents; provided, however, that said date may be extended by written agreement of the Debtor and the Bank without the necessity of any further order of this Court;

(ii) the failure of Debtor to perform in any material respect any of their obligations to the Bank under the Loan Documents (as Amended by the DIP Loan Agreement and this Interim Order);

(iii) the failure to provide the Bank by noon each Friday with a detailed report showing all cash receipts and disbursements for the prior seven (7) day period, and specifically comparing the actual cash disbursements to the Budget;

(iv) the failure to provide the Bank by noon each Friday the [borrowing base certificates and other reporting as required by the DIP Loan Documents

(v) any expenditure that deviates more than ten percent (10%) in any one week period from any line item in the Budget;

(vi)     the occurrence of an Event of Default (as defined below), which Event of Default is not cured by Debtor within seven (7) days after the giving of written notice of such Event of Default to the Debtor by the Bank;

(vii)     the conversion of this case to a case under chapter 7 of the Bankruptcy Code, the dismissal of the case, or the appointment of a trustee for the Debtor;

(viii)     notification given by the Debtor to the Bank, in writing, of the Debtor's election to terminate the DIP Loan;

(ix)     the stay, vacation, termination or material modification of this Interim Order;

(x)     the filing of a motion by any party or party in interest seeking a lien with priority over the Bank's liens in the Debtor's assets or seeking an administrative claim that would be senior or equal in priority to the Section 507(b) super-priority administrative claim granted to the Bank under this Interim Order.

(a)     Each of the following shall constitute an "Event of Default":

(i)     the failure of the Debtor to perform or observe any obligation under the Loan Documents as modified in accordance with and as permitted under this Interim Order:

(ii)     the use of funds from the DIP Loan to pay any item not described in the Budget;

(iii)     the obtaining of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage, or other lien on all or any portion of the Collateral that is equal or senior to any security interest, mortgage or other lien of the Bank, or (ii) entitled to priority administrative status which is senior to that granted to the Bank without first (or contemporaneously) having paid all obligations owed by the Debtor to the Bank;

(iv)    The occurrence of any event or circumstance with respect to the Debtor, such that Bank shall believe in good faith that the prospect of payment of all or any part of the Debtor's obligations to the Bank or the performance by the Debtor under the DIP Loan Agreement or any other agreement between Bank and the Debtor is materially impaired or there shall occur any material adverse change in the business or financial condition of the Debtor including without limitation a change in the status of the Nestlé Dispute that, in Bank's good faith judgment, significantly increases the risk that Bank will not be repaid in full.

16.    Remedies; Cessation of Funding; Relief From Stay.  Upon or after the occurrence of a Termination Event, (as that term is defined above) (unless such Termination Event is specifically waived in writing by the Bank, which waiver shall not be implied from any other action, inaction or acquiescence by the Bank), then, in the Bank's sole discretion, the Bank may: (i) immediately suspend making further advances under the DIP Loan and (ii) accelerate all Pre-Petition Debt and Post-Petition Debt then outstanding; and (iii) file a motion for relief from stay seeking authority to exercise all remedies and enforce all rights under the Loan Documents and applicable law.  The Court shall grant the Bank a hearing on such a motion five (5) business days (or as soon thereafter as the Court's calendar permits) after notice of such hearing is served on Debtor's counsel, counsel to the Committee, if any, a Trustee if appointed and the United States Trustee, and all other parties-in-interest who have entered an appearance in the case and requested service of pleadings. In any hearing on the Bank's motion for relief from stay, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, a Termination Event has occurred.  If the Court finds that a Termination Event has occurred, then it shall grant relief from stay to permit the Bank immediately to enforce its security interests and liens granted under the Loan Documents and this Interim Order with respect to the Pre-Petition Collateral and

18

Post-Petition Collateral and to take all other action and exercise all other remedies available under the Loan Documents and applicable law and to proceed against and realize upon the collateral and any other property of the estate of the Debtor upon which the Bank has been or may hereafter be granted liens and security interests to obtain repayment of its indebtedness.  Any order granting relief from stay pursuant to this paragraph shall waive the ten (10) day stay provided for in Bankruptcy Rule 4001(a)(3).

17.     Reservation of Rights; Section 507(b).  Nothing herein shall be deemed to be a waiver by the Bank of its right to request additional or further protection of its interests in any property of Debtors, or to request any other relief, nor shall anything herein constitute an admission by the Bank of the quantity, quality or value of any Collateral securing the Pre-Petition Debt or Post-Petition Debt (other than that the fair market value on the Petition Date of the Pre-Petition Collateral exceeds the outstanding Pre-Petition Debt) or constitute a finding of adequate protection with respect to the interests of the Bank in any Collateral.  The Bank shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with the grant of the liens securing the DIP Loan or with any use, sale or other disposition of any of the Pre-Petition Collateral or Post-Petition Collateral, to the extent that the protection afforded by this Interim Order to the Bank's interests in any Pre-Petition Collateral or Post-Petition Collateral proves to be inadequate.  Nothing herein shall be deemed to be a waiver by Debtor of their rights to object to any of the foregoing relief requested by the Bank.

18.     No Surcharge.  No costs or expenses of administration pursuant to Section 506(c) of the Bankruptcy Code which have or may be incurred in the Case or after any conversion of the Case pursuant to Section 1112 of the Bankruptcy Code, shall be charged against the Bank, its claims, or any of its Collateral, without the prior written consent of the Bank, and no such consent shall be implied from any other action, inaction or acquiescence by the Bank and no obligations incurred or payments

or other transfers made by or on behalf of the Debtor on account of the DIP Loan shall be avoidable or recoverable from the Bank under Sections 547, 548, 550, 553 or any other provision of the Bankruptcy Code.

19.    <u>No Marshalling</u>.  In no event shall the Bank be subject to the equitable doctrine of marshalling or any similar doctrine with respect to the Collateral nor to any "equities of the case" exception under Section 552(b) of the Bankruptcy Code.

20.    <u>No Returns of Inventory or Consent to Setoff</u>.  The Debtor shall not, without the consent of the Bank, enter into any agreement to return any inventory to any of its creditors for application against any pre-petition indebtedness under Section 546(h) of the Bankruptcy Code, or consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise, unless the Court otherwise directs.

21.    <u>No Priming Liens</u>.  The DIP Loan is made in reliance on this Interim Order and upon the Debtor's agreement not to directly or indirectly, create, incur, assume, request or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind that is senior to the Bank's liens on the Debtor's assets, or take or fail to take any action which would grant or create a lien in favor of any person in such assets.  Accordingly, the Debtor shall not seek and this Court shall not approve any request for an order that authorizes the use of cash collateral in which the Bank has a security interest or that seeks to obtain financing with a lien that is senior to or would have priority over any lien of the Bank or that is equal to or pari passu with the Bank.  The liens and security interest granted to or for the benefit of the Bank hereunder and the rights of the Bank pursuant to this Interim Order with respect to the Debtor's obligations to the Bank and with respect to the Collateral are

cumulative and shall not be altered, modified, extended, impaired, or affected by any plan(s) of reorganization of Debtor.

22.   <u>No Subrogation</u>.   In no event shall any person or entity who pays (or, through the extension of credit to Debtors, causes to be paid) any of the Post-Petition Debt be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, the Bank by the terms of this Interim Order, until such time as all of the Pre-Petition Debt and all of the Post-Petition Debt are paid in full.

23.   <u>Right to Credit Bid.</u>   At or in connection with any auction or sale of the Bank's assets, including without limitation a sale under section 363 of the Bankruptcy Code or under a plan, the Bank shall have the right to credit bid the greater of, (a) the full amount of its allowed secured claim as of the Petition Date, or (b) the value of its collateral, including without limitation its Adequate Protection Lien as of the date of any such sale.

24.   <u>Modification of Stay to Effectuate Order</u>.   The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby lifted and terminated as to the Bank to the extent necessary to implement the financing provisions of this Interim Order, thereby permitting the Bank to receive the proceeds arising out of the Pre-Petition Collateral and/or the Post-Petition Collateral for application to, respectively, the Pre-Petition Debt and Post-Petition Debt as provided herein, to file or record any UCC-1 financing statements, mortgages and other instruments and documents evidencing the liens and security interest granted to the Bank in the Pre-Petition Collateral and Post- Petition Collateral, to enforce the Bank's liens and security interests in the Collateral to the extent permitted in this Interim Order.

25.     <u>Binding on Successors and Assigns</u>.  The provisions of this Interim Order shall be binding upon Debtor and their respective successors and assigns, including, without limitation, any trustee appointed in any of this Case or any case to which this Case is subsequently converted.

26.     <u>No Third Party Rights</u>.  This Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

27.     <u>Debtor's Acknowledgements</u>.  Notwithstanding the foregoing rights of the Creditors' Committee during the Challenge Period, the Debtor has acknowledged and agreed that the liens and security interests of the Bank in and upon the Pre-Petition Collateral are valid, binding, enforceable, perfected and non-voidable; and the Pre-Petition Debt is allowable as a fully secured claim against Debtor and is not subject to any offset, counterclaim or equitable subordination.

28.     <u>Protection of Bank if Order is Modified; Section 364(e)</u>.  Consistent with 11 U.S.C. Section 364(e), if any or all of the provisions of this Interim Order are hereafter terminated, modified, vacated or stayed:

(a)     Such termination, stay, modification or vacation shall not affect the validity or priority of any obligation, indebtedness, liability or lien granted or incurred by the Debtor to the Bank prior to the effective date of such termination, stay, modification or vacation, or the validity, enforceability or priority of any lien, priority or right authorized or created under the original provisions of this Interim Order; and

(b)     Any indebtedness, obligation or liability incurred by Debtor to the Bank under this Interim Order prior to the effective date of such termination, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Bank shall be entitled to all the rights, remedies, privileges and benefits, including the liens, security interests and priorities granted herein and pursuant to this Interim Order, with respect to any

such indebtedness, obligation or liability.  The DIP Loan is made pursuant to and in reliance on the protections granted in and confirmed by this Interim Order.  Accordingly, the indebtedness resulting from the DIP Loan prior to the effective date of any termination, stay, modification or vacation of this Interim Order cannot be subordinated, lose its lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the Bank under this Interim Order, as a result of any subsequent order in this Case, or in any superseding case.

29.    <u>Bank Not In Control of Debtor</u>.  The Bank is not and shall not be deemed to be in control of the Debtor or the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) by virtue of the interests, rights and remedies granted to or conferred upon the Bank under this Interim Order, including, without limitation, such rights and remedies as may be exercisable by the Bank in the making (or causing to be made), administration or collection of the loans, advances and other financial accommodations to be provided thereunder.

30.    <u>No Enforcement of Junior Liens</u>.  Except as otherwise provided herein, until all Pre-Petition Debt and Post-Petition Debt shall have been indefeasibly paid and satisfied in full and without further order of the Court, no party in interest shall foreclose or otherwise seek to enforce any lien junior or subordinate to the Bank's liens on and security interests in the Collateral or other right such other party may have in and to any Collateral; <u>provided</u>, <u>however</u>, that the foregoing shall not be construed to prohibit any other party-in-interest having standing to do so to seek adequate protection of its interest in any of the Pre-Petition Collateral and/or Post-Petition Collateral.

31.    <u>Continuation of Cash Management</u>.    The Debtor shall continue to use the existing accounts at the Bank;  to the extent established pursuant to the DIP Loan and instructed by the Bank, the Debtor shall deposit or cause to be deposited, or to remit, in kind, immediately to the Bank, all monies, checks, credit card sales drafts, credit card sales or charge slips or receipts, or other forms of store receipts, drafts and any other payments or proceeds of Pre-Petition Collateral and Post-Petition Collateral into lock box accounts or blocked accounts to be established for the benefit of the Bank (the "Blocked Accounts"), to instruct all parties now or hereafter in possession of monies, claims or other payments for the account of the Debtor or other property of the Debtor's estate in which the Bank has a lien to remit such payments to the Blocked Accounts; and to enter into such agreements as may be necessary to effectuate the foregoing.  The Bank shall have authority to continue to sweep the Debtor's accounts daily and apply all amounts to the balance outstanding under the DIP Loan, all in accordance with the pre-petition operation of the revolving loan and operation of the cash management arrangement involving the Bank and the Debtor.  Although the Bank has not required that the Borrower enter into a Blocked Accounts agreement or similar arrangement other than as described in the DIP Loan Agreement, the Bank expressly reserves the right at any time hereafter to require Borrower to enter into an arrangement or agreement requiring the Debtor to use Blocked Accounts reasonably satisfactory to Bank in order better to secure Bank's rights in the Collateral, and Borrower's failure to do so shall constitute an Event of Default hereunder.

32.    <u>DIP Order Governs if Conflict</u>.  To the extent the terms and conditions of this Interim Order are in conflict with the terms and conditions of the Loan Documents, the terms and condition of this Interim Order shall control.

33.    <u>No Stay of Order; Rule 6004(h)</u>.  As authorized by Bankruptcy Rule 6004(h), the provisions of this Interim Order shall not be stayed and shall be effective immediately upon entry, and

any actions taken pursuant to this Interim Order shall be protected pursuant to the terms of this Interim Order notwithstanding any conflicting provision of any Order that may be entered confirming any plan(s) of reorganization, dismissing any of the Cases, or converting any or all of the Cases from chapter 11 to chapter 7.

34.    <u>Notice of Order</u>.  Promptly after the entry of this Interim Order, the Debtor shall mail, by first class mail, a copy of this Interim Order and a notice of the final hearing hereon (the "<u>Final Hearing</u>") to the United States Trustee, the 20 largest unsecured creditors of the Debtor, the Debtor, the Lessors, the Internal Revenue Service, all creditors known to have any liens in any of the Debtor's assets or properties (whether contractual, statutory or judgment), all reclamation claimants, and all other interested parties to whom the Debtor served a copy of the Motion; shall serve notice of the Final Hearing on all of the foregoing parties; and shall file a certificate of service regarding same with the Clerk of the Court.

35.    <u>Term of DIP Loan</u>.  The term of the DIP Loan made pursuant to this Interim Order shall be for a period commencing on the date hereof and ending at the conclusion of the final hearing on the Motion, which shall commence on **June 5**, 2019, unless otherwise ordered by this Court.

36.    <u>Objection Deadline</u>.  If any party in interest shall have an objection to any of the provisions of this Interim Order, such party shall be authorized to assert such objection at the Final Hearing, provided that a written statement setting forth the basis for such objection is filed with the Court and concurrently served upon counsel for the Debtor and counsel for the Bank, as shown below, on or before 5:00 p.m. on **June 3**, 2019.  Unless an objecting party shall be and appear at the Final Hearing to assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned.

37.    <u>Final Hearing</u>.  The Final Hearing shall be held at  1:30    **p.m., on June 5,** 2019. If no objection to the Motion or this Interim Order is timely filed and asserted at the Final Hearing, then this Interim Order shall become a final order, and shall continue in effect until terminated in accordance with the terms hereof, subject, however, to such modifications as the Court may make at the Final Hearing and that are acceptable to the Bank and the Debtor.

38.    <u>Notices</u>.  Any notice permitted or required to be given hereunder shall be deemed given (a) two (2) days after delivery of the notice to an overnight courier, such as UPS or FEDEX, addressed to the party intended to receive such notice at the address(es) set forth below, with all delivery charges prepaid; (b) three (3) days after depositing of the notice in the U.S. Mail, First Class, postage prepaid, and addressed to the party intended to receive such notice at the address(es) set forth below, or (c) upon hand delivery to the party intended to receive such notice at the address(es) set forth below.

|  |  |
|---|---|
| To the Debtor: | Keith Benoit<br>Sure Winner Foods<br>2 Lehner Road<br>Saco, ME 04072 |
| With a copy to: | Robert J. Keach, Esq.<br>Bernstein Shur<br>100 Middle Street, 6th Floor<br>P.O. Box 9729<br>Portland, ME  04104-5029 |
| To the Bank: | Neil C. Buitenhuys<br>Mailcode: ME-01-CP-0402<br>One Canal Plaza<br>Portland, ME 04101 |
| With a copy to: | Roger A. Clement, Jr., Esq.<br>Verrill Dana, LLP<br>One Portland Square<br>P.O. Box 586<br>Portland, ME  04112-0586 |

Dated:   May 8, 2019

/s/ Peter G. Cary

The Honorable Peter G. Cary
United States Bankruptcy Judge


**EXHIBIT**

A

## LOAN AND SECURITY AGREEMENT
## (ALL ASSETS)

THIS LOAN AND SECURITY AGREEMENT (the **"Agreement"**) is made as of the 16th day of May, 2014 by and between SURE WINNER FOODS, a Maine corporation with a place of business at Lehner Road, Saco, Maine 04072 (hereinafter, together with its permitted successors and assigns hereunder, referred to as the **"Borrower"**) and KEYBANK NATIONAL ASSOCIATION a national banking association with a place of business at One Canal Plaza, Portland, Maine 04101 (hereinafter, together with its successors and assigns, called the **"Bank"**), WHO AGREE as follows:

1.     **SECURITY INTEREST.** For valuable consideration, the receipt whereof is hereby acknowledged, Borrower hereby grants to Bank a continuing security interest in and to, and assigns to Bank, all assets of the Borrower (subject to any liens permitted hereunder), wherever located and whether now owned or hereafter acquired, including, without limitation, the following:

(a)     all inventory, including all goods, merchandise, raw materials and work in process, finished goods, and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Borrower's business (all hereinafter called the **"Inventory"**);

(b)     all accounts as defined in Article 9 of the Uniform Commercial Code, (hereinafter **"Accounts"**), contracts, contract rights, notes, bills, drafts, acceptances, general intangibles (including without limitation registered and unregistered tradenames, copyrights, customer lists, goodwill, computer programs, computer records, computer software, computer data, trade secrets, servicemarks, trademarks, patents, ledger sheets, files, records, data processing records relating to any Accounts and all tax refunds of every kind and nature to which Borrower is now or hereafter may become entitled to, no matter how arising), instruments, documents, chattel paper (whether tangible or electronic) deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, security entitlements, security accounts, investment property, supporting obligations, choses in action, commercial tort claims, and all other debts, obligations and liabilities in whatever form, owing to Borrower from any person, firm or corporation or any other legal entity, whether now existing or hereafter arising, now or hereafter received by or belonging or owing to Borrower, for goods sold by it or for services rendered by it, or however otherwise same may have been established or created, all guarantees and securities therefor, all right, title and interest of Borrower in the merchandise or services which gave rise thereto, including the rights of reclamation and stoppage in transit, all rights to replevy goods, and all rights of an unpaid seller of merchandise or services;

(c)     all machinery, equipment, fixtures and other similar goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired by the Borrower and wherever located, all replacements and substitutions therefor or accessions thereto and all proceeds thereof (all hereinafter called the **"Equipment"**);

(d)     all moneys, securities and other property (and the proceeds thereof) now or hereafter held or received by, or in transit to Bank, from or for it, whether for safekeeping, pledge, custody, transmission, collection or otherwise and all credits and balances of it, with Bank at any time existing;

(e)     all goods, machinery, equipment and all of Borrower's other tangible personal property (to the extent not included within Inventory or Equipment), now owned or hereafter acquired and wherever located, as well as all of Borrower's right, title and interest in and to any such goods as may be now or hereafter held or used by Borrower under any lease, lease-purchase, conditional sales, use or other agreements under which Borrower is or may become entitled to the use and possession thereof, with any and all other rights and benefits flowing from or under such agreements, all as may be used, useful or bought for use in connection with the ownership and/or operation of Borrower's business, and any operations incidental to or associated with the same, or otherwise, and all service contracts relating to any of the foregoing, all whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all additions and accessions thereto;

(f)     all right, title and interest of Borrower in any Master Swap Agreement between Borrower and Bank that may be entered into in the future, and each transaction entered into thereunder including, without limitation, all amounts payable or deliverable thereunder and the benefit of any guarantee or other credit support in connection therewith; and

(g)     all proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (all of the assets described in this Section 1, together with any other property or interests that are now or hereafter subject to the Security Documents (defined below), are sometimes hereinafter referred to as the **"Collateral"**).

2.     **ADDITIONAL DEFINITIONS.**  In addition to the other defined terms herein, including in Section 10(b), as used in this Agreement, the following capitalized words shall have the following meanings:

**"Default Rate"** means a fluctuating rate that is the daily equivalent to a rate equal to the aggregate of: (x) the Prime Rate (as defined below), and (y) four percent (4%) per annum.

**"Loans"** means, collectively, the Term Loan (as defined below) and the Line of Credit Loan (as defined below), and **"Loan"** means either the Term Loan or the Line of Credit Loan.

**"Loan Documents"** means, collectively, this Agreement, the Line of Credit Note (as defined below), the Term Note (as defined below), the Security Documents, the Hazardous Materials Indemnity Agreement of or about even date herewith and all other agreements, documents and instruments now or hereafter evidencing, securing or otherwise relating to the Obligations, each as amended, replaced, extended, renewed,

2

restated, or otherwise modified from time to time.

"**Mortgage**" means the Mortgage and Security Agreement of or about even date herewith from Borrower to the Bank with respect to the Borrower's property in Saco, Maine.

"**Notes**" means, collectively, the Line of Credit Note (as defined below) and the Term Note (as defined below), together with any and all amendments and modifications thereto, substitutions therefor, and renewals, restatements and extensions thereof, and "**Note**" means any of the Notes.

"**Out of Formula Advances**" means the amount by which the principal balance of all outstanding Line of Credit Loans exceeds the Borrowing Base (as defined below).

"**Overline Advances**" means the amount by which the principal balance of all outstanding Line of Credit Loans exceeds the Credit Limit (as defined below).

"**Premises**" means the real property in Saco, Maine that is owned by the Borrower and the buildings and other improvements thereon, and which on the date hereof is subject to the Mortgage.

"**Security Documents**" means this Agreement, the Mortgage, any UCC-1 Financing Statements filed by Bank with respect to its interest in the Collateral, and any other agreement, document or instrument now or hereafter securing the Obligations or any portion thereof, each together with all modifications and amendments thereto, restatements thereof and substitutions therefor.

3.   **OBLIGATIONS SECURED.**  The security interest granted hereby is to secure payment and performance of all debts, liabilities and obligations of Borrower to Bank hereunder and under the Line of Credit Note and the Term Note, and also any and all other debts, liabilities and obligations of Borrower to Bank of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the transactions described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, fees, charges, expenses and overdrafts, and also including, without limitation, all obligations and liabilities which Bank may incur or become liable for, on account of, or as a result of, any transactions between Bank and Borrower including any which may arise out of any letter of credit, acceptance or similar instrument or obligation issued or caused to be issued pursuant to this Agreement, and further including any obligations arising under any credit card receivables, currency swaps, electronic fund transfers (whether through automated clearing houses or otherwise), provisional credit, check cashing, foreign exchange transactions, futures, options, collars, interest rate swaps, caps, floors, forward rate or other interest rate protection agreements, or similar agreements and all obligations of the

3

Borrower to the Bank arising out of or in connection with any Automated Clearing House ("ACH") agreements relating to the processing of ACH transactions, together with all fees, expenses, charges and other amounts owing by or chargeable to the Borrower under any ACH agreements (all hereinafter called **"Obligations"**).

4.    **BORROWER'S PLACES OF BUSINESS, INVENTORY LOCATIONS AND SUBSIDIARIES.** Borrower warrants that Borrower has no places of business other than the Premises and as listed on Schedule A, annexed hereto. Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that indicated as such on Schedule A. All Inventory presently owned by Borrower is stored at the locations set forth on Schedule A and no other places. Borrower will obtain a landlord's consent from each landlord of leased premises where any material portion of Inventory is stored and a bailee's consent from each bailee holding any material portion of Inventory, in each case on such forms as Bank may require from time to time. Borrower will promptly notify Bank in writing of any change in the location of any place of business or the location of any Inventory or the establishment of any new place of business or location of Inventory or office where its records are kept which would be shown in this Agreement if it were executed after such change.

5.    **BORROWER'S    ADDITIONAL    REPRESENTATIONS    AND WARRANTIES.** Borrower represents and warrants that:

(a)    Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Maine and shall hereafter remain in good standing as a corporation in that state, and is duly qualified and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of the Borrower.

(b)    Borrower's exact legal name is as set forth in this Agreement.

(c)    The Borrower's shareholders and their respective ownership interests in the Borrower, is as set forth on Schedule A.

(d)    The execution, delivery and performance of this Agreement, and the other Loan Documents, are within the Borrower's corporate powers, have been duly authorized, are not in contravention of law or the terms of the Borrower's articles of incorporation, bylaws or other organizational documents, or of any indenture, agreement or undertaking to which the Borrower is a party or by which it or any of its properties may be bound.

(e)    All shares in Borrower that are issued and outstanding were and are properly issued and all books and records of Borrower, including but not limited to its stock register, minute books and books of account, are accurate and up to date and will be so maintained.

4

(f)     Borrower owns all of the assets reflected in the most recent of Borrower's financial statements that have been provided to Bank, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the Collateral, are free and clear of any lien, pledge, security interest, charge, mortgage or encumbrance of any nature whatsoever, except (i) the security interests and other encumbrances (if any) listed on <u>Schedule B</u> annexed hereto, (ii) those leases of personal property set forth on <u>Schedule C</u> annexed hereto, (iii) those liens permitted pursuant to Section 17(d) of this Agreement, or (iv) liens and security interests in favor of Bank.

(g)     Borrower has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a lien on any Collateral being hereby deemed material); has paid all taxes shown or determined to be due thereon except those being contested in good faith and which Borrower has, prior to the date of such contest, identified in writing to Bank as being contested; and has made adequate provision for the payment of all taxes so contested, so that no lien will encumber any Collateral, and in respect of subsequent periods.

(h)     Borrower (i) is subject to no organizational or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction which could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its organizational documents, all contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith, or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of any Collateral.

(i)     There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of any Collateral.

(j)     Borrower is in compliance with ERISA; no Reportable Event has occurred and is continuing with respect to any Plan; and it has no unfunded vested liability under any Plan. The word **"Plan"** as used in this Agreement means any employee plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended (**"ERISA"**) maintained for employees of Borrower, any subsidiary of Borrower or any other trade or business under common control with Borrower within the meaning of Section 414(c) of the Internal Revenue Code of 1986, as amended, or any regulations thereunder.

6.    **TERM LOAN.**

(a)    Subject to Section 11 and to the other terms and conditions of this Agreement, Bank agrees to lend to Borrower Four Million Nine Hundred Thousand and 00/100 Dollars ($4,900,000) (the "**Term Loan**"). The proceeds of Term Loan shall be used to repay existing secured mortgage debt and for no other purposes. The Term Loan shall be due on May 16, 2021, if not sooner called in accordance with the terms hereof (the "**Term Loan Maturity Date**") and shall be evidenced by and repayable in accordance with a term note drawn to the order of Bank, as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor (the "**Term Note**").

(b)    Bank shall advance, and Borrower shall accept, the proceeds of the Term Loan subject to and in accordance with the provisions of this Agreement. Principal amounts advanced and repaid under the Term Note may not be reborrowed.

(c)    The amount outstanding under the Term Loan from time to time shall bear interest at the One Month LIBOR Rate plus the LIBOR Rate Margin, except that LIBOR Rate Loans may not be available to Borrower after the occurrence and during the continuation of an Event of Default, in which case the interest rate would be the Prime Rate plus the Prime Rate Margin, plus the Default Rate (see Section 10 for definitions of certain defined terms). The Term Loan shall be paid in monthly installments of principal as set forth in the Term Note, plus accrued interest, sufficient to repay the Term Loan in full on the Term Loan Maturity Date.

(d)    Borrower shall have the right to prepay the amounts due under the Term Loan only as follows. Borrower shall have the right at any time to prepay any Prime Rate Loan without premium or penalty hereunder (but subject to the terms of any swap or similar agreements), provided that any amount prepaid shall be accompanied by accrued interest on the principal repaid to the date of payment. To the extent that a Loan is a LIBOR Loan, then Borrower shall have the right to prepay such Loan only on the expiration of the applicable Interest Period (as defined in Section 10), as a whole or in part (but subject to the terms of any swap or similar agreements), upon prior notice to the Bank, provided that such prepayment shall be accompanied by accrued interest through the date of prepayment. Such optional prepayment privilege is in addition to, and not in substitution of, any repayment of principal required or otherwise contemplated under this Agreement. Borrower may provide notice of its election hereunder in writing or by telephone, provided, however, that any telephonic notice shall follow such procedures as Bank may require and Bank shall have no duty to confirm the authority of a person making a telephonic request. Borrower shall pay to Bank, upon request of Bank, such amount or amounts as shall be sufficient (in the reasonable opinion of Bank) to compensate it for any loss, cost, or expense incurred ("**Breakage Costs**") as a result of: (i) any payment of a LIBOR Loan on a date other than the last day of the Interest Period for such Loan, whether such payment is payable because of demand, default or otherwise; (ii) any failure by Borrower to borrow a LIBOR Loan on the date specified by Borrower's written notice; (iii) any failure by Borrower to pay a LIBOR Loan on the date for payment specified in Borrower's written notice.

6

7.     **LINE OF CREDIT LOANS.**

(a)     Provided that there has not occurred an Event of Default or an event that, with notice or the lapse of time or both, would constitute an Event of Default, Bank agrees, from time to time upon Borrower's request made in accordance with Section 10 hereof, to make advances (each, a **"Line of Credit Loan"** and, collectively, the **"Line of Credit Loans"**) to Borrower so long as the sum of the aggregate principal amount of all Line of Credit Loans outstanding and the requested Line of Credit Loan does not exceed the lesser of (i) the Borrowing Base (as defined below), or (ii) the Credit Limit (as defined below)(the **"Maximum Availability"**). The proceeds of the Line of Credit Loans shall be used to provide Borrower with working capital and for general corporate purposes. Each Line of Credit Loan shall be in the minimum aggregate amount of Ten Thousand Dollars ($10,000) and any integral multiple thereof.

(b)     All Line of Credit Loans shall be evidenced by and repayable in accordance with a revolving note drawn to the order of Bank, as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor (the **"Line of Credit Note"**), but in the absence of the Line of Credit Note shall be conclusively evidenced by Bank's records of Line of Credit Loans and repayments. All Line of Credit Loans shall bear interest upon the principal sum thereof from time to time advanced at the Overnight LIBOR Rate plus the LIBOR Rate Margin. Interest will be charged to Borrower as set forth in the Line of Credit Note, upon any balance owing to Bank at the close of each day and shall be payable (i) at the end of each Interest Period, for LIBOR Rate Loans; (ii) on April 30, 2016 (the **"Line Maturity Date"** and together with the Term Loan Maturity Date, each a **"Maturity Date"**); provided, however, the Line Maturity Date may be extended in writing by Bank from time to time, in its sole discretion, in which case such extended date shall be the "Line Maturity Date"; (iii) on acceleration of the time for payment of the Obligations pursuant to Section 18 hereof; and (iv) on the date the Obligations are paid in full. Borrower shall pay to Bank, upon request of Bank, any Breakage Costs as a result of: (i) any payment of a LIBOR Loan on a date other than the last day of the Interest Period for such Loan, whether such payment is payable because of demand, default or otherwise; (ii) any failure by Borrower to borrow a LIBOR Loan on the date specified by Borrower's written notice; (iii) any failure by Borrower to pay a LIBOR Loan on the date for payment specified in Borrower's written notice. Borrower shall make monthly payments of accrued interest on the Line of Credit Loan.

(c)     The term **"Borrowing Base"** as used herein shall mean the sum of (i) eighty percent (80%) of the unpaid face amount of Qualified Accounts (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to Borrower, if Bank determines in its reasonable judgment that there has been a change in circumstances relating to any or all Accounts from those circumstances in existence on or prior to the date hereof, and (ii) fifty percent (50%) of the value of Qualified Inventory (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to Borrower, if Bank determines in its reasonable judgment that there has been a change in circumstances relating to any or all Inventory from those circumstances in existence on or prior to the date hereof.

7

(d)     The term **"Credit Limit"** as used herein shall mean an amount equal to Twelve Million Dollars ($12,000,000).

(e)     The Borrowing Base formula set forth above is intended solely for monitoring purposes. The making of Line of Credit Loans, advances, and credits by Bank to the Borrower in excess of the above described Borrowing Base formula is for the benefit of the Borrower and does not affect the obligations of Borrower hereunder; all such Line of Credit Loans constitute Obligations and must be repaid by Borrower in accordance with the terms of this Agreement.

(f)     Borrower shall pay to Bank the principal amount of all Line of Credit Loans as follows:

(i)     <u>Borrowing Base Exceeded</u>. Whenever the outstanding principal balance of all Line of Credit Loans exceeds the Borrowing Base, Borrower shall immediately pay to Bank all Out of Formula Advances.

(ii)     <u>Credit Line Exceeded</u>. Whenever the outstanding principal balance of all Line of Credit Loans exceeds the Credit Line, Borrower shall immediately pay to Bank all Overline Advances.

(iii)     <u>Payment in Full on Line Maturity Date</u>. On the Line Maturity Date or, if sooner, acceleration of the obligations pursuant to Section 18, Borrower shall pay to Bank the entire outstanding principal balance of all Line of Credit Loans.

8.     **DEFINITION OF QUALIFIED ACCOUNT.** The term **"Qualified Account"**, as used herein, means an Account owing to Borrower which met the following specifications at the time it came into existence and continues to meet the same until it is collected in full:

(a)     The Account is not more than ninety (90) days from the date of the invoice thereof.

(b)     The Account arose from the performance of services or an outright sale of goods by Borrower, such goods have been shipped to the account debtor, and Borrower has possession of, or has delivered to Bank, shipping and delivery receipts evidencing such shipment.

(c)     The Account is not subject to any prior assignment, claim, lien, or security interest, and Borrower will not make any further assignment thereof or create any further security interest therein, nor permit Borrower's rights therein to be reached by attachment, levy, garnishment or other judicial process.

(d)     The Account is not a contra account, or otherwise subject to setoff, credit, allowance or adjustment by the account debtor, except discount allowed for prompt payment and

8

the account debtor has not complained as to his liability thereon and has not returned any of the goods from the sale of which the Account arose.

(e)    The Account arose in the ordinary course of Borrower's business and did not arise from the performance of services or a sale of goods to a supplier or employee of the Borrower.

(f)    No notice of bankruptcy or insolvency of the account debtor has been received by or is known to the Borrower.

(g)    The Account is not owed by an account debtor located outside the United States of America unless such Account is covered by accounts receivable insurance satisfactory to Bank.

(h)    The Account is not owed by an entity that is a parent, brother/sister, subsidiary or affiliate of Borrower.

(i)    The Account is not evidenced by a promissory note.

(j)    The Account did not arise out of any sale made on a bill and hold, guaranteed sale, sale and return, sale on approval, consignment, dating or delayed shipment basis or any other repurchase or return basis and is not evidenced by chattel paper.

(k)    The Account is not owed by the United States of America, any state or any department, agency or instrumentality of any of them, unless Borrower assigns its right to payment of such Account to Bank pursuant to the Federal Assignment of Claims Act of 1940, as amended or has otherwise complied with other applicable statutes or ordinances.

(l)    The Account does not arise out of a progress billing in excess of the scheduled billing therefor.

(m)    Bank, in accordance with its normal credit policies, has not deemed the Account to be unacceptable in its reasonable judgment.

PROVIDED THAT if at any time twenty percent (20%) or more of the aggregate amount of the Accounts due from any account debtor are unpaid in whole or in part more than ninety (90) days from the respective dates of invoice, from and after such time none of the Accounts (then existing or hereafter arising) due from such account debtor shall be deemed to be Qualified Accounts until such time as all Accounts due from such account debtor are (as a result of actual payments received thereon) no more than ninety (90) days from the date of invoice; Accounts payable by Borrower to an account debtor shall be netted against Accounts due from such account debtor and the difference (if positive) shall constitute Qualified Accounts from such account debtor for purposes of determining the Borrowing Base (notwithstanding paragraph (d) above); characterization of any Account due from an account debtor as a Qualified Account shall not be deemed a determination by Bank as to its actual value nor in any way obligate Bank to

accept any Account subsequently arising from such account debtor to be, or to continue to deem such Account to be, a Qualified Account; it is Borrower's responsibility to determine the creditworthiness of account debtors and all risks concerning the same and collection of Accounts are with Borrower; and all Accounts whether or not Qualified Accounts constitute Collateral.

9.    **DEFINITION OF QUALIFIED INVENTORY.**    The term **"Qualified Inventory"**, as used herein, means, at the relevant time of reference thereto, the lower of cost or fair market value of all Inventory owned by Borrower and located at the Premises, including both raw materials and finished goods held for sale, in which Bank has a perfected first security interest, <u>provided</u> that Qualified Inventory shall not include any inventory (a) held on consignment, or not otherwise owned by Borrower, or of a type no longer sold by Borrower, (b) which has been returned by a customer or is damaged or subject to any legal encumbrance other than Permitted Liens, (c) which has been shipped to a customer of Borrower regardless of whether such shipment is on a consignment basis, (d) which consists of supplies or packaging materials, or (e) which in the reasonable judgment of Bank is obsolete or not marketable.

10.    **LOAN REQUEST PROCEDURE; INTEREST RATE PROVISIONS.**

(a)    <u>Loan Request Procedure</u>:    The Term Loan will be disbursed in a single disbursement, on or about the date hereof, as directed by the Borrower in a written notice to the Bank, and the Borrower hereby irrevocably requests that the entire amount be advanced as a LIBOR Rate Loan, and any unamortized portion be automatically rolled over into another LIBOR Rate Loan at the expiration of each Interest Period (unless there is an Event of Default or the Interest Period for such new LIBOR Rate Loan would not be allowed hereunder, in which case no such request will be honored hereunder). The Borrower may request Line of Credit Loans on any Business Day prior to the Line Maturity Date, provided there is then no Event of Default hereunder; and further provided that Borrower shall give Bank prior notice (which notice must be received by Bank prior to 11:00 a.m. Portland, Maine time) two (2) Business Days prior to the requested advance date, specifying in each case: (i) the amount to be borrowed, and (ii) the requested borrowing date (which must be a Business Day). Borrower may provide notice of an election hereunder in writing or by telephone, provided, however, that any telephonic notice shall follow such procedures as Bank may require and Bank shall have no duty to confirm the authority of a person making a telephonic request. Borrower agrees that any requests for advances of Line of Credit Loans shall be at least $10,000 and that there shall be no more than ten (10) LIBOR Rate Loans in effect at any given time. LIBOR Rate Loans shall be made available to the Borrower no later than 11:00 a.m. Portland, Maine time on the first day of the applicable LIBOR Interest Period, by deposit to the account of the Borrower at the Bank as shall have been specified in its borrowing request. Borrower shall be deemed to have requested that each LIBOR Rate Loan be rolled over into another LIBOR Rate Loan (unless there is an Event of Default or the Interest Period for such new LIBOR Rate Loan would not be allowed hereunder, in which case no such request will be deemed to have been made hereunder). If, because of the introduction of or any change in, or because of any judicial, administrative, or other governmental interpretation of, any law or regulation, it becomes unlawful for Bank to make, fund, or maintain any LIBOR Rate Loan, then (a) Bank shall notify Borrower that Bank is no longer able to maintain the interest rate at a rate based on the LIBOR Rate and Borrower's ability

10

to elect LIBOR Rate Loans shall immediately terminate, and (b) LIBOR Loans for which the interest rate is then the Overnight LIBOR Rate shall automatically be converted to Prime Rate Loans, and (c) LIBOR Loans for which the interest rate is then the One Month LIBOR Rate shall automatically be converted to Prime Rate Loans, and Borrower shall pay to Bank the amount of Breakage Costs incurred in connection with such conversion. Thereafter, Borrower shall not be entitled to elect LIBOR Rate Loans until such time as the situation described herein is no longer in effect.

(b)    Certain Definitions: The following terms used herein, and in any notes or other documents relating hereto, shall have the following meanings:

**"Business Day"** means (a) any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Maine; and (b) when such term is used to describe a day on which a borrowing, payment, prepayment or repayment is to be made in respect of a LIBOR Rate Loan (a "LIBOR Business Day"), any day which is (i) neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Maine or in New York City; and (ii) a London Business Day; and ( c) when such term is used to describe a day on which an interest rate determination is to be made in respect of a LIBOR Rate Loan, any day which is a London Banking Day.

**"Interest Period"** means:  relative to any LIBOR Rate Loans, (i) for Loans bearing interest at the Overnight LIBOR Rate, it means the period commencing on the day on which such Loan is made, continued, or converted and continuing overnight, with successive periods commencing daily thereafter, and (ii) for Loans bearing interest at the One Month LIBOR Rate, it means the period commencing on the date an advance bearing interest at the LIBOR Rate is made, continued, or converted and continuing for a period of one month, with successive periods commencing on the same day of each month thereafter; provided, however, that (i) if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month and the applicable rate is the One Month LIBOR, in which case such Interest Period shall end on the first preceding Business Day; and (ii) no Interest Period may end later than the applicable Maturity Date.

**"Interest Rate"** means either the Overnight LIBOR Rate, the One Month LIBOR Rate or the Prime Rate.

**"LIBOR Rate Loan"** means any Loan for the period when the rate of interest applicable to such Loan is calculated by reference to the LIBOR Rate.

**"LIBOR Rate"** means, relative to any LIBOR Interest Period for a LIBOR Rate Loan, the rate per annum calculated by Bank in good faith, which Bank determines with reference to the rate per annum (rounded upwards to the next higher whole multiple of 1/16th if such rate is not such a multiple) at which deposits in United States dollars are offered by prime banks in the London interbank eurodollar market (i) two LIBOR Business Days prior to the day on which such rate is calculated by Bank, based on a one-month maturity (for the "One Month LIBOR

11

Rate"), or (ii) on the LIBOR Business Day on which such rate is calculated by Bank, based on a daily rate (for the "Overnight LIBOR Rate"). For the Term Note the initial One Month LIBOR Rate shall be the One Month LIBOR Rate determined by Bank on the first day of the month in which the Term Note is issued; thereafter, the One Month LIBOR Rate shall be adjusted by Bank on the first day of each succeeding month. If the first day of such month falls on a day that is not a LIBOR Business Day, then Bank shall determine the One Month LIBOR Rate on the LIBOR Business Day immediately preceding the first day of such month, effective as of the first day of such month.

**"LIBOR Rate Margin"** means 1.75% per annum, with respect to the Term Loan and the Line of Credit Loan.

**"Loan"** means a loan, sometimes referred to herein as an advance, made to Borrower by Bank, of the entire amount of the Term Loan at closing, or of a portion of the Maximum Availability for Line of Credit Loans from time to time pursuant to Section 7 of this Agreement, and "Loans" means all of such loans, collectively. In certain instances the term "Loan" is used to mean all of such loans, collectively.

**"London Banking Day"** means a day on which dealings in US dollar deposits are transacted in the London interbank Eurodollar market.

**"One Month LIBOR Rate"** means the rate obtained by dividing (x) the rate determined in accordance with the portion of the definition of LIBOR Rate that is used for determining the One Month LIBOR Rate by (y) a percentage equal to one hundred percent (100%) minus the Reserve Percentage.

**"Overnight LIBOR Rate"** means the rate obtained by dividing (x) the rate determined in accordance with the portion of the definition of LIBOR Rate that is used for determining the Overnight LIBOR Rate by (y) a percentage equal to one hundred percent (100%) minus the Reserve Percentage.

**"Prime Rate"** shall mean the rate per annum designated as the "Prime Rate" in The Wall Street Journal as the base rate posted by 70% of the nation's largest banks. If more than one such rate is published on any given day, the highest published rate shall be used to determine the Prime Rate. If The Wall Street Journal ceases to publish a "Prime Rate," the Bank may choose a substitute source for the Prime Rate or may choose a substitute index. If the Bank chooses a substitute index, it may also choose a substitute margin so that the new index and margin result in an interest rate substantially similar to the Prime Rate in effect at the time the Prime Rate ceases to be published in The Wall Street Journal. Any change In the Prime Rate shall be effective immediately from and after such change in the Prime Rate. Interest accruing by reference to the Prime Rate shall be calculated on the basis of actual days elapsed and a 360-day year. The Borrower acknowledges that the Bank may make loans to its customers above, at or below the Prime Rate.

"**Prime Rate Loan**" means any Loan for the period when the rate of interest applicable to such Loan is calculated by reference to the Prime Rate.

"**Prime Rate Margin**" means 0% per annum with respect to the Term Loan and the Line of Credit Loan.

"**Reserve Percentage**" means for any LIBOR Interest Period, that percentage which is specified three (3) business days before the first day of the such LIBOR Interest Period by the Board of Governors of the Federal Reserve System (or any successor) or any other governmental or quasi-governmental authority with jurisdiction over Bank for determining the maximum reserve requirement (including, but not limited to, any basic, supplemental, marginal, or emergency reserve requirement) for Bank with respect to liabilities or assets constituting or including (among other liabilities) "Eurocurrency liabilities" (as defined in Regulation D of the Board of Governors of the Federal Reserve System) in an amount equal to that of the advances affected by such LIBOR Interest Period and with a maturity equal to the LIBOR Interest Period.

11.    **CONDITIONS OF LENDING.**

(a)    The obligation of Bank to make the initial Loans hereunder shall be subject to the condition precedent that Bank shall have received all of the following, each in form and substance satisfactory to Bank:

(i)    This Agreement, properly executed on behalf of Borrower.

(ii)    The Term Note and the Line of Credit Note drawn to the order of Bank.

(iii)    The Mortgage properly executed and notarized.

(iv)    All of the other Loan Documents properly executed on behalf of the respective parties thereto.

(v)    Current searches of appropriate filing offices showing that (A) no financing statements have been filed and remain in effect against Borrower, except those financing statements relating to liens set forth on Schedule "B", the liens of the secured lender to be paid with the proceeds of the initial Loans and those financing statements filed by the Bank, and (B) the Bank has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

(vi)    A certificate from the Secretary or Clerk of the Borrower, certifying as to (A) the resolutions of the shareholders of Borrower, authorizing the execution, delivery and performance of this Agreement and related documents, (B) the Articles of Incorporation and Bylaws of Borrower, and (C) the specimen signatures of the officers or agents of Borrower authorized to execute and deliver this Agreement and other

13

instruments, agreements and certificates, including loan requests, on behalf of Borrower.

(vii)    A current certificate issued by the Secretary of State of the state of the Borrower's organization, certifying that Borrower is in compliance with all organizational requirements of such state.

(viii)    Evidence that Borrower is duly licensed or qualified to transact business in Maine and in all other jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(ix)    An opinion of counsel to the Borrower and each organizational guarantor, addressed to Bank, in form and substance satisfactory to Bank.

(x)    Certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in favor of Bank.

(xi)    Payment of the fees due through the date of the Closing and expenses incurred by Bank through such date required to be paid by Borrower pursuant to this Agreement, including, without limitation, an origination fee of $33,800.

(xii)    A Borrowing Base Certificate in the form specified by the Bank indicating that the Line of Credit Loans outstanding on the date hereof do not exceed the Borrowing Base.

(xiii)    Such other documents, instruments and agreements as Bank in its sole discretion may require.

(b)    The obligation of Bank to make each Line of Credit Loan after the date of this Agreement shall be subject to the further conditions precedent on such date:

(i)    the representations and warranties contained in Sections 4 and 5 hereof are correct on and as of the date of such Line of Credit Loan as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date; and

(ii)    no event has occurred and is continuing, or would result from such Line of Credit Loan which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

12.    **CAPITAL ADEQUACY.**

(a)    If Bank shall determine that, after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or

14

administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank or its parent corporation with any requirement or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

> (i)    shall subject Bank or its parent corporation to any tax, duty or other similar charge with respect to the Loans or the Notes or shall change the basis of taxation of payments to Bank or its parent corporation of the Obligations or the principal of or interest on the Loans or of any other amounts due under this Agreement in respect of the Loans or the Notes (except for any change in respect of any tax imposed on the overall income of Bank or its parent corporation); or

> (ii)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, Bank or its parent corporation or shall impose on Bank or its parent corporation any other condition affecting the Loans or the Notes;

and the result of any of the foregoing is to increase the cost to Bank or its parent corporation of making or maintaining any Loans, or to reduce the amount of any sum received or receivable by Bank or its parent corporation under this Agreement or the Notes, by an amount deemed by Bank or its parent corporation to be material, then upon demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank or its parent corporation for such increased cost or reduction.

> (b)    If Bank shall determine that the adoption after the date hereof of any applicable law, rule or regulation regarding capital adequacy, or any change therein after the date hereof, any change after the date hereof in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank or its parent corporation with any guideline or request issued after the date hereof regarding capital adequacy (whether nor not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's or the Banks parent corporations capital as a consequence of the Loans or the Bank's obligations hereunder to a level below that which the Bank or its parent corporation could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies with respect to capital adequacy and those of the Bank's parent corporation) by an amount reasonably deemed to the Bank or its parent corporation to be material, then from time to time on demand by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank or its parent corporation for such reduction.

> (c)    Bank shall allocate such cost increases or reductions in its returns among its customers reasonably and in good faith and on an equitable basis. Notwithstanding anything to the contrary contained herein, the Borrower shall not have any obligation to pay to the Bank

15

amounts owing under this section unless, at the time it requests such compensation, it is the policy or general practice of the Bank to request compensation for comparable costs in similar circumstances under other comparable loan agreements. Certificates of the Bank sent to the Borrower from time to time claiming compensation under this section, stating the reason therefor and setting forth in reasonable detail the calculation of the additional amount or amounts to be paid to the Bank hereunder shall be conclusive absent manifest error. In determining such amounts, the Bank or its parent corporation may use any reasonable averaging and attribution methods consistent with the other provisions of this section.

13. **COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; EXPENSES; POWER OF ATTORNEY.**

(a)     Borrower hereby authorizes and directs Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so), following an Event of Default: (i) to pay accrued interest as the same becomes due and payable pursuant to this Agreement or pursuant to any Note or other agreement between Borrower and Bank, and to treat the same as a Loan to Borrower, which shall be added to Borrower's Loan balance pursuant to this Agreement; (ii) to charge any of Borrower's accounts under the control of Bank for any such items; or (iii) apply the proceeds of Collateral, including, without limitation, payments on Accounts and other payments from sales or lease of Inventory and any other funds to the payment of such items.

(b)     Borrower hereby grants to Bank a lien, security interest and right of setoff as security for all liabilities and Obligations to Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or in transit to it. At any time, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or Obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(c)     Borrower will also establish at Bank a zero-balance checking account against which Borrower will draw disbursement checks in order to obtain Line of Credit Loans hereunder. Subject to Borrowing Base availability, the amount of all disbursements checks will be debited to the Borrower's loan account. The sum of all disbursement checks paid each day will be posted to Borrower's loan account as of the conclusion of each day. Bank shall be Borrower's main bank of deposit. Borrower shall inform Bank in writing of each deposit account that Borrower at any time opens or maintains at any other bank, and Borrower shall, with respect to any such deposit account, at Bank's request and option, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the depositary bank to agree to comply at any time with instructions from Bank to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Borrower, or

16

(ii) arrange for Bank to become the customer of the depositary bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account. Bank agrees with Borrower that Bank shall not give any such instructions or withhold any withdrawal rights from Borrower, unless an Event of Default has occurred and is continuing, or, after giving effect to any withdrawal not otherwise permitted by this Agreement would occur. The provisions of this paragraph shall not apply to (i) any deposit account for which Borrower, the depositary bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depositary bank and Bank for the specific purpose set forth therein, or (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees.

(d)      Bank may at any time, after the occurrence of an Event of Default or an event which, with notice or the passage of time or both, would constitute an Event of Default, notify account debtors that Collateral has been assigned to Bank and that payments shall be made directly to or as directed by Bank. Upon request of Bank at any time, Borrower will so notify such account debtors and will indicate on all billings to such account debtors that their Accounts must be paid directly to or as directed by Bank. After the occurrence and during the continuation of any Event of Default, Bank shall have full power to collect, compromise, endorse, sell or otherwise deal with the Collateral or proceeds thereof in its own name or in the name of Borrower.

(e)      Borrower shall pay to Bank on demand any and all reasonable counsel fees and other expenses incurred by Bank in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all Accounts collected, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Bank to obtain or enforce payment of any Account either as against the account debtor, Borrower, or any Guarantor or other guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Bank's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses incurred or paid by Bank in connection with the administration, supervision, protection or realization on any security held by Bank for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Bank in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Bank in connection with the debt secured hereby, all of which amounts shall be considered advances to protect Bank's security, and shall be secured hereby. At its option, and without limiting any other rights or remedies, after the occurrence and during the continuation of any Event of Default, Bank may at any time pay or discharge any taxes, liens, security interests or other encumbrances at any time levied against or placed on any of the Collateral, and may procure and pay any premiums on any insurance required to be carried by Borrower, and provide for the maintenance and preservation of any of the Collateral, and otherwise take any action

17

reasonably deemed necessary to Bank to protect its security, and all amounts expended by Bank in connection with any of the foregoing matters, including reasonable attorneys' fees, shall be considered obligations of Borrower and shall be secured hereby.

(f) Borrower does hereby make, constitute and appoint any officer or agent of Bank as Borrower's true and lawful attorney-in-fact, with power, after the occurrence and during the continuation of any Event of Default, to endorse the name of Borrower or any of Borrower's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under any policy of insurance on the Collateral) or Collateral that may come into possession of Bank in full or part payment of any amounts owing to Bank; to sign and endorse the name of Borrower or any of Borrower's officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts, and any instrument or documents relating thereto or to Borrower's rights therein; to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to Borrower may be delivered directly to Bank; granting upon Borrower's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as Borrower might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof. Neither Bank nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except to the extent of their negligence or willful misconduct. This power of attorney shall be irrevocable for the term of this Agreement and all transactions hereunder and thereafter as long as Borrower may be indebted to Bank, but shall automatically terminate upon full and final payment and performance of the Obligations, and termination of any obligation of Bank to make further advances to Borrower.

14. **FINANCING STATEMENTS.** Borrower hereby irrevocably authorizes Bank at any time and from time to time, and at Borrower's sole cost, to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment. Borrower agrees to furnish any such information to Bank promptly upon request. Borrower also ratifies its authorization for Bank to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. In addition, at the request of Bank, Borrower will join with Bank in executing any other notices appropriate under applicable law in form satisfactory to Bank and will pay the cost of filing the same in all public offices wherever filing is deemed by Bank to be necessary or desirable.

15.  **BORROWER'S REPORTS.**

(a)  Borrower shall deliver to Bank all documents, as frequently as indicated below, or at such other times as Bank may request, and all other documents and information requested by Bank:

|  | DOCUMENT | FREQUENCY DUE |
|---|---|---|
| (i) | A Borrowing Base Certificate | Monthly, within twenty (20) days after the end of each month |
| (ii) | Accounts receivable aging report, in form satisfactory to Bank | Monthly, within twenty (20) days after the end of each month |
| (iii) | Budget for the following year in form satisfactory to Bank | Annually, within thirty (30) after the end of the prior fiscal year end |
| (iv) | Notice of noncompliance with the provisions of this Agreement | Immediately upon learning of such noncompliance, or if any representation or warranty contained herein is no longer true or accurate |
| (v) | Compliance Certificate | Quarterly, within forty five (45) days after the end of each fiscal quarter and annually within one hundred twenty (120) days after the close of each fiscal year |
| (vi) | Financial Statements | Annually and quarterly, as set forth below |

19

(b)    Borrower will furnish Bank, annually, as soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, a balance sheet as of the end of such fiscal year, a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year, and all prepared in accordance with generally accepted accounting principles consistently applied, audited by independent public accountants selected by the Borrower and acceptable to Bank, and accompanied by an opinion thereon from such accountants acceptable to Bank and together with such independent public accountant's statement that they have reviewed the provisions of this Agreement in accordance with generally accepted accounting principles and that they have no knowledge of any event or condition which constitutes an Event of Default or which, after notice or expiration of any applicable grace period or both, would constitute such an Event of Default or, if they have such knowledge, specifying the nature and period of existence thereof.

(c)    Borrower will furnish Bank as soon as available, and in any event within forty-five (45) days after the end of each fiscal quarter, management-prepared financial statements, in form satisfactory to Bank, including a balance sheet, income statement and statement of cash flows, certified by the controller or chief financial officer of Borrower.

(d)    Borrower will promptly, upon receipt thereof, deliver to Bank, copies of any reports submitted to the Borrower by Borrower's independent public accountants in connection with the examination of the financial statements of the Borrower made by such accountants (the so-called "Management Letter").

(e)    In addition to the foregoing, Borrower shall provide Bank promptly with such other and additional information concerning the Borrower, the Collateral, the operation of Borrower's business, Borrower's financial condition, including financial reports and statements, as Bank may from time to time reasonably request.  All financial information provided to Bank in connection with or pursuant to this Agreement shall be prepared in accordance with generally accepted accounting or auditing principles (as applicable) applied consistently in the preparation thereof and consistently with prior periods to fairly reflect the financial condition of Borrower at the close of, and its results of operations for, the periods in question.

(f)    In addition to the foregoing, Bank shall have the right to conduct field examinations of the Accounts and Inventory, in advance of the first Line of Credit Loan and thereafter after an Event of Default (or as required by law or regulation), and Borrower shall be responsible for all costs, fees and expenses in connection therewith.

### 16.   GENERAL AGREEMENTS OF BORROWER.

(a)   Borrower agrees to keep all the Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that required by Bank with loss payable to Bank and Borrower, as their interests may appear, hereby appointing Bank as attorney for Borrower in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts.  As further assurance for the payment and performance of the Obligations, Borrower hereby assigns to Bank all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the Collateral and Borrower hereby directs each insurance company issuing any such policy to make payment of such sums directly to Bank.

(b)   Bank or its agents have the right to inspect the Collateral and all records pertaining thereto at intervals to be determined by Bank and without hindrance or delay upon reasonable prior notice to Borrower.  Bank shall also have the right to obtain in the case of an Event of Default (or as required by law or regulation) at the sole cost and expense of Borrower an appraisal and/or field examination of the Collateral by an appraiser acceptable to Bank.

(c)   Although, as above set forth, Bank has a continuing security interest in all of Borrower's Collateral and in the proceeds thereof, Borrower will at all times maintain as the minimum security hereunder a Borrowing Base not less than the aggregate unpaid principal of all Line of Credit Loans made hereunder and if Borrower fails to do so, Borrower will immediately make the necessary reduction in the unpaid principal amount of said Line of Credit Loans so that the Line of Credit Loans outstanding hereunder do not in the aggregate exceed the Borrowing Base.

(d)   Borrower will at all times keep accurate and complete records of Borrower's Accounts and other Collateral, and Bank, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Bank, upon reasonable prior notice to Borrower, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Borrower's Accounts, and other Collateral or other transactions, between the parties thereto and the general financial condition of Borrower and Bank may remove any of such records temporarily for the purpose of having copies made thereof.  Borrower shall pay to Bank all reasonable audit fees, plus all travel and other expenses incurred in connection with any such audit.

(e)   Borrower will maintain a standard and modern system of accounting which enables Borrower to produce financial statements in accordance with generally accepted accounting principles and maintain records pertaining to the Collateral that contain information as from time to time may be requested by Bank.

(f)   Borrower will maintain its corporate existence in good standing and comply with all laws and regulations of the United States or of any state or states thereof or of

21

any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

(g)     Borrower will pay all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it, or payable by it at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to its property.

(h)     Bank may in its own name or in the name of others upon not less than three (3) Business Days' advance notice to Borrower (except following an Event of Default, in which case notice shall not be required) communicate with account debtors in order to verify with them to Bank's satisfaction the existence, amount and terms of any Accounts.

(i)     If any of Borrower's Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, Borrower will immediately notify Bank thereof in writing and execute any instruments and take any steps required by Bank in order that all monies due and to become due under such contracts shall be assigned to Bank and notice thereof given to the Government under the Federal Assignment of Claims Act.

(j)     If any of Borrower's Accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, Borrower will immediately deliver same to Bank, appropriately endorsed to Bank's order and, regardless of the form of such endorsement, Borrower hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(k)     If any Collateral is at any time in the possession of a bailee, Borrower shall promptly notify Bank thereof and, if requested by Bank, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and shall act upon the instructions of Bank, without the further consent of Borrower. Bank agrees with Borrower that Bank shall not give any such instructions unless an Event of Default has occurred and is continuing, or an event which, with notice or the passage of time or both, would constitute an Event of Default has occurred and is continuing, or would occur after taking into account any action by Borrower with respect to the bailee.

(l)     If Borrower is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Borrower, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, Borrower shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Bank of the proceeds of any drawing under the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit, with Bank agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an Account.

22

(m)    If Borrower shall at any time hold or acquire a commercial tort claim, Borrower shall immediately notify Bank in a writing signed by Borrower of the brief details thereof and grant to Bank in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

(n)    Borrower will promptly pay when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Bank, promptly furnish Bank the receipted bills therefor.  At its option, after the occurrence and during the continuation of any Event of Default, Bank may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral.  Borrower agrees to reimburse Bank on demand for any payments made, or any expenses incurred by Bank pursuant to the foregoing authorization, and upon failure of the Borrower so to reimburse Bank, any such sums paid or advanced by Bank shall be deemed secured by the Collateral and constitute part of the Obligations.

(o)    Borrower will immediately notify Bank upon receipt of notification of any potential or known release or threat of release of hazardous materials, hazardous waste, hazardous or toxic substance or oil from any site operated by Borrower or of the incurrence of any expense or loss in connection therewith or with the Borrower's obtaining knowledge of any investigation, action or the incurrence of any expense or loss by any governmental authority in connection with the assessment, containment or removal of any hazardous material or oil for which expense or loss the Borrower may be liable.  As used herein, the terms "hazardous waste," "hazardous or toxic substance," "hazardous material" or "oil" shall have the same meanings as defined and used in any of the following (the "**Acts**"): the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 USC Sections 9601-9657, as amended by the Superfund Accounts and Reauthorization Act of 1986; the Federal Resource Conservation and Recovery Act, 42 USC Sections 6901 et seq.; the Hazardous Materials Transportation Act, 49 USC Sections 1801 et seq.; the Toxic Substances Control Act, 15 USC Sections 2601 et seq.; the Federal Water Pollution Control Act, 33 USC Sections 1251 et seq.; the Clean Air Act, 42 USC Sections 741 et seq.; the Clean Water Act, 33 USC Section 701; the Safe Drinking Water Act, 42 USC Sections 300(f)-300(j); the Uncontrolled Hazardous Substance Sites Law, 38 M.R.S.A. § 1361, et seq.; the Hazardous Matter Control Law, 38 M.R.S.A. § 1317, et seq.; the Maine Hazardous Waste, Septage, and Solid Waste Management Act, 38 M.R.S.A. § 1301, et seq.; the Toxics Use and Hazardous Waste Reduction Law, 38 M.R.S.A. § 2301 et seq.; and the Site Location of Development Law, 38 M.R.S.A. § 481 et seq.; and/or the regulations adopted and publications promulgated pursuant to any of the Acts, as the same may be amended from time to time.

(p)    Except to the extent of  Bank's negligence or willful misconduct, Borrower will indemnify and save Bank harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Bank may sustain or incur by reason of defending or protecting this security interest or the priority thereof

23

or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of Bank's agreement to make Loans available to Borrower and the termination of this Agreement.

(q)    At the option of Bank, Borrower will furnish to Bank, from time to time, within five (5) days after the accrual in accordance with applicable law of Borrower's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Bank that such deposits have been made as required.

(r)    Should Borrower fail to make any of such deposits or furnish such proof, then Bank may, in its sole and absolute discretion, (a) make any of such deposits or any part thereof, (b) pay such taxes, or any part thereof, or (c) set up such reserves as Bank, in its judgment, shall deem necessary to satisfy the liability for such taxes. Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all Collateral and any other property at any time pledged by Borrower with Bank. Nothing herein shall be deemed to obligate Bank to make any such deposit or payment or setup such reserve and the making of one or more of such deposits or payments or the setting up of such reserve shall not constitute (i) an agreement on Bank's part to take any further or similar action, or (ii) a waiver of any default by Borrower under the terms hereof.

(s)    Borrower hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owing from Borrower to Bank are fully paid and discharged, the right to use all premises or places of business which Borrower presently has or may hereafter have and where any of the Collateral may be located, at a total rental for the entire period of $1.00. Bank agrees not to exercise the rights granted in this paragraph unless and until Bank determines to exercise its rights against the Collateral.

(t)    Borrower will, at its expense, upon request of Bank promptly and duly execute and deliver such documents and assurances and take such actions as may be necessary or desirable or as Bank may request in order to correct any defect, error or omission which may at any time be discovered or to more effectively carry out the intent and purpose of this Agreement and to establish, perfect and protect Bank's security interest, rights and remedies created or intended to be created hereunder. Without limiting the generality of the above, Borrower will join with Bank in executing any notices appropriate under applicable federal or state law in form satisfactory to Bank and filing the same in all public offices and jurisdictions wherever and whenever requested by Bank.

(u)    Borrower shall perform any and all further steps requested by Bank to perfect Bank's security interest in Inventory, such as leasing warehouses to Bank or its designee, placing and maintaining signs, appointing custodians, maintaining stock records and transferring

Inventory to warehouses.  A physical listing of all Inventory, wherever located, shall be taken by Borrower whenever requested by Bank if one or more of the Events of Default exist.

(v)    Borrower hereby grants to Bank for a term to commence on the date of this Agreement and continuing thereafter until all debts and Obligations of any kind or character owed to Bank are fully paid and discharged, a non-exclusive irrevocable royalty-free license in connection with Bank's exercise of its rights hereunder, following an Event of Default, to use, apply or affix any trademark, trade name logo or the like and to use any patents, in which the Borrower now or hereafter has rights, which license may be used by Bank upon and after the occurrence of any one or more of the Events of Default, provided, however, that such use by Bank shall be suspended if such Events of Default are cured.  This license shall be in addition to, and not in lieu of, the inclusion of all of Borrower's trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the Collateral; in addition to the right to use said Collateral as provided in this paragraph, Bank shall have full right to exercise any and all of its other rights regarding Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(w)    At Bank's request, Borrower shall enter into a contract consent in a form prescribed by Bank with the contract party under each material contract in effect from time to time including the contracts listed on Schedule D and shall promptly deliver each such consent to Bank.

## 17.  BORROWER'S NEGATIVE COVENANTS.

(a)    (Operating Cash Flow/Total Fixed Charges)  Borrower will maintain a ratio of its Operating Cash Flow to its Total Fixed Charges of at least 1.25:1.0 for each fiscal quarter, to be measured quarterly, commencing with the quarter ending on or about March 31, 2014 and each subsequent quarter in 2014, on a year-to-date basis, and thereafter to be measured on a rolling four-quarter basis.

(b)    (Distributions)  Borrower will not at any time make distributions to its shareholders during any fiscal year of Borrower if, after giving effect thereto, Borrower will not be in compliance with Section 17(a) hereof.

(c)    (Disposition of Collateral)  Borrower will not at any time sell, assign, exchange or otherwise dispose of any of the Collateral, except Inventory, in accordance with Section 20, and other than  (i) scrap, waste, defective goods and the like; (ii) obsolete goods; and (iii) Equipment which is no longer required or deemed necessary for the conduct of Borrower's business, so long as Borrower receives therefor a sum substantially equal to such Equipment's fair value, remits such sum to Bank in accordance with the terms of this Agreement or replaces such Equipment with other equipment of similar value which is subject to a first security interest in Bank's favor.

(d)    (Liens) Borrower will not at any time create, permit to be created or suffer to exist any lien, encumbrance or security interest of any kind ("**Lien**") upon any of the

25

Collateral or any other property of Borrower, now owned or hereafter acquired, except Liens: (i) consisting of landlords', carriers', warehousemen's, mechanics' and other similar liens arising by operation of law in the ordinary course of Borrower's business; (ii) arising out of pledge or deposits under workers' compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation; (iii) consisting of purchase money Liens arising in the ordinary course of business for the purchase of equipment and software (so long as the indebtedness secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to the purchased item, and any proceeds thereof, and to no other property); (iv) for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of permitted protests; (v) which are the subject of permitted protests; (vi) set forth on Schedule B annexed hereto; and (vii) in favor of Bank; the term "permitted protests" as used herein means the right of the Borrower to protest any Lien (other than a Lien that secures the Obligations), tax (other than payroll taxes or taxes that are the subject of a federal or state tax lien) or rental payment, provided that (x) a reserve with respect to such liability is established on the books of the Borrower in an amount that is reasonably satisfactory to the Bank, (y) any such protest is instituted and diligently prosecuted by the Borrower in good faith, and (z) the Bank is satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of the Bank in and to the Collateral.

      (e)    (Indebtedness) Borrower will not at any time incur indebtedness, assume, or otherwise become directly or contingently liable in respect of, any indebtedness, in excess of $50,000 outstanding at any one time, other than the Line of Credit Loans and the Term Loan hereunder without the express prior written consent of the Bank.

      (f)    (Loans) Borrower will not at any time make any loans or advances to any individual, partnership, trust or other corporation, including without limitation Borrower's directors, officers and employees, except advances to officers or employees with respect to expenses incurred by them in the ordinary course of their duties which are properly reimbursable by Borrower.

      (g)    (Guarantees) Borrower will not at any time assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a debtor or otherwise to assure a creditor against loss), any indebtedness (except guarantees by endorsement of instruments for deposit or collection in the ordinary course of business and guarantees in favor of Bank) of any individual, partnership, trust or other corporation.

      (h)    (Investments) Borrower will not at any time: (i) use any Loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock or securities of any individual, partnership, trust or other corporation except (x) its current holdings consisting of a mutual fund in the amount of approximately $151,000 and a note payable from Falmouth Country Club in the amount of approximately $100,000, (y) readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof or (z) time deposits with or certificates of deposit issued by the Bank.

(i)    (Transactions with Affiliates) Borrower will not at any time enter into any lease or other transaction with any shareholder, officer or affiliate on terms any less favorable than those which might be obtained at the time from persons who (or entities which) are not such a shareholder, officer or affiliate.

(j)    (Subsidiaries) Borrower has no subsidiaries except as set forth on Exhibit A and shall not create any others.

(k)    (Mergers, Consolidations or Sales) Borrower will not at any time: (i) merge or consolidate with or into another entity, or convert into another entity, or participate in a share exchange; (ii) enter into any joint venture or partnership with any person, firm, corporation or other entity; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other person, firm, corporation or other entity, except for the sale of Inventory in the ordinary course of its business; or (d) convey, lease or sell any of its assets to any person, firm, corporation or other entity for less than the fair market value thereof.

(l)    (Change in Legal Status) Borrower will not at any time: (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, and (ii) change its type of organization, jurisdiction or organization or other legal structure.

(m)    (Modification of Capital Structure) Borrower will not allow the structure of the equity interests of Borrower to change from the equity structure that exists on the date of this Agreement, whether by increase or decrease in the number of shares, addition of another class of shares or otherwise.

For purposes of this section: "affiliate" shall mean any person or entity (i) which directly or indirectly controls, or is controlled by or is under common control with the Borrower or a subsidiary, (ii) which directly or indirectly beneficially holds or owns five (5%) percent or more of any class of voting stock of the Borrower or any subsidiary, or (iii) five (5%) percent or more of the voting stock of which is directly or indirectly beneficially owned or held by the Borrower or a subsidiary; "distributions" shall mean all payment or distributions to shareholders in cash or in property other than reasonable salaries, bonuses and expense reimbursements; "indebtedness" shall mean (i) all liabilities for borrowed money, for the deferred purchase price of property or services, and under leases which are or should be, under generally accepted accounting principles, recorded as capital leases, in respect of which a person or entity is directly or indirectly, absolutely or contingently liable as obligor, guarantor, endorser or otherwise, or in respect of which such person or entity otherwise assures a creditor against loss, (ii) all liabilities of the type described in (i) above which are secured by (or for which the holder has an existing right, contingent or otherwise, to be secured by) any lien upon property owned by such person or entity, whether or not such person or entity has assumed or become liable for the payment thereof, and (iii) all other liabilities or obligations which would, in accordance with generally accepted accounting principles, be classified as liabilities of such person or entity; "Operating Cash Flow" shall mean net income after taxes (exclusive of extraordinary gains and losses, gains

27

and losses on the sale of fixed assets and other non-recurring/non-operating income) plus depreciation, amortization and interest expense, less dividends and distributions for owner's income tax liability based on the Borrower's earnings (operating leases are not included in this calculation); "**Total Fixed Charges**" shall mean the sum of interest expense, current maturities of long-term debt and current maturities of capital leases (operating leases are not included in this calculation).

18.    **DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.**

(a)    Upon the occurrence of any one or more of the following events (herein, "**Events of Default**"), Bank may decline to make any or all further Line of Credit Loans hereunder or under any other agreements with Borrower, any and all Obligations of the Borrower to Bank shall become immediately due and payable, at the option of Bank and without further notice or demand. The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between Bank and the Borrower and instruments and papers given Bank by the Borrower, whether such agreements, instruments, or papers now exist or hereafter arise, namely:

(i)    The failure by the Borrower to pay any principal, interest, fees, costs, and expenses due pursuant to this Agreement within five (5) days of the date when due.

(ii)    The failure by the Borrower to pay any other Obligations within five (5) days of Bank's demand therefor.

(iii)    Default by the Borrower in the observance or performance of any of the covenants or agreements of the Borrower contained in Sections 16(a), 16(f), or 17 of this Agreement.

(iv)    The failure by the Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, other than those described in the foregoing clauses (i), (ii) and (iii), or in any other agreement with Bank which is not remedied within the earlier of fifteen (15) days after (i) notice thereof by Bank to Borrower, or (ii) the date Borrower was required to give notice to Bank pursuant to Section 15(a)(iv) hereof.

(v)    The determination by Bank that any representation or warranty heretofore, now or hereafter made by the Borrower to Bank, in any documents, instrument, agreement, or paper was not true or accurate when given in any material respect.

(vi)    The occurrence of any event such that any material indebtedness of the Borrower from any lender other than Bank, could be accelerated, notwithstanding that such acceleration has not taken place.

(vii)    The occurrence of any event that would cause a lien creditor, as that term is defined in Section 9-1102 of the Maine Uniform Commercial Code, to take priority over advances made by Bank.

(viii)    A filing against or relating to the Borrower of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state.

(ix)    The occurrence of any event of default (including any event identified and/or defined as an "Event of Default") and the expiration of any expressly applicable grace or cure periods under any of the Loan Documents or under any other agreement between Bank and the Borrower or any other instrument or paper given Bank by the Borrower, whether such Loan Document or other agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Bank may not have exercised its rights upon default under any such Loan Document or other agreement, instrument or paper).

(x)    Any act by, against, or relating to the Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of the Borrower's property.

(xi)    The granting of any trust mortgage or execution of an assignment for the benefit of the creditors of the Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for the Borrower; the failure by the Borrower to generally pay the debts of the Borrower as they mature; adjudication of bankruptcy or insolvency relative to the Borrower; the entry of an order for relief or similar order with respect to the Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (hereinafter the "Bankruptcy Code") or any other federal bankruptcy law; the filing of any complaint, application, or petition by or against the Borrower initiating any matter in which the Borrower is or may be granted any relief from the debts of the Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; the calling or sufferance of a meeting of creditors of the Borrower; the meeting by the Borrower of a formal or informal creditor's committee; the offering by or entering into by the Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of the Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including the Borrower which seeks or intends to accomplish a reorganization or arrangement with creditors.  If any of the foregoing actions or proceedings are involuntary, and Borrower shall vigorously pursue the vacation or termination of such action or proceeding, then it shall not constitute an Event of Default hereunder if Borrower is successful at having such matter vacated or terminated within sixty (60) days.

29

(xii)    The entry of any judgment(s) against Borrower in an aggregate amount in excess of $50,000.00, which judgment(s) is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry.

(xiii)    The entry of any court order which enjoins, restrains or in any way prevents Borrower from conducting all or any substantial part of its business affairs in the ordinary course of business.

(xiv)    The occurrence of any event or circumstance with respect to the Borrower such that Bank shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Borrower under this Agreement or any other agreement between Bank and the Borrower is materially impaired or there shall occur any material adverse change in the business or financial condition of the Borrower.

(xv)    The service of any process upon Bank seeking to attach by trustee process any funds of the Borrower on deposit with Bank that is not terminated or bonded over to the satisfaction of the Bank in five (5) business days.

(xvi)    Any direct or indirect change in the ownership of the equity interests of the Borrower from that existing at the execution of this Agreement, other than transfers of equity interests among the current shareholders of Borrower and other than other changes in ownership that involve, in the aggregate, up to 10% of the equity of the Borrower.

(xvii)    The occurrence of any material uninsured loss, theft, damage or destruction to any material Collateral.

(xviii)    The death, termination of existence, dissolution or liquidation of the Borrower, or the ceasing to carry on actively any substantial part of Borrower's current business.

(xix)    This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority security interest in and to the property purported to be subject to this Agreement; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by the Borrower, or any Guarantor or any other guarantor of the Borrower denies it has any further liability or obligation hereunder.

(xx)    Any of the following events occur or exist with respect to the Borrower or any ERISA affiliate: (A) any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code) involving any Plan; (B) any "reportable event" (as defined in Section 4043 of ERISA and the regulations issued under such Section) shall occur with respect to any Plan; (C) The filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any

Plan; (D) any event or circumstance exists which might constitute grounds entitling the Pension Benefit Guaranty Corporation (PBGC) to institute proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution by the PBGC of any such proceedings; (E) or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization, insolvency, or termination of any Multiemployer Plan; and in each case above, such event or condition, together with all other events or conditions, if any, could in the opinion of Bank subject the Borrower to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise.

(xxi) The occurrence of (A) any of the Events of Default described in Sections 18(a) (vi), (viii), (ix), (x), (xi), (xii), or (xviii), with respect to any Guarantor or any other guarantor to Bank of the Obligations, as if such Guarantor or other guarantor were the "Borrower" described therein, or (B) the failure by any Guarantor or any other guarantor to Bank of the Obligations to perform in accordance with the terms of any agreement between Guarantor or such other guarantor, as the case may be, and the Bank, and such failure continues beyond any expressly applicable grace or cure period.

Upon the occurrence of an Event of Default, Bank may declare any obligation Bank may have hereunder to be cancelled, declare all Obligations of Borrower to be due and payable and may proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise. Upon the occurrence of, and during the continuance of, an Event of Default, the Borrower, as additional compensation to the Bank for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at the Default Rate.

(b)     Upon the filing of any complaint, application, or petition by or against the Borrower initiating any matter in which the Borrower is or may be granted any relief from the debts of the Borrower pursuant to the Bankruptcy Code, Bank's obligation hereunder shall be canceled immediately, automatically, and without notice, and all Obligations of the Borrower then outstanding shall become immediately due and payable without presentation, demand, or notice of any kind to the Borrower but if such filing is against the Borrower by one or more third parties, only if the Borrower shall fail to contest such filing actively or shall fail to cause it to be removed within sixty (60) days.

(c)     Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Bank deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to the Bank's disposition of the Collateral. The Bank may conduct any such sale or other disposition of the Collateral upon the Borrower's premises. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Bank shall provide the Borrower with such notice as may be practicable under the

31

circumstances), the Bank shall give the Borrower at least the greater of the minimum notice required by law or ten (10) days prior written notice of the date, time and place of any proposed public sale, and of the date after which any private sale or other disposition of the Collateral may be made. The Bank may purchase the Collateral, or any portion of it at any public sale.

(d)      If the Bank sells any of the Collateral on credit, the Borrower will be credited only with payments actually made by the purchaser of such Collateral and received by the Bank. If the purchaser fails to pay for the Collateral, the Bank may re-sell the Collateral and the Borrower shall be credited with the proceeds of the sale.

(e)      In connection with the Bank's exercise of the Bank's rights after the occurrence of an Event of Default, the Bank may enter upon, occupy and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Bank. The Bank shall not be required to remove any of the Collateral from any such premises upon the Bank's taking possession thereof, and may render any Collateral unusable to the Borrower. In no event shall the Bank be liable to the Borrower for use or occupancy by the Bank of any premises pursuant to this Agreement.

(f)      Upon the occurrence of any Event of Default, the Bank may require the Borrower to assemble the Collateral and make it available to the Bank at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Bank and the Borrower.

19.    **STANDARDS FOR EXERCISING REMEDIES.** To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of the Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to

32

insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Bank would not be commercially unreasonable in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to Borrower or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

20. **PROCESSING AND SALES OF INVENTORY; RELEASE OF MORTGAGE.** So long as Borrower is not in default hereunder, Borrower shall have the right, in the regular course of business, to process and sell Borrower's Inventory. A sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt. Upon the written request of Borrower with a specific reference to this section of the Loan Agreement, Bank agrees that it shall discharge the Mortgage but only if (i) there is then no Event of Default (unless Bank has waived such default in writing), or event which, with the passage of time or giving of notice would constitute an Event of Default, and (ii) the principal balance of the Term Note has been reduced to no more than $2,450,000.

21. **WAIVER OF JURY TRIAL.** BORROWER AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. Borrower hereby certifies that neither Bank nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Bank would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury. Borrower acknowledges that Bank has been induced to enter into this Agreement by, among other things, this waiver. Borrower acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

22. **CONSENT TO JURISDICTION.** Borrower and Bank agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in any court of the State of Maine sitting in the County of Cumberland, or in the District Court of the United States for the District of Maine, and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of Maine or the United States of America.

23. **ADVANCES AFTER EVENT OF DEFAULT.** In the event that Bank continues to make Line of Credit Loans hereunder after the occurrence of an Event of Default, all

such Line of Credit Loans: (i) shall be made in the sole and absolute discretion of Bank; and (ii) shall, together with all other Obligations, be payable thereafter **ON DEMAND**.

24. **ACKNOWLEDGMENT OF THE POSITION OF THE PARTIES.** The Borrower acknowledges to and agree with the Bank that the Bank does not directly or indirectly have any obligation or duty of any kind whatsoever to renew or extend any indebtedness of Borrower to the Bank, to extend any further loans or credit to Borrower (except for advances under the Line of Credit Loan in accordance with the terms thereof), to further amend, modify or supplement this Agreement or any power or remedies in any matter whatsoever other than as provided in the loan documents. Notwithstanding any other provision of this Agreement or any other contract or instrument between Borrower and the Bank, the relationship between the Bank and the Borrower shall be limited to the relationship of the lender to a borrower in a commercial loan transaction, as applicable; the Bank is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower (or of any other person), and neither Bank nor the Borrower intend Bank to assume any such status; and the Bank is not and shall not be deemed to be responsible for (or a participant in) any acts, omissions or decisions of Borrower.

25. **MISCELLANEOUS.**

(a)     No delay or omission on the part of Bank in exercising any rights shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Bank's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

(b)     Bank is authorized to make Loans under the terms of this Agreement upon the request, either written or oral, in the name of Borrower or any authorized person whose name appears at the end of this Agreement, or of any of the persons from time to time holding the offices of President or Treasurer of Borrower, or of such other officers and authorized signatories as may from time to time be set forth in any banking and borrowing resolutions, or of any other agents or officers with apparent authority to act for Borrower in requesting loans hereunder.

(c)     This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Bank's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Bank shall release Borrower from its Obligations. Bank may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Bank's rights and benefits hereunder. In connection with any assignment or participation, Bank may disclose all documents and information which Bank now or hereafter may have relating to Borrower or Borrower's business. To the extent that Bank assigns its rights and obligations hereunder to another party, Bank thereafter shall be released

from such assigned obligations to Borrower and such assignment shall effect a novation between Borrower and such other party.

(d)    Unless otherwise provided in this Agreement, all notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to or under this Agreement (each, a **"Notice"**) shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) four (4) business days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one (1) business day after the date of delivery of such Notice to a nationwide, reputable commercial courier service specifying next day delivery:

If to Bank:                    KeyBank National Association
                               One Canal Plaza, Second Floor
                               Portland, Maine 04101
                               Attention: Neil C. Buitenhuys

If to Borrower:                Sure Winner Foods
                               2 Lehner Road, Saco Industrial Park
                               Saco, Maine 04072
                               Attention: Chairman, CEO, CFO

Any party may change the address to which any Notice is to be delivered to any other address within the United States of America by furnishing written Notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such Notice of change shall be effective unless and until received by such other parties. Rejection or refusal to accept, or inability to deliver because of changed address or because no Notice of changed address was given, shall be deemed to be receipt of any such Notice. Any Notice to an entity shall be deemed to be given on the date specified in this paragraph, without regard to when such Notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed. If a Notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with such entity shall not affect the effectiveness of such Notice. Notices may be given on behalf of any party by such party's attorneys.

(e)    Any paragraph and section headings used in this Agreement are for convenience only, and shall not affect the meaning or construction of this Agreement. If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect in any way the validity, legality or enforceability of such provision (or its

35

application) in any other jurisdiction or of any other provision of this Agreement (or its application) in any jurisdiction.

(f)     By signing below, Borrower agrees and acknowledges that, under Maine law, no promise, contract, or agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of a debt for more than $250,000 may be enforced against Bank unless the promise, contract, or agreement (or some memorandum or note thereof) is in writing and signed by Bank.

(g)     Bank may at any time pledge all or any portion of its rights under the Loan Documents including any portion of the Notes to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or enforcement thereof shall release Bank from its obligations under any of the Loan Documents.

(h)     Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to Borrower or any guarantor, to grant to one or more banks or other financial institutions (each, an "Assignee"), and each Borrower and each guarantor agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Agreement and to any other documents, instruments and agreements executed in connection herewith as Bank shall deem necessary to effect the foregoing. In addition, at the request of Bank and any such Assignee, Borrowers shall issue one or more new promissory notes, as applicable, to any such Assignee and, if Bank has retained any of its rights and obligations hereunder following such assignment, to Bank, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by Bank prior to such assignment and shall reflect the amount of the respective commitments and loans held by such Assignee and Bank after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Bank in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Bank, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Bank hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by Bank pursuant to the assignment documentation between Bank and such Assignee, and Bank shall be released from its obligations hereunder and thereunder to a corresponding extent. Bank may furnish any information concerning Borrowers in its possession from time to time to prospective Participants, provided that Bank shall require any such prospective Participant to agree in writing to maintain the confidentiality of such information.

(i)     Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to Borrower or any guarantor, to grant to one or more banks or other financial institutions (each, a "Participant") participating interests in Bank's obligation to lend hereunder and/or any or all of the loans held by Bank hereunder. In the event of any such grant by Bank of a participating interest to a Participant, whether or not upon notice to Borrower, Bank shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Bank in connection with the Bank's rights and

obligations hereunder.    Bank may furnish any information concerning Borrowers in its possession from time to time to prospective Participants, provided that Bank shall require any such prospective Participant to agree in writing to maintain the confidentiality of such information.

(j)    Upon receipt of an affidavit of an officer of Bank as to the loss, theft, destruction or mutilation of the Notes or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement note or other loan document in the same principal amount thereof and otherwise of like tenor.

(k)    All agreements between Borrower and Bank are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Bank for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Agreement shall be governed by such new law as of its effective date.  In this regard, it is expressly agreed that it is the intent of Borrower and Bank in the execution, delivery and acceptance of this Agreement to contract in strict compliance with the laws of the State of Maine from time to time in effect.  If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any promissory note evidencing the  Loans at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever Bank should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance hereunder and not to the payment of interest.  This provision shall control every other provision of all agreements between Borrower and Bank.

(l)    This Agreement, together with the Notes and the other Loan Documents, are intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Agreement.    All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superseded by this Agreement, and no party is relying on any promise, agreement or understanding not set forth in this Agreement. This Agreement may not be amended or modified except by a written instrument describing such amendment or modification executed by Borrower and Bank.

(m)    All instruments executed and delivered in connection with the closing of this loan shall be in form and substance satisfactory to Bank and its counsel. All other matters relating to the law shall be made to meet the satisfaction of such counsel.

(n)    If any payment hereunder or under any promissory note relating hereto becomes due on a day which is not a Business Day, the due date of such payment shall be

extended to the next succeeding Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment.

(o)    Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank or Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(p)    This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maine.  This Agreement shall take effect as a sealed instrument.

**[The next page is the signature page.]**

WITNESSETH:

Name:

Name:

SURE WINNER FOODS

By: _____

Name:  KEITH BENOIT

Title:  CEO

KEYBANK NATIONAL ASSOCIATION

By: _____

Name:  Neil Critchley

Title:  Senior Vice President

## EIGHTH AMENDMENT TO LOAN AND SECURITY AGREEMENT
### (ALL ASSETS)

THIS Amendment is made as of the 25th day of January, 2019 by and between SURE WINNER FOODS, a Maine corporation with a place of business at Lehner Road, Saco, Maine 04072 (hereinafter, together with its permitted successors and assigns hereunder, referred to as the "Borrower") and KEYBANK NATIONAL ASSOCIATION, a national banking association with a place of business at One Canal Plaza, Portland, Maine 04101 (hereinafter, together with its successors and assigns, called the "Bank"), WHO AGREE as follows:

1.    **RECITALS**. Borrower and Bank are parties to a Loan and Security Agreement (All Assets) dated as of May 16, 2014, as amended February 20, 2015, April 26, 2016 May 30, 2016, June 6, 2016, May 25, 2017, August 31, 2017, and January 2, 2018 (the "Loan Agreement") and desire to amend it further.

2.    **AMENDMENT**. The Loan Agreement is hereby amended as follows:

   (a)    The definition of "Credit Limit" in Section 7(d) is hereby changed to mean an amount equal to Fifteen Million Dollars ($15,000,000.00), provided, however, that such term shall mean an amount equal to Twenty Million Dollars ($20,000,000) from and including January 25, 2019, through and including May 24, 2019 (the "**Temporary Period**"); on May 25, 2019 the Credit Limit shall automatically revert to $15,000,000 and the aggregate principal amount of all Line of Credit Loans outstanding in excess of $15,000,000 shall be immediately due and payable without demand or notice from Bank.

3.    **FEES AND EXPENSES**.    Borrower shall pay to Bank a commitment fee of $2,000 upon execution of this Amendment, in connection with the increase in the Credit Limit referred to herein. In addition, Borrower shall pay all of Bank's expenses, including legal fees, in connection with this Amendment.

4.    **NO OTHER CHANGES**.    In all other respects, the Loan Agreement remains unmodified and in full force and effect and is hereby ratified and affirmed. Borrower represents and warrants to Bank that no default now exists under the Loan Agreement. From and after the date of this Amendment, any reference in the Loan Agreement to "this Agreement," and any reference in any of the related documents (including promissory notes) to the Loan Agreement, shall mean such Agreement as amended hereby.

**[The next page is the signature page.]**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered, to be effective as of the date first set forth above regardless of the actual date of execution and delivery.

WITNESSETH:

Name:

SURE WINNER FOODS

By: KEITH BENOIT
Name:
Title: CEO

KEYBANK NATIONAL ASSOCIATION

Name:

By:
Name:
Title:

Eighth Amendment 22 January 2019_12424241(1).DOC 12424241_1 12424241_1

2

**Surewinner**
**13 week Cash Projection**
**5/6/2019 to 7/29/2019**

| | Week Ending=======>>>>> | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 5/6/2019 | 5/13/2019 | 5/20/2019 | 5/27/2019 | 6/3/2019 | 6/10/2019 | 6/17/2019 | 6/24/2019 | 7/1/2019 | 7/8/2019 | 7/15/2019 | 7/22/2019 | 7/29/2019 | Total |
| Cash Receipts | 3,296,376 | 3,184,708 | 3,204,874 | 3,093,692 | 3,257,828 | 3,559,057 | 3,345,855 | 3,440,600 | 4,283,096 | 5,268,986 | 3,893,938 | 4,152,054 | 5,194,426 | 49,175,492 |
| Purchases | 2,077,647 | 3,461,632 | 3,482,631 | 2,140,681 | 1,987,082 | 3,373,459 | 2,800,052 | 3,894,294 | 4,557,837 | 3,446,014 | 3,909,356 | 3,590,702 | 3,998,467 | 42,719,854 |
| Truck Leases | 150,000 | | | | 150,000 | | | | 150,000 | | | | | 450,000 |
| Rent | 59,211 | | | | 59,211 | | | | 59,211 | | | | | 177,633 |
| Long Term Debt Repayment | 152,333 | | | | 152,333 | | | | 152,333 | | | | | 456,999 |
| Fuel | 115,000 | | | | 115,000 | | | | 115,000 | | | | | 345,000 |
| Payroll | 257,819 | 248,759 | 248,747 | 262,740 | 262,906 | 260,000 | 343,830 | 349,102 | 265,239 | 281,387 | 281,238 | 265,988 | 285,979 | 3,613,733 |
| Interest | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 90,000 |
| Benefits | 74,866 | 5,000 | 5,000 | 5,000 | 74,866 | 5,000 | 5,000 | 5,000 | 74,866 | 5,000 | 5,000 | 5,000 | 5,000 | 274,598 |
| Other | 40,000 | 40,000 | 40,000 | 40,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 610,000 |
| Professional Fees | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 360,000 |
| | 2,973,799 | 3,802,315 | 3,823,301 | 2,495,344 | 2,898,321 | 3,715,382 | 3,225,805 | 4,325,319 | 5,451,408 | 3,809,324 | 4,272,516 | 3,938,613 | 4,366,369 | 49,097,817 |
| Change in Cash | 322,577 | (617,607) | (618,427) | 598,348 | 359,508 | (156,325) | 120,050 | (884,719) | (1,168,312) | 1,459,663 | (378,578) | 213,441 | 828,057 | 77,675 |
| Line of Credit - Beginning | 5,653,282 | 5,330,705 | 5,948,312 | 6,566,739 | 5,968,391 | 5,608,884 | 5,765,208 | 5,645,158 | 6,529,877 | 7,698,189 | 6,238,527 | 6,617,105 | 6,403,664 | 5,653,282 |
| Line of Credit - Ending | 5,330,705 | 5,948,312 | 6,566,739 | 5,968,391 | 5,608,884 | 5,765,208 | 5,645,158 | 6,529,877 | 7,698,189 | 6,238,527 | 6,617,105 | 6,403,664 | 5,575,607 | 5,575,607 |



**EXHIBIT B**



# AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT
## (ALL ASSETS)
## (DEBTOR IN POSSESSION FINANCING)

THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (the **"Agreement"**) is made as of the 8th day of May, 2019 by and between SURE WINNER FOODS, a Maine corporation with a place of business at Lehner Road, Saco, Maine 04072, as debtor in possession under the U.S. Bankruptcy case of Borrower, Docket Number 19-20226, (hereinafter, together with its permitted successors and assigns hereunder, referred to as the **"Borrower"**) and KEYBANK NATIONAL ASSOCIATION a national banking association with a place of business at One Canal Plaza, Portland, Maine 04101 (hereinafter, together with its successors and assigns, called the **"Bank"**), WHO AGREE as follows:

Borrower and Bank agree to the following preliminary recitals:

A.      This Agreement amends and restates the Loan and Security Agreement (All Assets) dated as of May 16, 2014, by and between Sure Winner Foods and Bank, as amended February 20, 2015, April 26, 2016, May 30, 2016, June 6, 2016, May 25, 2017, August 31, 2017, January 2, 2018, and January 25, 2019 (the "**Existing Loan Agreement**"), and is not intended as a novation.

B.      This Agreement is being entered into in the context of Borrower's recently filed and on-going Chapter 11 case filed with the United States Bankruptcy Court for the District of Maine (the "**Bankruptcy Court**") under the Bankruptcy Code (the "**Chapter 11 Case**").

C.      This Agreement relates to the DIP Loan, as that term is used in the Interim Order of the Bankruptcy Court, dated May 8, 2019 (the "**Interim Order**").

D.      Borrower and Bank acknowledge that any statements made by Borrower herein relating to the authority of Borrower are expressly subject to the jurisdiction of the Bankruptcy Court and to the Bankruptcy Case.

E.      As of 9:00 a.m. on May 8, 2019, Borrower owed $400,000 in principal amount under the Term Loan (as defined in the Existing Loan Agreement), and $4,998,403.07 in principal amount under the Line of Credit Loan (as defined in the Existing Loan Agreement), in each case along with interest, costs and fees.

F.      Borrower affirms that the value of its current assets that constitute collateral security for the amounts it owes to Bank as described in the Existing Loan Agreement and related documents (the "**Existing Loan Documents**") are more than sufficient to repay all such amounts.

G.      Borrower has requested that Bank not terminate the line of credit facility under the Existing Loan Agreement, or require immediate payment of all amounts due under the Existing Loan Documents, but instead agree to continue to lend new funds under the line of credit to the extent described herein and allow Borrower to repay the line of credit, and the remaining portion of the outstanding term loan, in accordance with the terms of this Agreement in exchange for Borrower's agreement to the changes reflected in this Agreement (including without limitation a reduction in the maximum amount allowed under the line of credit, a change in the interest rates applicable hereunder, the additional conditions to Bank's obligations, and the provision of the additional collateral referred to herein).

H.      Borrower and Bank agree that entering into this Agreement will have the effect of using Borrower's existing assets, including receivables, to pay down Borrower's existing debt to Bank and using any collateral acquired after the date hereof, including new accounts receivable, to repay the new loan proceeds with related interests and costs.

I.      It is an express condition of the Bank's obligation under this Agreement that the Bankruptcy Court shall have approved Borrower's entry into this Agreement, in the form hereof, pursuant to a court order issued on or before May 8, 2019.

1.      **SECURITY INTEREST**. For valuable consideration, the receipt whereof is hereby acknowledged, Borrower hereby reconfirms its grant to Bank of a continuing security interest in and to, and reconfirms its assignment to Bank of, all assets of the Borrower (subject to any liens permitted hereunder), wherever located and whether now owned or hereafter acquired, including, without limitation, the following:

(a)      all inventory, including all goods, merchandise, raw materials and work in process, finished goods, and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of service or used or consumed in Borrower's business (all hereinafter called the **"Inventory"**);

(b)      all accounts as defined in Article 9 of the Uniform Commercial Code, (hereinafter **"Accounts"**), contracts, contract rights, notes, bills, drafts, acceptances, general intangibles (including without limitation registered and unregistered tradenames, copyrights, customer lists, goodwill, computer programs, computer records, computer software, computer data, trade secrets, servicemarks, trademarks, patents, ledger sheets, files, records, data processing records relating to any Accounts and all tax refunds of every kind and nature to which Borrower is now or hereafter may become entitled to, no matter how arising), instruments, documents, chattel paper (whether tangible or electronic) deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, security entitlements, security accounts, investment property, supporting obligations, choses in action, commercial tort claims, and all other debts, obligations and liabilities in whatever form, owing to Borrower from any person, firm or corporation or any other legal entity, whether now existing or hereafter arising, now or hereafter received by or belonging or owing to Borrower, for goods sold by it or for services rendered by it, or however otherwise same may have been established or created, all guarantees and securities therefor, all right, title and interest of Borrower in the merchandise or services which gave rise thereto, including the rights of reclamation and stoppage in transit, all rights to replevy goods, and all rights of an unpaid seller of merchandise or services;

(c)      all machinery, equipment, fixtures and other similar goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired by the Borrower and wherever located, all replacements and substitutions therefor or accessions thereto and all proceeds thereof (all hereinafter called the **"Equipment"**);

(d)      all moneys, securities and other property (and the proceeds thereof) now or hereafter held or received by, or in transit to Bank, from or for it, whether for safekeeping,

2

pledge, custody, transmission, collection or otherwise and all credits and balances of it, with Bank at any time existing;

(e)     all goods, machinery, equipment and all of Borrower's other tangible personal property (to the extent not included within Inventory or Equipment), now owned or hereafter acquired and wherever located, as well as all of Borrower's right, title and interest in and to any such goods as may be now or hereafter held or used by Borrower under any lease, lease-purchase, conditional sales, use or other agreements under which Borrower is or may become entitled to the use and possession thereof, with any and all other rights and benefits flowing from or under such agreements, all as may be used, useful or bought for use in connection with the ownership and/or operation of Borrower's business, and any operations incidental to or associated with the same, or otherwise, and all service contracts relating to any of the foregoing, all whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all additions and accessions thereto;

(f)     all right, title and interest of Borrower in any Master Swap Agreement between Borrower and Bank that may be entered into in the future, and each transaction entered into thereunder including, without limitation, all amounts payable or deliverable thereunder and the benefit of any guarantee or other credit support in connection therewith;

(g)     the proceeds of any commercial tort claim arising out of or relating to Borrower's dispute with Nestlé S.A. and any of its affiliates, including without limitation Nestlé Dreyer's Ice Cream Company ("**Nestlé**" and such dispute being referred to as the "**Nestlé Dispute**"); and

(h)     all proceeds and products of all of the foregoing in any form, including, without limitation, all proceeds of credit, fire or other insurance, and also including, without limitation, rents and profits resulting from the temporary use of any of the foregoing (all of the assets described in this Section 1, together with any other property or interests that are now or hereafter subject to the Security Documents (defined below), are sometimes hereinafter referred to as the "**Collateral**").

2.     **ADDITIONAL DEFINITIONS**.  In addition to the other defined terms herein, including in Section 10(b), as used in this Agreement, the following capitalized words shall have the following meanings:

"**Default Rate**" means a fluctuating rate that is the daily equivalent to a rate equal to the aggregate of: (x) the Prime Rate (as defined below), and (y) four percent (4%) per annum.

"**Loans**" means, collectively, the Term Loan (as defined below) and the Line of Credit Loan (as defined below), and "**Loan**" means either the Term Loan or the Line of Credit Loan.

"**Loan Documents**" means, collectively, this Agreement, the Line of Credit Note (as

3

defined below), the Term Note (as defined below), the Security Documents, the Hazardous Materials Indemnity Agreement of or about even date herewith and all other agreements, documents and instruments now or hereafter evidencing, securing or otherwise relating to the Obligations, each as amended, replaced, extended, renewed, restated, or otherwise modified from time to time.

**"Mortgage"** means the Mortgage and Security Agreement of or about even date herewith from Borrower to the Bank with respect to the Borrower's property in Saco, Maine.

**"Notes"** means, collectively, the Line of Credit Note (as defined below) and the Term Note (as defined below), together with any and all amendments and modifications thereto, substitutions therefor, and renewals, restatements and extensions thereof, and **"Note"** means any of the Notes.

**"Operating Budget"** means the weekly budget submitted by Borrower in accordance with Section 15(a)(iii); each such Operating Budget requires review and approval by Bank pursuant to Section 7(g).

**"Out of Formula Advances"** means the amount by which the principal balance of all outstanding Line of Credit Loans exceeds the Borrowing Base (as defined below).

**"Overline Advances"** means the amount by which the principal balance of all outstanding Line of Credit Loans exceeds the Credit Limit (as defined below).

**"Premises"** means the real property in Saco, Maine that is owned by the Borrower and the buildings and other improvements thereon, and which on the date hereof is subject to the Mortgage.

**"Security Documents"** means this Agreement, the Mortgage, any UCC-1 Financing Statements filed by Bank with respect to its interest in the Collateral, and any other agreement, document or instrument now or hereafter securing the Obligations or any portion thereof, each together with all modifications and amendments thereto, restatements thereof and substitutions therefor.

3.    **OBLIGATIONS SECURED**.  The security interest reaffirmed hereby is to secure payment and performance of all debts, liabilities and obligations of Borrower to Bank hereunder and under the Line of Credit Note and the Term Note, and also any and all other debts, liabilities and obligations of Borrower to Bank of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the transactions described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting or reaffirming of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, fees, charges, expenses and

4

overdrafts, and also including, without limitation, all obligations and liabilities which Bank may incur or become liable for, on account of, or as a result of, any transactions between Bank and Borrower including any which may arise out of any letter of credit, acceptance or similar instrument or obligation issued or caused to be issued pursuant to this Agreement, and further including any obligations arising under any credit card or purchase card receivables, currency swaps, electronic fund transfers (whether through automated clearing houses or otherwise), provisional credit, check cashing, foreign exchange transactions, futures, options, collars, interest rate swaps, caps, floors, forward rate or other interest rate protection agreements, or similar agreements and all obligations of the Borrower to the Bank arising out of or in connection with any Automated Clearing House ("ACH") agreements relating to the processing of ACH transactions, together with all fees, expenses, charges and other amounts owing by or chargeable to the Borrower under any ACH agreements (all hereinafter called **"Obligations"**).

4.    **BORROWER'S PLACES OF BUSINESS, INVENTORY LOCATIONS AND SUBSIDIARIES**.  Borrower warrants that Borrower has no places of business other than the Premises and as listed on <u>Schedule A</u>, annexed hereto.  Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that indicated as such on Schedule A.  All Inventory presently owned by Borrower is stored at the locations set forth on Schedule A and no other places.  Borrower will obtain a landlord's consent from each landlord of leased premises where any material portion of Inventory is stored and a bailee's consent from each bailee holding any material portion of Inventory, in each case on such forms as Bank may require from time to time. Borrower will promptly notify Bank in writing of any change in the location of any place of business or the location of any Inventory or the establishment of any new place of business or location of Inventory or office where its records are kept which would be shown in this Agreement if it were executed after such change.

5.    **BORROWER'S    ADDITIONAL    REPRESENTATIONS    AND WARRANTIES**.  Borrower represents and warrants that:

(a)    Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Maine and shall hereafter remain in good standing as a corporation in that state, and is duly qualified and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of the Borrower.

(b)    Borrower's exact legal name is as set forth in this Agreement.

(c)    The Borrower's shareholders and their respective ownership interests in the Borrower, is as set forth on <u>Schedule A</u>.

(d)    The execution, delivery and performance of this Agreement, and the other Loan Documents, are within the Borrower's corporate powers, have been duly authorized, are not in contravention of law or the terms of the Borrower's articles of incorporation, bylaws or

5

other organizational documents, or of any indenture, agreement or undertaking to which the Borrower is a party or by which it or any of its properties may be bound.

(e)     All shares in Borrower that are issued and outstanding were and are properly issued and all books and records of Borrower, including but not limited to its stock register, minute books and books of account, are accurate and up to date and will be so maintained.

(f)     Borrower owns all of the assets reflected in the most recent of Borrower's financial statements that have been provided to Bank, except assets sold or otherwise disposed of in the ordinary course of business since the date thereof, and such assets together with any assets acquired since such date, including without limitation the Collateral, are free and clear of any lien, pledge, security interest, charge, mortgage or encumbrance of any nature whatsoever, except for the Bankruptcy Case and (i) the security interests and other encumbrances (if any) listed on Schedule B annexed hereto, (ii) those leases of personal property set forth on Schedule C annexed hereto, (iii) those liens permitted pursuant to Section 17(d) of this Agreement, or (iv) liens and security interests in favor of Bank.

(g)     Borrower has made or filed all tax returns, reports and declarations relating to any material tax liability required by any jurisdiction to which it is subject (any tax liability which may result in a lien on any Collateral being hereby deemed material); has paid all taxes shown or determined to be due thereon except those being contested in good faith and which Borrower has, prior to the date of such contest, identified in writing to Bank as being contested; and has made adequate provision for the payment of all taxes so contested, so that no lien will encumber any Collateral, and in respect of subsequent periods.

(h)     Borrower (i) is subject to no organizational or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction, other than the Bankruptcy Case and the Nestlé Dispute, which could have a material adverse effect on its financial condition, business or prospects, and (ii) is in compliance with its organizational documents, all contractual requirements by which it or any of its properties may be bound and all applicable laws, rules and regulations (including without limitation those relating to environmental protection) other than laws, rules or regulations the validity or applicability of which it is contesting in good faith, or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of any Collateral.

(i)     There is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of any Collateral, other than the Nestlé Dispute and the Bankruptcy Case.

(j)     Borrower is in compliance with ERISA; no Reportable Event has occurred and is continuing with respect to any Plan; and it has no unfunded vested liability under any

6

Plan.  The word **"Plan"** as used in this Agreement means any employee plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended (**"ERISA"**) maintained for employees of Borrower, any subsidiary of Borrower or any other trade or business under common control with Borrower within the meaning of Section 414(c) of the Internal Revenue Code of 1986, as amended, or any regulations thereunder.

6.     **TERM LOAN.**

(a)     Borrower acknowledges that Bank made a term loan to Borrower on May 16, 2014, in the original principal amount of  Four Million Nine Hundred Thousand and 00/100 Dollars ($4,900,000) (the "**Term Loan**").  The principal amount remaining due under the Term Loan as of the date hereof is $400,000.00. The Term Loan is due on May 16, 2021, if not sooner called in accordance with the terms hereof (the "**Term Loan Maturity Date**") and is evidenced by and repayable in accordance with a term note drawn to the order of Bank and dated May 16, 2014, as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor (the "**Term Note**").

(b)     Principal amounts advanced and repaid under the Term Note may not be reborrowed.

(c)     The amount outstanding under the Term Loan from time to time shall bear interest at the One Month LIBOR Rate plus the LIBOR Rate Margin, except that LIBOR Rate Loans may not be available to Borrower after the occurrence and during the continuation of an Event of Default, in which case the interest rate would be the Prime Rate plus the Prime Rate Margin, plus the Default Rate (see Section 10 for definitions of certain defined terms).  The Term Loan shall be paid in monthly installments of principal as set forth in the Term Note, plus accrued interest, sufficient to repay the Term Loan in full on the Term Loan Maturity Date.

(d)     Borrower shall have the right to prepay the amounts due under the Term Loan only as follows.  Borrower shall have the right at any time to prepay any Prime Rate Loan without premium or penalty hereunder (but subject to the terms of any swap or similar agreements), provided that any amount prepaid shall be accompanied by accrued interest on the principal repaid to the date of payment.  To the extent that a Loan is a LIBOR Loan, then Borrower shall have the right to prepay such Loan only on the expiration of the applicable Interest Period (as defined in Section 10), as a whole or in part (but subject to the terms of any swap or similar agreements), upon prior notice to the Bank, provided that such prepayment shall be accompanied by accrued interest through the date of prepayment.  Such optional prepayment privilege is in addition to, and not in substitution of, any repayment of principal required or otherwise contemplated under this Agreement.  Borrower may provide notice of its election hereunder in writing or by telephone, provided, however, that any telephonic notice shall follow such procedures as Bank may require and Bank shall have no duty to confirm the authority of a person making a telephonic request.  Borrower shall pay to Bank, upon request of Bank, such amount or amounts as shall be sufficient (in the reasonable opinion of Bank) to compensate it for any loss, cost, or expense incurred  ("**Breakage Costs**") as a result of:  (i) any payment of a

7

LIBOR Loan on a date other than the last day of the Interest Period for such Loan, whether such payment is payable because of demand, default or otherwise; (ii) any failure by Borrower to borrow a LIBOR Loan on the date specified by Borrower's written notice; (iii) any failure by Borrower to pay a LIBOR Loan on the date for payment specified in Borrower's written notice.

7.     **LINE OF CREDIT LOANS.**

(a)     Provided that there has not occurred an Event of Default or an event that, with notice or the lapse of time or both, would constitute an Event of Default, Bank agrees, from time to time upon Borrower's request made in accordance with Section 10 hereof, to make advances (each, a **"Line of Credit Loan"** and, collectively, the **"Line of Credit Loans"**) to Borrower so long as the sum of the aggregate principal amount of all Line of Credit Loans outstanding and the requested Line of Credit Loan does not exceed the lesser of (i) the Borrowing Base (as defined below), or (ii) the Credit Limit (as defined below)(the **"Maximum Availability"**). The proceeds of the Line of Credit Loans shall be used to provide Borrower with working capital and for general corporate purposes but may only be used to fund expenses within such categories to the extent they are within the Operating Budget that relates to the time that the disbursement is requested and that has been approved by Bank. Each Line of Credit Loan shall be in the minimum aggregate amount of Ten Thousand Dollars ($10,000) and any integral multiple thereof.

(b)     All Line of Credit Loans shall be evidenced by and repayable in accordance with a revolving note drawn to the order of Bank, as the same may hereafter be amended, supplemented or restated from time to time and any note or notes issued in substitution therefor (the **"Line of Credit Note"**), but in the absence of the Line of Credit Note shall be conclusively evidenced by Bank's records of Line of Credit Loans and repayments. All Line of Credit Loans shall bear interest upon the principal sum thereof from time to time advanced at the Overnight LIBOR Rate plus the LIBOR Rate Margin. Interest will be charged to Borrower as set forth in the Line of Credit Note, upon any balance owing to Bank at the close of each day and shall be payable (i) at the end of each Interest Period, for LIBOR Rate Loans; (ii) on June 6, 2019 (the **"Line Maturity Date"** and together with the Term Loan Maturity Date, each a **"Maturity Date"**); provided, however, the Line Maturity Date may be extended in writing by Bank from time to time, in its sole discretion, in which case such extended date shall be the "Line Maturity Date"; (iii) on acceleration of the time for payment of the Obligations pursuant to Section 18 hereof; and (iv) on the date the Obligations are paid in full. Borrower shall pay to Bank, upon request of Bank, any Breakage Costs as a result of: (i) any payment of a LIBOR Loan on a date other than the last day of the Interest Period for such Loan, whether such payment is payable because of demand, default or otherwise; (ii) any failure by Borrower to borrow a LIBOR Loan on the date specified by Borrower's written notice; (iii) any failure by Borrower to pay a LIBOR Loan on the date for payment specified in Borrower's written notice. Borrower shall make monthly payments of accrued interest on the Line of Credit Loan.

(c)     The term **"Borrowing Base"** as used herein shall mean the sum of (i) eighty percent (80%) of the unpaid face amount of Qualified Accounts (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to

8

Borrower, if Bank determines in its reasonable judgment that there has been a change in circumstances relating to any or all Accounts from those circumstances in existence on or prior to the date hereof, and (ii) fifty percent (50%) of the value of Qualified Inventory (as defined below) or such other percentage thereof as may from time to time be fixed by Bank upon notice to Borrower, if Bank determines in its reasonable judgment that there has been a change in circumstances relating to any or all Inventory from those circumstances in existence on or prior to the date hereof.

(d)     The term **"Credit Limit"** as used herein shall mean an amount equal to Seven Million Dollars ($7,000,000).

(e)     The Borrowing Base formula set forth above is intended solely for monitoring purposes.  The making of Line of Credit Loans, advances, and credits by Bank to the Borrower in excess of the above described Borrowing Base formula is for the benefit of the Borrower and does not affect the obligations of Borrower hereunder; all such Line of Credit Loans constitute Obligations and must be repaid by Borrower in accordance with the terms of this Agreement.

(f)     Borrower shall pay to Bank the principal amount of all Line of Credit Loans as follows:

(i)     <u>Borrowing Base Exceeded</u>. Whenever the outstanding principal balance of all Line of Credit Loans exceeds the Borrowing Base, Borrower shall immediately pay to Bank all Out of Formula Advances.

(ii)     <u>Credit Line Exceeded</u>. Whenever the outstanding principal balance of all Line of Credit Loans exceeds the Credit Line, Borrower shall immediately pay to Bank all Overline Advances.

(iii)     <u>Payment in Full on Line Maturity Date</u>. On the Line Maturity Date or, if sooner, acceleration of the obligations pursuant to Section 18, Borrower shall pay to Bank the entire outstanding principal balance of all Line of Credit Loans.

(g)     Upon Borrower's delivery to Bank of each weekly Operating Budget as required in Section 15(a)(iii), Bank shall review such Operating Budget and shall communicate any objections to Borrower which shall submit a revised budget promptly in response to such objections. Bank agrees to review each Operating Budget and to communicate any objections to Borrower promptly. Borrower agrees that it shall not be entitled to any Line of Credit Loans except to the extent the requested funds are used only for the purposes set forth in an Operating Budget covering the applicable period and approved by Bank.  Bank's approval of an Operating Budget pursuant to this provision is solely for Bank's internal purposes and shall not be deemed a determination by Bank as to the advisability of the proposed expense, it being Borrower's sole responsibility to determine the advisability of any given expense.

9

8.     **DEFINITION OF QUALIFIED ACCOUNT.** The term **"Qualified Account"**, as used herein, means an Account owing to Borrower which met the following specifications at the time it came into existence and continues to meet the same until it is collected in full:

(a)     The Account is not more than ninety (90) days from the date of the invoice thereof.

(b)     The Account arose from the performance of services or an outright sale of goods by Borrower, such goods have been shipped to the account debtor, and Borrower has possession of, or has delivered to Bank, shipping and delivery receipts evidencing such shipment.

(c)     The Account is not subject to any prior assignment, claim, lien, or security interest, and Borrower will not make any further assignment thereof or create any further security interest therein, nor permit Borrower's rights therein to be reached by attachment, levy, garnishment or other judicial process.

(d)     The Account is not a contra account, or otherwise subject to setoff, credit, allowance, or adjustment by the account debtor, except discount allowed for prompt payment and the account debtor has not complained as to his liability thereon and has not returned any of the goods from the sale of which the Account arose. For purposes of this sub paragraph (d), Bank agrees to credit Borrower with otherwise valid Accounts due from Nestlé notwithstanding the Nestlé Dispute, provided that Nestlé does not assert the right to any setoff, credit, allowance, or adjustment.

(e)     The Account arose in the ordinary course of Borrower's business and did not arise from the performance of services or a sale of goods to a supplier or employee of the Borrower.

(f)     No notice of bankruptcy or insolvency of the account debtor has been received by or is known to the Borrower.

(g)     The Account is not owed by an account debtor located outside the United States of America unless such Account is covered by accounts receivable insurance satisfactory to Bank.

(h)     The Account is not owed by an entity that is a parent, brother/sister, subsidiary or affiliate of Borrower.

(i)     The Account is not evidenced by a promissory note.

(j)     The Account did not arise out of any sale made on a bill and hold, guaranteed sale, sale and return, sale on approval, consignment, dating or delayed shipment basis or any other repurchase or return basis and is not evidenced by chattel paper.

10

(k)     The Account is not owed by the United States of America, any state or any department, agency or instrumentality of any of them, unless Borrower assigns its right to payment of such Account to Bank pursuant to the Federal Assignment of Claims Act of 1940, as amended or has otherwise complied with other applicable statutes or ordinances.

(l)     The Account does not arise out of a progress billing in excess of the scheduled billing therefor.

(m)     Bank, in accordance with its normal credit policies, has not deemed the Account to be unacceptable in its reasonable judgment.

PROVIDED THAT if at any time twenty percent (20%) or more of the aggregate amount of the Accounts due from any account debtor are unpaid in whole or in part more than ninety (90) days from the respective dates of invoice, from and after such time none of the Accounts (then existing or hereafter arising) due from such account debtor shall be deemed to be Qualified Accounts until such time as all Accounts due from such account debtor are (as a result of actual payments received thereon) no more than ninety (90) days from the date of invoice; Accounts payable by Borrower to an account debtor shall be netted against Accounts due from such account debtor and the difference (if positive) shall constitute Qualified Accounts from such account debtor for purposes of determining the Borrowing Base (notwithstanding paragraph (d) above); characterization of any Account due from an account debtor as a Qualified Account shall not be deemed a determination by Bank as to its actual value nor in any way obligate Bank to accept any Account subsequently arising from such account debtor to be, or to continue to deem such Account to be, a Qualified Account; it is Borrower's responsibility to determine the creditworthiness of account debtors and all risks concerning the same and collection of Accounts are with Borrower; and all Accounts whether or not Qualified Accounts constitute Collateral.

9.     **DEFINITION OF QUALIFIED INVENTORY.**    The term **"Qualified Inventory"**, as used herein, means, at the relevant time of reference thereto, the lower of cost or fair market value of all Inventory owned by Borrower and located at the Premises, including both raw materials and finished goods held for sale, in which Bank has a perfected first security interest, underlined provided that Qualified Inventory shall not include any inventory (a) held on consignment, or not otherwise owned by Borrower, or of a type no longer sold by Borrower, (b) which has been returned by a customer or is damaged or subject to any legal encumbrance other than Permitted Liens, (c) which has been shipped to a customer of Borrower regardless of whether such shipment is on a consignment basis, (d) which consists of supplies or packaging materials, or (e) which in the reasonable judgment of Bank is obsolete or not marketable. Notwithstanding the foregoing, Bank reserves the right to limit the amount of Inventory provided by Nestlé that qualifies as "Qualified Inventory" hereunder if Nestlé asserts the right to any setoff, credit, allowance, or adjustment with respect to its Accounts or its Inventory.

10.     **LOAN REQUEST PROCEDURE; INTEREST RATE PROVISIONS**.

(a)     Loan Request Procedure:  The Term Loan was disbursed in a single disbursement and the Borrower irrevocably requested that the entire amount be advanced as a LIBOR Rate

11

Loan, and any unamortized portion be automatically rolled over into another LIBOR Rate Loan at the expiration of each Interest Period (unless there is an Event of Default or the Interest Period for such new LIBOR Rate Loan would not be allowed hereunder, in which case no such request will be honored hereunder).  The Borrower may request Line of Credit Loans on any Business Day prior to the Line Maturity Date, provided there is then no Event of Default hereunder; and further provided that Borrower shall give Bank prior notice (which notice must be received by Bank prior to 11:00 a.m. Portland, Maine time) two (2) Business Days prior to the requested advance date, specifying in each case: (i) the amount to be borrowed, (ii) the requested borrowing date (which must be a Business Day), (iii) showing in detail how the requested advance is within the Operating Budget relating to the date of the requested advance that has been approved by Bank in accordance with Section 7(g).  Any such request shall constitute Borrower's affirmation of the representations and warranties in Sections 4 and 5 hereof, as of the date of such request. Borrower may provide notice of an election hereunder in writing or by telephone, provided, however, that any telephonic notice shall follow such procedures as Bank may require and Bank shall have no duty to confirm the authority of a person making a telephonic request.  Borrower agrees that any requests for advances of Line of Credit Loans shall be at least $10,000 and that there shall be no more than ten (10) LIBOR Rate Loans in effect at any given time.  LIBOR Rate Loans shall be made available to the Borrower no later than 11:00 a.m. Portland, Maine time on the first day of the applicable LIBOR Interest Period, by deposit to the account of the Borrower at the Bank as shall have been specified in its borrowing request. Borrower shall be deemed to have requested that each LIBOR Rate Loan be rolled over into another LIBOR Rate Loan (unless there is an Event of Default or the Interest Period for such new LIBOR Rate Loan would not be allowed hereunder, in which case no such request will be deemed to have been made hereunder). If, because of the introduction of or any change in, or because of any judicial, administrative, or other governmental interpretation of, any law or regulation, it becomes unlawful for Bank to make, fund, or maintain any LIBOR Rate Loan, then (a) Bank shall notify Borrower that Bank is no longer able to maintain the interest rate at a rate based on the LIBOR Rate and Borrower's ability to elect LIBOR Rate Loans shall immediately terminate, and (b) LIBOR Loans for which the interest rate is then the Overnight LIBOR Rate shall automatically be converted to Prime Rate Loans, and (c) LIBOR Loans for which the interest rate is then the One Month LIBOR Rate shall automatically be converted to Prime Rate Loans, and Borrower shall pay to Bank the amount of Breakage Costs incurred in connection with such conversion.  Thereafter, Borrower shall not be entitled to elect LIBOR Rate Loans until such time as the situation described herein is no longer in effect.

      (b)    <u>Certain Definitions</u>:  The following terms used herein, and in any notes or other documents relating hereto, shall have the following meanings:

      **"Business Day"** means (a) any day which is neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Maine; and (b) when such term is used to describe a day on which a borrowing, payment, prepayment or repayment is to be made in respect of a LIBOR Rate Loan (a "**LIBOR Business Day**"), any day which is (i) neither a Saturday or Sunday nor a legal holiday on which commercial banks are authorized or required to be closed in Maine or in New York City; and (ii) a London Business

Day; and ( c) when such term is used to describe a day on which an interest rate determination is to be made in respect of a LIBOR Rate Loan, any day which is a London Banking Day.

"**Interest Period**" means:  relative to any LIBOR Rate Loans, (i) for Loans bearing interest at the Overnight LIBOR Rate, it means the period commencing on the day on which such Loan is made, continued, or converted and continuing overnight, with successive periods commencing daily thereafter, and (ii) for Loans bearing interest at the One Month LIBOR Rate, it means the period commencing on the date an advance bearing interest at the LIBOR Rate is made, continued, or converted and continuing for a period of one month, with successive periods commencing on the same day of each month thereafter; provided, however, that (i) if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month and the applicable rate is the One Month LIBOR, in which case such Interest Period shall end on the first preceding Business Day; and (ii) no Interest Period may end later than the applicable Maturity Date.

"**Interest Rate**" means either the Overnight LIBOR Rate, the One Month LIBOR Rate or the Prime Rate.

"**LIBOR Rate Loan**" means any Loan for the period when the rate of interest applicable to such Loan is calculated by reference to the LIBOR Rate.

"**LIBOR Rate**" means, relative to any LIBOR Interest Period for a LIBOR Rate Loan, the rate per annum calculated by Bank in good faith, which Bank determines with reference to the rate per annum (rounded upwards to the next higher whole multiple of 1/16th if such rate is not such a multiple) at which deposits in United States dollars are offered by prime banks in the London interbank eurodollar market (i) two LIBOR Business Days prior to the day on which such rate is calculated by Bank, based on a one-month maturity (for the "One Month LIBOR Rate"), or (ii) on the LIBOR Business Day on which such rate is calculated by Bank, based on a daily rate (for the "Overnight LIBOR Rate").  For the Term Note the initial One Month LIBOR Rate shall be the One Month LIBOR Rate determined by Bank on the first day of the month in which the Term Note is issued; thereafter, the One Month LIBOR Rate shall be adjusted by Bank on the first day of each succeeding month. If the first day of such month falls on a day that is not a LIBOR Business Day, then Bank shall determine the One Month LIBOR Rate on the LIBOR Business Day immediately preceding the first day of such month, effective as of the first day of such month.  In the event that the LIBOR Rate is determined to be less than zero, such LIBOR Rate shall be deemed to be zero for purposes of this Agreement.

"**LIBOR Rate Margin**" means 4.75% per annum, with respect to the Term Loan and the Line of Credit Loan.

"**Loan**" means a loan, sometimes referred to herein as an advance, made to Borrower by Bank, of the entire amount of the Term Loan at closing, or of a portion of the Maximum Availability for Line of Credit Loans from time to time pursuant to Section 7 of this Agreement,

and "Loans" means all of such loans, collectively.  In certain instances the term "Loan" is used to mean all of such loans, collectively.

**"London Banking Day"** means a day on which dealings in US dollar deposits are transacted in the London interbank Eurodollar market.

**"One Month LIBOR Rate"** means the rate obtained by dividing (x) the rate determined in accordance with the portion of the definition of LIBOR Rate that is used for determining the One Month LIBOR Rate by (y) a percentage equal to one hundred percent (100%) minus the Reserve Percentage.

**"Overnight LIBOR Rate"** means the rate obtained by dividing (x) the rate determined in accordance with the portion of the definition of LIBOR Rate that is used for determining the Overnight LIBOR Rate by (y) a percentage equal to one hundred percent (100%) minus the Reserve Percentage.

**"Prime Rate"** shall mean the rate per annum designated as the "Prime Rate" in The Wall Street Journal as the base rate posted by 70% of the nation's largest banks.  If more than one such rate is published on any given day, the highest published rate shall be used to determine the Prime Rate.  If The Wall Street Journal ceases to publish a "Prime Rate," the Bank may choose a substitute source for the Prime Rate or may choose a substitute index.  If the Bank chooses a substitute index, it may also choose a substitute margin so that the new index and margin result in an interest rate substantially similar to the Prime Rate in effect at the time the Prime Rate ceases to be published in The Wall Street Journal. Any change In the Prime Rate shall be effective immediately from and after such change in the Prime Rate. Interest accruing by reference to the Prime Rate shall be calculated on the basis of actual days elapsed and a 360-day year. The Borrower acknowledges that the Bank may make loans to its customers above, at or below the Prime Rate.

**"Prime Rate Loan"** means any Loan for the period when the rate of interest applicable to such Loan is calculated by reference to the Prime Rate.

**"Prime Rate Margin"** means 3% per annum with respect to the Term Loan and the Line of Credit Loan.

**"Reserve Percentage"** means for any LIBOR Interest Period, that percentage which is specified three (3) business days before the first day of the such LIBOR Interest Period by the Board of Governors of the Federal Reserve System (or any successor) or any other governmental or quasi-governmental authority with jurisdiction over Bank for determining the maximum reserve requirement (including, but not limited to, any basic, supplemental, marginal, emergency reserve requirement) for Bank with respect to liabilities or assets constituting or including (among other liabilities) "Eurocurrency liabilities" (as defined in Regulation D of the Board of Governors of the Federal Reserve System) in an amount equal to that of the advances affected by such LIBOR Interest Period and with a maturity equal to the LIBOR Interest Period.

14

11.    **CONDITIONS OF LENDING.**

(a)    The obligation of Bank to make the first Line of Credit Loan under this Agreement on or about the date hereof shall be subject to the condition precedent that Bank shall have received all of the following, each in form and substance satisfactory to Bank:

(i)    This Agreement, properly executed on behalf of Borrower.

(ii)    An Amended and Restated Line of Credit Note drawn to the order of Bank.

(iii)    The Mortgage properly executed and notarized.

(iv)    All of the other DIP Loan Documents properly executed on behalf of the respective parties thereto.

(v)    Current searches of appropriate filing offices showing that (A) no financing statements have been filed and remain in effect against Borrower, except those financing statements relating to liens set forth on Schedule "B", the liens of the secured lender to be paid with the proceeds of the initial Loans and those financing statements filed by the Bank, and (B) the Bank has duly filed all financing statements necessary to perfect the security interests granted hereunder, to the extent the security interests are capable of being perfected by filing.

(vi)    A certificate from the Secretary or Clerk of the Borrower, certifying as to (A) the resolutions of the shareholders of Borrower, authorizing the execution, delivery and performance of this Agreement and related documents, (B) the Articles of Incorporation and Bylaws of Borrower, and (C) the specimen signatures of the officers or agents of Borrower authorized to execute and deliver this Agreement and other instruments, agreements and certificates, including loan requests, on behalf of Borrower.

(vii)    A current certificate issued by the Secretary of State of the state of the Borrower's organization, certifying that Borrower is in compliance with all organizational requirements of such state.

(viii)    Evidence that Borrower is duly licensed or qualified to transact business in Maine and in all other jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.

(ix)    An order of the Bankruptcy Court approving the DIP Loan Documents, in form and substance satisfactory to Bank in its sole discretion.

(x)    Certificates of the insurance required hereunder, with all hazard

15

insurance containing a lender's loss payable endorsement in favor of Bank.

(xi)    Payment of the fees due through the date of the Closing and expenses incurred by Bank through such date required to be paid by Borrower pursuant to this Agreement, including, without limitation, a DIP loan fee of $140,000.

(xii)    A Borrowing Base Certificate in the form specified by the Bank indicating that the Line of Credit Loans outstanding on the date hereof do not exceed the Borrowing Base.

(xiii)    Such other documents, instruments and agreements as Bank in its sole discretion may require.

(b)    The obligation of Bank to make each Line of Credit Loan after the date of this Agreement shall be subject to the further conditions precedent on such date:

(i)    the representations and warranties contained in Sections 4 and 5 hereof are correct on and as of the date of such Line of Credit Loan as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date; and

(ii)    no event has occurred and is continuing, or would result from such Line of Credit Loan which constitutes an Event of Default or which, with notice or the passage of time or both, would constitute an Event of Default.

(c)    Although Bank is not requiring that Borrower enter into a lock box agreement or similar arrangement with respect to Accounts, as of the date hereof, beyond the requirements of Section 13, Bank expressly reserves the right at any time hereafter to require Borrower to enter into a lock box agreement reasonably satisfactory to Bank and nay other similar arrangements in order better to secure Bank's rights in the Collateral and Borrower's failure to do so shall constitute an Event of Default hereunder.

12.    **CAPITAL ADEQUACY.**

(a)    If Bank shall determine that, after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank or its parent corporation with any requirement or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(i)    shall subject Bank or its parent corporation to any tax, duty or other similar charge with respect to the Loans or the Notes or shall change the basis of taxation of payments to Bank or its parent corporation of the Obligations or the principal

16

of or interest on the Loans or of any other amounts due under this Agreement in respect of the Loans or the Notes (except for any change in respect of any tax imposed on the overall income of Bank or its parent corporation); or

       (ii)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System) against assets of, deposits with or for the account of, or credit extended by, Bank or its parent corporation or shall impose on Bank or its parent corporation any other condition affecting the Loans or the Notes;

and the result of any of the foregoing is to increase the cost to Bank or its parent corporation of making or maintaining any Loans, or to reduce the amount of any sum received or receivable by Bank or its parent corporation under this Agreement or the Notes, by an amount deemed by Bank or its parent corporation to be material, then upon demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank or its parent corporation for such increased cost or reduction.

       (b)    If Bank shall determine that the adoption after the date hereof of any applicable law, rule or regulation regarding capital adequacy, or any change therein after the date hereof, any change after the date hereof in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank or its parent corporation with any guideline or request issued after the date hereof regarding capital adequacy (whether nor not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's or the Banks parent corporations capital as a consequence of the Loans or the Bank's obligations hereunder to a level below that which the Bank or its parent corporation could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies with respect to capital adequacy and those of the Bank's parent corporation) by an amount reasonably deemed to the Bank or its parent corporation to be material, then from time to time on demand by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank or its parent corporation for such reduction.

       (c)    Bank shall allocate such cost increases or reductions in its returns among its customers reasonably and in good faith and on an equitable basis. Notwithstanding anything to the contrary contained herein, the Borrower shall not have any obligation to pay to the Bank amounts owing under this section unless, at the time it requests such compensation, it is the policy or general practice of the Bank to request compensation for comparable costs in similar circumstances under other comparable loan agreements. Certificates of the Bank sent to the Borrower from time to time claiming compensation under this section, stating the reason therefor and setting forth in reasonable detail the calculation of the additional amount or amounts to be paid to the Bank hereunder shall be conclusive absent manifest error. In determining such amounts, the Bank or its parent corporation may use any reasonable averaging and attribution methods consistent with the other provisions of this section.

13.    **COLLECTIONS; SET OFF; DEPOSIT ACCOUNTS; NOTICE OF ASSIGNMENT; EXPENSES; POWER OF ATTORNEY.**

(a)    Borrower hereby reaffirms its authorization of and direction to Bank, in Bank's sole discretion (provided, however, Bank shall have no obligation to do so), following an Event of Default: (i) to pay accrued interest as the same becomes due and payable pursuant to this Agreement or pursuant to any Note or other agreement between Borrower and Bank, and to treat the same as a Loan to Borrower, which shall be added to Borrower's Loan balance pursuant to this Agreement; (ii) to charge any of Borrower's accounts under the control of Bank for any such items; or (iii) apply the proceeds of Collateral, including, without limitation, payments on Accounts and other payments from sales or lease of Inventory and any other funds to the payment of such items.

(b)    Borrower hereby reaffirms its grant to Bank of a lien, security interest and right of setoff as security for all liabilities and Obligations to Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or in transit to it. At any time, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or Obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

(c)    Borrower will also continue to maintain at Bank a zero-balance checking account against which Borrower will draw disbursement checks in order to obtain Line of Credit Loans hereunder. Subject to Borrowing Base availability, the amount of all disbursement checks will be debited to the Borrower's loan account. The sum of all disbursement checks paid each day will be posted to Borrower's loan account as of the conclusion of each day. Bank shall be Borrower's main bank of deposit. Borrower shall inform Bank in writing of each deposit account that Borrower at any time opens or maintains at any other bank, and Borrower shall, with respect to any such deposit account, at Bank's request and option, pursuant to an agreement in form and substance satisfactory to Bank, either (i) cause the depositary bank to agree to comply at any time with instructions from Bank to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Borrower, or (ii) arrange for Bank to become the customer of the depositary bank with respect to the deposit account, with Borrower being permitted, only with the consent of Bank, to exercise rights to withdraw funds from such deposit account. The provisions of this paragraph shall not apply to (i) any deposit account for which Borrower, the depositary bank and Bank have entered into a cash collateral agreement specially negotiated among Borrower, the depositary bank and Bank for the specific purpose set forth therein, or (ii) deposit accounts specially and exclusively used

18

for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees.

(d)     Bank may at any time notify account debtors that Collateral has been assigned to Bank and that payments shall be made directly to or as directed by Bank.  Upon request of Bank at any time, Borrower will so notify such account debtors and will indicate on all billings to such account debtors that their Accounts must be paid directly to or as directed by Bank.  Bank shall have full power to collect, compromise, endorse, sell or otherwise deal with the Collateral or proceeds thereof in its own name or in the name of Borrower.

(e)     Borrower shall pay to Bank on demand any and all reasonable counsel fees and other expenses incurred by Bank in connection with the preparation, interpretation, enforcement, administration or amendment of this Agreement, or of any documents relating thereto, and any and all expenses, including, but not limited to, a collection charge on all Accounts collected, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Bank to obtain or enforce payment of any Account either as against the account debtor, Borrower, or any Guarantor or other guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Bank's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings (including the Bankruptcy Case) and all costs and expenses incurred or paid by Bank in connection with the administration, supervision, protection or realization on any security held by Bank for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Bank in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Bank in connection with the debt secured hereby, all of which amounts shall be considered advances to protect Bank's security, and shall be secured hereby.  At its option, and without limiting any other rights or remedies, Bank may at any time pay or discharge any taxes, liens, security interests or other encumbrances at any time levied against or placed on any of the Collateral, and may procure and pay any premiums on any insurance required to be carried by Borrower, and provide for the maintenance and preservation of any of the Collateral, and otherwise take any action reasonably deemed necessary to Bank to protect its security, and all amounts expended by Bank in connection with any of the foregoing matters, including reasonable attorneys' fees, shall be considered obligations of Borrower and shall be secured hereby.

(f)     Borrower does hereby make, constitute and appoint any officer or agent of Bank as Borrower's true and lawful attorney-in-fact, with power, to endorse the name of Borrower or any of Borrower's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under any policy of insurance on the Collateral) or Collateral that may come into possession of Bank in full or part payment of any amounts owing to Bank; to sign and endorse the name of Borrower or any of Borrower's officers or agents upon any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts, and

19

any instrument or documents relating thereto or to Borrower's rights therein; to give written notice to such office and officials of the United States Post Office to effect such change or changes of address so that all mail addressed to Borrower may be delivered directly to Bank; granting upon Borrower's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as Borrower might or could do, and hereby ratifying all that said attorney shall lawfully do or cause to be done by virtue hereof.  Neither Bank nor the attorney shall be liable for any acts or omissions nor for any error of judgment or mistake, except to the extent of their negligence or willful misconduct.  This power of attorney shall be irrevocable for the term of this Agreement and all transactions hereunder and thereafter as long as Borrower may be indebted to Bank, but shall automatically terminate upon full and final payment and performance of the Obligations, and termination of any obligation of Bank to make further advances to Borrower.

14.     **FINANCING STATEMENTS**.  Borrower hereby irrevocably authorizes Bank at any time and from time to time, and at Borrower's sole cost, to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment.  Borrower agrees to furnish any such information to Bank promptly upon request.  Borrower also ratifies its authorization for Bank to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.  In addition, at the request of Bank, Borrower will join with Bank in executing any other notices appropriate under applicable law in form satisfactory to Bank and will pay the cost of filing the same in all public offices wherever filing is deemed by Bank to be necessary or desirable.

15.     **BORROWER'S REPORTS**.

(a)     Borrower shall deliver to Bank all documents, as frequently as indicated below, or at such other times as Bank may request, and all other documents and information requested by Bank:

|  | **DOCUMENT** | **FREQUENCY DUE** |
|---|---|---|
| (i) | A Borrowing Base Certificate | Weekly, on or before Friday at Noon (Portland, Maine time) for the seven-day period ending with the immediately prior Sunday |

| (ii) | Accounts receivable aging report, in form satisfactory to Bank | Weekly, on or before Friday at Noon (Portland, Maine time) for the seven-day period ending with the immediately prior Sunday |
| --- | --- | --- |
| (iii) | Operating Budget for the following week (Sunday through Saturday) in form satisfactory to Bank (together with the update described in 15(g) below) | Weekly, by Noon (Portland, Maine time) of the Friday of the week before the weekly budget is to take effect |
| (iv) | Notice of noncompliance with the provisions of this Agreement | Immediately upon learning of such noncompliance, or if any representation or warranty contained herein is no longer true or accurate |
| (v) | Compliance Certificate | Monthly, within ten (10) days after the end of each month, including December, and annually within one hundred twenty (120) days after the close of each fiscal year |
| (vi) | Financial Statements | Annually and monthly, as set forth below |
| (vii) | Update of the status of the Nestlé Dispute | Weekly, on or before Friday at Noon (Portland, Maine time) and immediately upon any material adverse change |

(b)     Borrower will furnish Bank, annually, as soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, a balance sheet as of the end of such fiscal year, a statement of income and retained earnings for such fiscal year, and a statement of cash flows for such fiscal year, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior fiscal year, and all prepared in accordance with generally accepted accounting principles consistently applied, audited by independent public accountants selected by the Borrower and acceptable to Bank, and accompanied by an opinion thereon from such accountants acceptable to Bank  and together with such independent public accountant's statement that they have reviewed the provisions of this Agreement in accordance with generally accepted accounting principles and that they have no knowledge of any event or condition which constitutes an Event of Default or which, after notice or expiration of any applicable grace period or both, would constitute such an Event of Default or, if they have such knowledge, specifying the nature and period of existence thereof.

(c)     Borrower will furnish Bank as soon as available, and in any event within twenty (20) days after the end of each month, management-prepared financial statements, in form satisfactory to Bank, including a balance sheet, income statement and statement of cash flows, certified by the controller or chief financial officer of Borrower.

(d)     Borrower will promptly, upon receipt thereof, deliver to Bank, copies of any reports submitted to the Borrower by Borrower's independent public accountants in connection with the examination of the financial statements of the Borrower made by such accountants (the so-called "Management Letter").

(e)     In addition to the foregoing, Borrower shall provide Bank promptly with such other and additional information concerning the Borrower, the Collateral, the operation of Borrower's business, Borrower's financial condition, including financial reports and statements, as Bank may from time to time reasonably request.  All financial information provided to Bank in connection with or pursuant to this Agreement shall be prepared in accordance with generally accepted accounting or auditing principles (as applicable) applied consistently in the preparation thereof and consistently with prior periods to fairly reflect the financial condition of Borrower at the close of, and its results of operations for, the periods in question.

(f)     In addition to the foregoing, Bank shall have the right to conduct field examinations of the Accounts and Inventory, in its discretion from time to time, and Borrower shall be responsible for all costs, fees and expenses in connection therewith.

(g)     Together with each weekly Operating Budget referred to above, Borrower shall also submit an update of the Operating Budget for the immediately preceding week (Sunday through Saturday), setting forth actual receipts, disbursements and changes in cash for such period as compared to the forecasted receipts, disbursements and changes in cash set forth in the Operating Budget as approved for such prior week.  A negative variance of actual expenditure to a forecasted expenditure of greater than ten percent (10%) in any week shall constitute an immediate Event of Default hereunder.

16.   **GENERAL AGREEMENTS OF BORROWER.**

(a)   Borrower agrees to keep all the Collateral insured with coverage and in amounts not less than that usually carried by one engaged in a like business and in any event not less than that required by Bank with loss payable to Bank and Borrower, as their interests may appear, hereby appointing Bank as attorney for Borrower in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts.  As further assurance for the payment and performance of the Obligations, Borrower hereby reconfirms its assignment to Bank all sums, including returns of unearned premiums, which may become payable under any policy of insurance on the Collateral and Borrower hereby directs each insurance company issuing any such policy to make payment of such sums directly to Bank.

(b)   Bank or its agents have the right to inspect the Collateral and all records pertaining thereto at intervals to be determined by Bank and without hindrance or delay upon reasonable prior notice to Borrower.  Bank shall also have the right to obtain from time to time, at the sole cost and expense of Borrower, an appraisal and/or field examination of the Collateral by an appraiser acceptable to Bank.

(c)   Although, as above set forth, Bank has a continuing security interest in all of Borrower's Collateral and in the proceeds thereof, Borrower will at all times maintain as the minimum security hereunder a Borrowing Base not less than the aggregate unpaid principal of all Line of Credit Loans made hereunder and if Borrower fails to do so, Borrower will immediately make the necessary reduction in the unpaid principal amount of said Line of Credit Loans so that the Line of Credit Loans outstanding hereunder do not in the aggregate exceed the Borrowing Base.

(d)   Borrower will at all times keep accurate and complete records of Borrower's Accounts and other Collateral, and Bank, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Bank, upon reasonable prior notice to Borrower, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence which relate to Borrower's Accounts, and other Collateral or other transactions, between the parties thereto and the general financial condition of Borrower and Bank may remove any of such records temporarily for the purpose of having copies made thereof.  Borrower shall pay to Bank all reasonable audit fees, plus all travel and other expenses incurred in connection with any such audit.

(e)   Borrower will maintain a standard and modern system of accounting which enables Borrower to produce financial statements in accordance with generally accepted accounting principles and maintain records pertaining to the Collateral that contain information as from time to time may be requested by Bank.

(f)   Borrower will maintain its corporate existence in good standing and comply with all laws and regulations of the United States or of any state or states thereof or of

23

any political subdivision thereof, or of any governmental authority which may be applicable to it or to its business.

(g)     Borrower will pay all real and personal property taxes, assessments and charges and all franchises, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it, or payable by it at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to its property.

(h)     Bank may in its own name or in the name of others communicate with account debtors in order to verify with them to Bank's satisfaction the existence, amount and terms of any Accounts.

(i)     If any of Borrower's Accounts arise out of contracts with the United States or any department, agency, or instrumentality thereof, Borrower will immediately notify Bank thereof in writing and execute any instruments and take any steps required by Bank in order that all monies due and to become due under such contracts shall be assigned to Bank and notice thereof given to the Government under the Federal Assignment of Claims Act.

(j)     If any of Borrower's Accounts should be evidenced by promissory notes, trade acceptances, or other instruments for the payment of money, Borrower will immediately deliver same to Bank, appropriately endorsed to Bank's order and, regardless of the form of such endorsement, Borrower hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.

(k)     If any Collateral is at any time in the possession of a bailee, Borrower shall promptly notify Bank thereof and, if requested by Bank, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Bank, that the bailee holds such Collateral for the benefit of Bank and shall act upon the instructions of Bank, without the further consent of Borrower.

(l)     If Borrower is at any time a beneficiary under a letter of credit now or hereafter issued in favor of Borrower, Borrower shall promptly notify Bank thereof and, at the request and option of Bank, Borrower shall, pursuant to an agreement in form and substance satisfactory to Bank, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Bank of the proceeds of any drawing under the letter of credit, or (ii) arrange for Bank to become the transferee beneficiary of the letter of credit, with Bank agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied in the same manner as any other payment on an Account.

(m)     If Borrower shall at any time hold or acquire a commercial tort claim in addition to any claim included within the Nestlé Dispute, Borrower shall immediately notify Bank in a writing signed by Borrower of the brief details thereof and grant to Bank in such writing a security interest therein, and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Bank.

24

(n)      Borrower will promptly pay when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement, or upon any note or notes evidencing the Obligations, and will, at the request of Bank, promptly furnish Bank the receipted bills therefor.   At its option, Bank may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may pay for insurance on the Collateral and may pay for the maintenance and preservation of the Collateral.  Borrower agrees to reimburse Bank on demand for any payments made, or any expenses incurred by Bank pursuant to the foregoing authorization, and upon failure of the Borrower so to reimburse Bank, any such sums paid or advanced by Bank shall be deemed secured by the Collateral and constitute part of the Obligations.

(o)      Borrower will immediately notify Bank upon receipt of notification of any potential or known release or threat of release of hazardous materials, hazardous waste, hazardous or toxic substance or oil from any site operated by Borrower or of the incurrence of any expense or loss in connection therewith or with the Borrower's obtaining knowledge of any investigation, action or the incurrence of any expense or loss by any governmental authority in connection with the assessment, containment or removal of any hazardous material or oil for which expense or loss the Borrower may be liable.  As used herein, the terms "hazardous waste," "hazardous or toxic substance,"  "hazardous material" or "oil" shall have the same meanings as defined and used in any of the following (the "**Acts**"): the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 USC Sections 9601-9657, as amended by the Superfund Accounts and Reauthorization Act of 1986; the Federal Resource Conservation and Recovery Act, 42 USC Sections 6901 et seq.; the Hazardous Materials Transportation Act, 49 USC Sections 1801 et seq.; the Toxic Substances Control Act, 15 USC Sections 2601 et seq.; the Federal Water Pollution Control Act, 33 USC Sections 1251 et seq.; the Clean Air Act, 42 USC Sections 741 et seq.; the Clean Water Act, 33 USC Section 701; the Safe Drinking Water Act, 42 USC Sections 300(f)-300(j); the Uncontrolled Hazardous Substance Sites Law, 38 M.R.S.A. § 1361, et seq.; the Hazardous Matter Control Law, 38 M.R.S.A. § 1317, et seq.; the Maine Hazardous Waste, Septage, and Solid Waste Management Act, 38 M.R.S.A. § 1301, et seq.; the Toxics Use and Hazardous Waste Reduction Law, 38 M.R.S.A. § 2301 et seq.; and the Site Location of Development Law, 38 M.R.S.A. § 481 et seq.; and/or the regulations adopted and publications promulgated pursuant to any of the Acts, as the same may be amended from time to time.

(p)      Except to the extent of  Bank's negligence or willful misconduct, Borrower will indemnify and save Bank harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Bank may sustain or incur by reason of defending or protecting this security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral.  This indemnity shall survive the repayment of the Obligations and the termination of Bank's agreement to make Loans available to Borrower and the termination of this Agreement.

25

(q)     At the option of Bank, Borrower will furnish to Bank, from time to time, within five (5) days after the accrual in accordance with applicable law of Borrower's obligation to make deposits for F.I.C.A. and withholding taxes and/or sales taxes, proof satisfactory to Bank that such deposits have been made as required.

(r)     Should Borrower fail to make any of such deposits or furnish such proof, then Bank may, in its sole and absolute discretion, (a) make any of such deposits or any part thereof, (b) pay such taxes, or any part thereof, or (c) set up such reserves as Bank, in its judgment, shall deem necessary to satisfy the liability for such taxes. Each amount so deposited or paid shall constitute an advance under the terms hereof, repayable on demand with interest, as provided herein, and secured by all Collateral and any other property at any time pledged by Borrower with Bank. Nothing herein shall be deemed to obligate Bank to make any such deposit or payment or setup such reserve and the making of one or more of such deposits or payments or the setting up of such reserve shall not constitute (i) an agreement on Bank's part to take any further or similar action, or (ii) a waiver of any default by Borrower under the terms hereof.

(s)     Borrower hereby reaffirms its grant to Bank for a term that commenced on the date of the Existing Loan Agreement and continuing thereafter until all debts and Obligations of any kind or character owing from Borrower to Bank are fully paid and discharged, the right to use all premises or places of business which Borrower presently has or may hereafter have and where any of the Collateral may be located, at a total rental for the entire period of $1.00. Bank agrees not to exercise the rights granted in this paragraph unless and until Bank determines to exercise its rights against the Collateral.

(t)     Borrower will, at its expense, upon request of Bank promptly and duly execute and deliver such documents and assurances and take such actions as may be necessary or desirable or as Bank may request in order to correct any defect, error or omission which may at any time be discovered or to more effectively carry out the intent and purpose of this Agreement and to establish, perfect and protect Bank's security interest, rights and remedies created or intended to be created hereunder. Without limiting the generality of the above, Borrower will join with Bank in executing any notices appropriate under applicable federal or state law in form satisfactory to Bank and filing the same in all public offices and jurisdictions wherever and whenever requested by Bank.

(u)     Borrower shall perform any and all further steps requested by Bank to perfect Bank's security interest in Inventory, such as leasing warehouses to Bank or its designee, placing and maintaining signs, appointing custodians, maintaining stock records and transferring Inventory to warehouses. A physical listing of all Inventory, wherever located, shall be taken by Borrower whenever requested by Bank.

(v)     Borrower hereby reaffirms its grant to Bank for a term that commenced on the date of the Existing Loan Agreement and continuing thereafter until all debts and Obligations of any kind or character owed to Bank are fully paid and discharged, a non-exclusive irrevocable royalty-free license in connection with Bank's exercise of its rights hereunder, following an Event of Default, to use, apply or affix any trademark, trade name logo or the like

26

and to use any patents, in which the Borrower now or hereafter has rights, which license may be used by.  This license shall be in addition to, and not in lieu of, the inclusion of all of Borrower's trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses in the Collateral; in addition to the right to use said Collateral as provided in this paragraph, Bank shall have full right to exercise any and all of its other rights regarding Collateral with respect to such trademarks, servicemarks, tradenames, logos, goodwill, patents, franchises and licenses.

(w)     At Bank's request, Borrower shall enter into a contract consent in a form prescribed by Bank with the contract party under each material contract in effect from time to time including the contracts listed on Schedule D and shall promptly deliver each such consent to Bank.

### 17.   BORROWER'S NEGATIVE COVENANTS.

(a)     (Operating Cash Flow/Total Fixed Charges)   Borrower will maintain a ratio of its Operating Cash Flow to its Total Fixed Charges of at least 1.25:1.0 for each fiscal quarter, to be measured on a rolling four-quarter basis.

(b)     (Distributions) Borrower will not at any time make distributions to its shareholders during any fiscal year of Borrower.

(c)     (Disposition of Collateral) Borrower will not at any time sell, assign, exchange or otherwise dispose of any of the Collateral, except Inventory, in accordance with Section 20, and other than  (i) scrap, waste, defective goods and the like; (ii) obsolete goods; and (iii) Equipment which is no longer required or deemed necessary for the conduct of Borrower's business, so long as Borrower receives therefor a sum substantially equal to such Equipment's fair value, remits such sum to Bank in accordance with the terms of this Agreement or replaces such Equipment with other equipment of similar value which is subject to a first security interest in Bank's favor.

(d)     (Liens) Borrower will not at any time create, permit to be created or suffer to exist any lien, encumbrance or security interest of any kind (**"Lien"**) upon any of the Collateral or any other property of Borrower, now owned or hereafter acquired, except for the Bankruptcy Case (with Bank reserving all rights and claims as to its Liens notwithstanding the Bankruptcy Case) and Liens: (i) consisting of landlords', carriers', warehousemen's, mechanics' and other similar liens arising by operation of law in the ordinary course of Borrower's business; (ii) arising out of pledge or deposits under workers' compensation, unemployment insurance, old age pension, social security, retirement benefits or other similar legislation; (iii) consisting of purchase money Liens arising in the ordinary course of business for the purchase of equipment and software (so long as the indebtedness secured thereby does not exceed the lesser of the cost or fair market value of the property subject thereto, and such Lien extends to the purchased item, and any proceeds thereof, and to no other property); (iv) for unpaid taxes that are either (x) not yet due and payable, or (y) are subject of permitted protests; (v) which are the subject of permitted protests; (vi) set forth on Schedule B annexed hereto; and (vii) in favor of Bank; the term "permitted protests" as used herein means the right of the Borrower to protest any Lien

27

(other than a Lien that secures the Obligations), tax (other than payroll taxes or taxes that are the subject of a federal or state tax lien) or rental payment, provided that (x) a reserve with respect to such liability is established on the books of the Borrower in an amount that is reasonably satisfactory to the Bank, (y) any such protest is instituted and diligently prosecuted by the Borrower in good faith, and (z) the Bank is satisfied that, while such protest is pending, there will be no impairment of the enforceability, validity or priority of any of the Liens of the Bank in and to the Collateral.

(e)      <u>(Indebtedness)</u> Borrower will not at any time incur indebtedness, assume, or otherwise become directly or contingently liable in respect of, any indebtedness, in excess of $50,000 outstanding at any one time, other than the Line of Credit Loans and the Term Loan hereunder without the express prior written consent of the Bank.

(f)      <u>(Loans)</u> Borrower will not at any time make any loans or advances to any individual, partnership, trust or other corporation, including without limitation Borrower's directors, officers and employees, except advances to officers or employees with respect to expenses incurred by them in the ordinary course of their duties which are properly reimbursable by Borrower.

(g)      <u>(Guarantees)</u> Borrower will not at any time assume, guaranty, endorse or otherwise become directly or contingently liable in respect of (including without limitation by way of agreement, contingent or otherwise, to purchase, provide funds to or otherwise invest in a debtor or otherwise to assure a creditor against loss), any indebtedness (except guarantees by endorsement of instruments for deposit or collection in the ordinary course of business and guarantees in favor of Bank) of any individual, partnership, trust or other corporation.

(h)      <u>(Investments)</u> Borrower will not at any time: (i) use any Loan proceeds to purchase or carry any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or (ii) invest in or purchase any stock or securities of any individual, partnership, trust or other corporation except (y) readily marketable direct obligations of, or obligations guaranteed by, the United States of America or any agency thereof or (z) time deposits with or certificates of deposit issued by the Bank.

(i)      <u>(Transactions with Affiliates)</u> Borrower will not at any time enter into any lease or other transaction with any shareholder, officer or affiliate on terms any less favorable than those which might be obtained at the time from persons who (or entities which) are not such a shareholder, officer or affiliate. Borrower shall not make any payments on subordinated debt until the Nestlé Dispute is resolved in Borrower's favor.

(j)      <u>(Subsidiaries)</u> Borrower has no subsidiaries except as set forth on <u>Exhibit A</u> and shall not create any others.

(k)      <u>(Mergers, Consolidations or Sales)</u> Borrower will not at any time: (i) merge or consolidate with or into another entity, or convert into another entity, or participate in a share exchange; (ii) enter into any joint venture or partnership with any person, firm, corporation

or other entity; (iii) convey, lease or sell all or any material portion of its property or assets or business to any other person, firm, corporation or other entity, except for the sale of Inventory in the ordinary course of its business; or (d) convey, lease or sell any of its assets to any person, firm, corporation or other entity for less than the fair market value thereof.

(l)　　(Change in Legal Status) Borrower will not at any time: (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, and (ii) change its type of organization, jurisdiction or organization or other legal structure.

(m)　　(Modification of Capital Structure) Borrower will not allow the structure of the equity interests of Borrower to change from the equity structure that exists on the date of this Agreement, whether by increase or decrease in the number of shares, addition of another class of shares or otherwise.

For purposes of this section: **"affiliate"** shall mean any person or entity (i) which directly or indirectly controls, or is controlled by or is under common control with the Borrower or a subsidiary, (ii) which directly or indirectly beneficially holds or owns five (5%) percent or more of any class of voting stock of the Borrower or any subsidiary, or (iii) five (5%) percent or more of the voting stock of which is directly or indirectly beneficially owned or held by the Borrower or a subsidiary; **"distributions"** shall mean all payment or distributions to shareholders in cash or in property other than reasonable salaries, bonuses and expense reimbursements; **"indebtedness"** shall mean (i) all liabilities for borrowed money, for the deferred purchase price of property or services, and under leases which are or should be, under generally accepted accounting principles, recorded as capital leases, in respect of which a person or entity is directly or indirectly, absolutely or contingently liable as obligor, guarantor, endorser or otherwise, or in respect of which such person or entity otherwise assures a creditor against loss, (ii) all liabilities of the type described in (i) above which are secured by (or for which the holder has an existing right, contingent or otherwise, to be secured by) any lien upon property owned by such person or entity, whether or not such person or entity has assumed or become liable for the payment thereof, and (iii) all other liabilities or obligations which would, in accordance with generally accepted accounting principles, be classified as liabilities of such person or entity; **"Operating Cash Flow"** shall mean net income after taxes (exclusive of extraordinary gains and losses, gains and losses on the sale of fixed assets and other non-recurring/non-operating income) plus depreciation, amortization and interest expense, less dividends and distributions for owner's income tax liability based on the Borrower's earnings (operating leases are not included in this calculation); **"Total Fixed Charges"** shall mean the sum of interest expense, current maturities of long-term debt and current maturities of capital leases (operating leases are not included in this calculation).

18.　　**DEFAULT; RIGHTS AND REMEDIES UPON DEFAULT.**

(a)      Upon the occurrence of any one or more of the following events (herein, **"Events of Default"**), Bank may decline to make any or all further Line of Credit Loans hereunder or under any other agreements with Borrower, any and all Obligations of the Borrower to Bank shall become immediately due and payable, at the option of Bank and without further notice or demand.  The occurrence of any such Event of Default shall also constitute, without notice or demand, a default under all other agreements between Bank and the Borrower and instruments and papers given Bank by the Borrower, whether such agreements, instruments, or papers now exist or hereafter arise, namely:

(i)      The failure by the Borrower to pay any principal, interest, fees, costs, and expenses due pursuant to this Agreement within five (5) days of the date when due.

(ii)      The failure by the Borrower to pay any other Obligations within five (5) days of Bank's demand therefor.

(iii)      Default by the Borrower in the observance or performance of any of the covenants or agreements of the Borrower contained in Sections 16(a), 16(f), or 17 of this Agreement, or there shall be a Termination Event (as defined in the Interim Order).

(iv)      The failure by the Borrower to promptly, punctually and faithfully perform, or observe any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement, other than those described in the foregoing clauses (i), (ii) and (iii), or in any other agreement with Bank which is not remedied within the earlier of fifteen (15) days after (i) notice thereof by Bank to Borrower, or (ii) the date Borrower was required to give notice to Bank pursuant to Section 15(a)(iv) hereof.

(v)      The determination by Bank that any representation or warranty heretofore, now or hereafter made by the Borrower to Bank, in any documents, instrument, agreement, or paper was not true or accurate when given in any material respect.

(vi)      The occurrence of any event such that any material indebtedness of the Borrower from any lender other than Bank, could be accelerated, notwithstanding that such acceleration has not taken place.

(vii)      The occurrence of any event, other than the filing of the Bankruptcy Case, that would cause a lien creditor, as that term is defined in Section 9-1102 of the Maine Uniform Commercial Code, to take priority over advances made by Bank.

(viii)      A filing against or relating to the Borrower of (A) a federal tax lien in favor of the United States of America or any political subdivision of the United

30

States of America, or (B) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state.

(ix)   The occurrence of any event of default (including any event identified and/or defined as an "Event of Default") and the expiration of any expressly applicable grace or cure periods under any of the Loan Documents or under any other agreement between Bank and the Borrower or any other instrument or paper given Bank by the Borrower, whether such Loan Document or other agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Bank may not have exercised its rights upon default under any such Loan Document or other agreement, instrument or paper).

(x)   Any act by, against, or relating to the Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of the Borrower's property.

(xi)   The granting of any trust mortgage or execution of an assignment for the benefit of the creditors of the Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for the Borrower; the failure by the Borrower to generally pay the debts of the Borrower as they mature; adjudication of bankruptcy or insolvency relative to the Borrower; the entry of an order for relief or similar order with respect to the Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (hereinafter the "Bankruptcy Code") or any other federal bankruptcy law; the filing of any complaint, application, or petition by or against the Borrower initiating any matter in which the Borrower is or may be granted any relief from the debts of the Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; the calling or sufferance of a meeting of creditors of the Borrower; the meeting by the Borrower of a formal or informal creditor's committee; the offering by or entering into by the Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of the Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including the Borrower which seeks or intends to accomplish a reorganization or arrangement with creditors.  If any of the foregoing actions or proceedings are involuntary, and Borrower shall vigorously pursue the vacation or termination of such action or proceeding, then it shall not constitute an Event of Default hereunder if Borrower is successful at having such matter vacated or terminated within sixty (60) days.

(xii)   The entry of any judgment(s) against Borrower in an aggregate amount in excess of $50,000.00, which judgment(s) is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry.

(xiii)  The entry of any court order which enjoins, restrains or in any way prevents Borrower from conducting all or any substantial part of its business affairs in the ordinary course of business.

(xiv)  The occurrence of any event or circumstance with respect to the Borrower, other than the filing of the Bankruptcy Case, such that Bank shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by the Borrower under this Agreement or any other agreement between Bank and the Borrower is materially impaired or there shall occur any material adverse change in the business or financial condition of the Borrower including without limitation a change in the status of the Nestlé Dispute that, in Bank's good faith judgment, significantly increases the risk that Bank will not be repaid in full.

(xv)  The service of any process upon Bank seeking to attach by trustee process any funds of the Borrower on deposit with Bank that is not terminated or bonded over to the satisfaction of the Bank in five (5) business days.

(xvi)  Any direct or indirect change in the ownership of the equity interests of the Borrower from that existing at the execution of this Agreement, other than transfers of equity interests among the current shareholders of Borrower and other than other changes in ownership that involve, in the aggregate, up to 10% of the equity of the Borrower.

(xvii)  The occurrence of any material uninsured loss, theft, damage or destruction to any material Collateral.

(xviii)  The death, termination of existence, dissolution or liquidation of the Borrower, or the ceasing to carry on actively any substantial part of Borrower's current business.

(xix)  This Agreement shall, at any time after its execution and delivery and for any reason, cease (A) to create a valid and perfected first priority security interest in and to the property purported to be subject to this Agreement; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by the Borrower, or any Guarantor or any other guarantor of the Borrower denies it has any further liability or obligation hereunder.

(xx)  Any of the following events occur or exist with respect to the Borrower or any ERISA affiliate: (A) any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Internal Revenue Code) involving any Plan; (B) any "reportable event" (as defined in Section 4043 of ERISA and the regulations issued under such Section) shall occur with respect to any Plan; (C) The filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan; (D) any event or circumstance exists which might constitute grounds entitling the Pension Benefit Guaranty Corporation (PBGC) to institute

32

proceedings under Section 4042 of ERISA for the termination of, or for the appointment of a trustee to administer, any Plan, or the institution by the PBGC of any such proceedings; (E) or partial withdrawal under Section 4201 or 4204 of ERISA from a Multiemployer Plan or the reorganization, insolvency, or termination of any Multiemployer Plan; and in each case above, such event or condition, together with all other events or conditions, if any, could in the opinion of Bank subject the Borrower to any tax, penalty, or other liability to a Plan, a Multiemployer Plan, the PBGC, or otherwise.

      (xxi)   The occurrence of (A) any of the Events of Default described in Sections 18(a) (vi), (viii), (ix), (x), (xi), (xii), or (xviii), with respect to any Guarantor or any other guarantor to Bank of the Obligations, as if such Guarantor or other guarantor were the "Borrower" described therein, or (B) the failure by any Guarantor or any other guarantor to Bank of the Obligations to perform in accordance with the terms of any agreement between Guarantor or such other guarantor, as the case may be, and the Bank, and such failure continues beyond any expressly applicable grace or cure period.

      Upon the occurrence of an Event of Default, Bank may declare any obligation Bank may have hereunder to be cancelled, declare all Obligations of Borrower to be due and payable and may proceed to enforce payment of the Obligations and to exercise any and all of the rights and remedies afforded to Bank by the Uniform Commercial Code or under the terms of this Agreement or otherwise. Upon the occurrence of, and during the continuance of, an Event of Default, the Borrower, as additional compensation to the Bank for its increased credit risk, promises to pay interest on all Obligations (including, without limitation, principal, whether or not past due, past due interest and any other amounts past due under this Agreement) at the Default Rate.

      (b)   Upon the filing of any complaint, application, or petition by or against the Borrower, other than the Bankruptcy Case, initiating any matter in which the Borrower is or may be granted any relief from the debts of the Borrower pursuant to the Bankruptcy Code, Bank's obligation hereunder shall be canceled immediately, automatically, and without notice, and all Obligations of the Borrower then outstanding shall become immediately due and payable without presentation, demand, or notice of any kind to the Borrower but if such filing is against the Borrower by one or more third parties, only if the Borrower shall fail to contest such filing actively or shall fail to cause it to be removed within sixty (60) days.

      (c)   Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Bank deems advisable, having due regard to compliance with any statute or regulation which might affect, limit or apply to the Bank's disposition of the Collateral. The Bank may conduct any such sale or other disposition of the Collateral upon the Borrower's premises. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Bank shall provide the Borrower with such notice as may be practicable under the circumstances), the Bank shall give the Borrower at least the greater of the minimum notice required by law or ten (10) days prior written notice of the date, time and place of any proposed

33

public sale, and of the date after which any private sale or other disposition of the Collateral may be made.  The Bank may purchase the Collateral, or any portion of it at any public sale.

(d)     If the Bank sells any of the Collateral on credit, the Borrower will be credited only with payments actually made by the purchaser of such Collateral and received by the Bank.  If the purchaser fails to pay for the Collateral, the Bank may re-sell the Collateral and the Borrower shall be credited with the proceeds of the sale.

(e)     In connection with the Bank's exercise of the Bank's rights after the occurrence of an Event of Default, the Bank may enter upon, occupy and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Bank.  The Bank shall not be required to remove any of the Collateral from any such premises upon the Bank's taking possession thereof, and may render any Collateral unusable to the Borrower.  In no event shall the Bank be liable to the Borrower for use or occupancy by the Bank of any premises pursuant to this Agreement.

(f)     Upon the occurrence of any Event of Default, the Bank may require the Borrower to assemble the Collateral and make it available to the Bank at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Bank and the Borrower.

19.     **STANDARDS FOR EXERCISING REMEDIES.**  To the extent that applicable law imposes duties on Bank to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Bank (a) to fail to incur expenses reasonably deemed significant by Bank to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring  all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of the Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties specifically to disclaim any warranties of title or the like, (k) to purchase insurance or credit enhancements to insure Bank against risks of loss, collection or disposition of Collateral or to provide to Bank a guaranteed return from the collection or disposition of Collateral, or (l) to the

34

extent deemed appropriate by Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Bank in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by Bank would not be commercially unreasonable in Bank's exercise of remedies against the Collateral and that other actions or omissions by Bank shall not be deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to Borrower or to impose any duties on Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

20. **PROCESSING AND SALES OF INVENTORY.** So long as Borrower is not in default hereunder, Borrower shall have the right, in the regular course of business, to process and sell Borrower's Inventory. A sale in the ordinary course of business shall not include a transfer in total or partial satisfaction of a debt.

21. **WAIVER OF JURY TRIAL.** BORROWER AND BANK EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. Borrower hereby certifies that neither Bank nor any of its representatives, agents or counsel has represented, expressly or otherwise, that Bank would not, in the event of any such suit, action or proceeding, seek to enforce this waiver of right to trial by jury. Borrower acknowledges that Bank has been induced to enter into this Agreement by, among other things, this waiver. Borrower acknowledges that it has read the provisions of this Agreement and in particular, this section; has consulted legal counsel; understands the right it is granting in this Agreement and is waiving in this section in particular; and makes the above waiver knowingly, voluntarily and intentionally.

22. **CONSENT TO JURISDICTION.** Borrower and Bank agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in any court of the State of Maine sitting in the County of Cumberland, or in the District Court of the United States for the District of Maine, and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of Maine or the United States of America.

23. **ADVANCES AFTER EVENT OF DEFAULT.** In the event that Bank continues to make Line of Credit Loans hereunder after the occurrence of an Event of Default, all such Line of Credit Loans: (i) shall be made in the sole and absolute discretion of Bank; and (ii) shall, together with all other Obligations, be payable thereafter **ON DEMAND**.

24. **ACKNOWLEDGMENT OF THE POSITION OF THE PARTIES**. The Borrower acknowledges to and agree with the Bank that the Bank does not directly or indirectly have any obligation or duty of any kind whatsoever to renew or extend any indebtedness of Borrower to the Bank, to extend any further loans or credit to Borrower (except for advances under

35

the Line of Credit Loan in accordance with the terms thereof), to further amend, modify or supplement this Agreement or any power or remedies in any matter whatsoever other than as provided in the loan documents. Notwithstanding any other provision of this Agreement or any other contract or instrument between Borrower and the Bank, the relationship between the Bank and the Borrower shall be limited to the relationship of the lender to a borrower in a commercial loan transaction, as applicable; the Bank is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower (or of any other person), and neither Bank nor the Borrower intend Bank to assume any such status; and the Bank is not and shall not be deemed to be responsible for (or a participant in) any acts, omissions or decisions of Borrower.

25. **RELEASE**. Borrower, in consideration of Bank entering into this Agreement, represents and warrants, by signing below, as follows: That it has no claims, causes of action, counterclaims, offsets, reductions, or defenses of any kind against or related in any way to Bank, or the Existing Loan Documents or this Agreement or the additional documents referred to herein (the "**DIP Loan Documents**"). That the sums and indebtedness owed to Bank under, pursuant to, or related in any way to the Existing Loan Documents and/or the DIP Loan Documents, and all rights, interests, and claims of (and obligations and indebtedness owed or which were owed to) Bank under, pursuant to, or related in any way to the Existing Loan Documents and/or the DIP Loan Documents were not and are not subject to any claim, counterclaim, offset, setoff, cause of action, defense, or reduction arising out of or relating to facts in existence as of the date of this Agreement. That Bank has heretofore properly performed and satisfied in a timely manner all of its obligations, covenants, and responsibilities due, if any, and contracts, if any, to or with Borrower. Furthermore, Borrower, on its own behalf and on behalf of its successors, agents and assigns, does hereby forever, finally, fully, unconditionally and completely release, relieve, acquit, forgive, cancel and discharge Bank and its subsidiaries, affiliates, parents, successors, predecessors, and assigns, and all past and present employees, officers, directors, agents, representatives, attorneys, insurers, accountants and shareholders, each in its or their representative capacities, from and against any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions and causes of action of any kind or nature whatsoever, that it or its successors, agents or assigns ever had, now have, or hereafter can, shall or may have, from the date of the beginning of the world to the date hereof, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, jointly or severally, directly or indirectly, accrued or unaccrued, contingent or fixed, at law or in equity, arising out of, or related to, any act, activity or event, failure to act or otherwise, relative to, or in connection with, the Existing Loan Documents or the DIP Loan Documents, provided, however, Borrower does not release its right to require Bank to perform its obligations under the DIP Loan Agreements. By accepting this general release, Bank does not release and hereby reserves and preserves any all claims against Borrower under and in connection with the Existing Loan Documents (as amended by this Agreement and the other DIP Loan Documents).

26.    **MISCELLANEOUS**.

(a)    No delay or omission on the part of Bank in exercising any rights shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All Bank's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

(b)    Bank is authorized to make Loans under the terms of this Agreement upon the request, either written or oral, in the name of Borrower or any authorized person whose name appears at the end of this Agreement, or of any of the persons from time to time holding the offices of President or Treasurer of Borrower, or of such other officers and authorized signatories as may from time to time be set forth in any banking and borrowing resolutions, or of any other agents or officers with apparent authority to act for Borrower in requesting loans hereunder.

(c)    This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Bank's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Bank shall release Borrower from its Obligations.  Bank may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment.  Bank reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Bank's rights and benefits hereunder.  In connection with any assignment or participation, Bank may disclose all documents and information which Bank now or hereafter may have relating to Borrower or Borrower's business.  To the extent that Bank assigns its rights and obligations hereunder to another party, Bank thereafter shall be released from such assigned obligations to Borrower and such assignment shall effect a novation between Borrower and such other party.

(d)    Unless otherwise provided in this Agreement, all notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to or under this Agreement (each, a **"Notice"**) shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) four (4) business days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one (1) business day after the date of delivery of such Notice to a nationwide, reputable commercial courier service specifying next day delivery:

If to Bank:                    KeyBank National Association
                               One Canal Plaza, Second Floor
                               Portland, Maine 04101
                               Attention: Neil C. Buitenhuys

<table>
<tr><td>If to Borrower:</td><td>Sure Winner Foods<br>2 Lehner Road, Saco Industrial Park<br>Saco, Maine  04072<br>Attention: Chairman, CEO, CFO</td></tr>
</table>

Any party may change the address to which any Notice is to be delivered to any other address within the United States of America by furnishing written Notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such Notice of change shall be effective unless and until received by such other parties.  Rejection or refusal to accept, or inability to deliver because of changed address or because no Notice of changed address was given, shall be deemed to be receipt of any such Notice.  Any Notice to an entity shall be deemed to be given on the date specified in this paragraph, without regard to when such Notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed.  If a Notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with such entity shall not affect the effectiveness of such Notice.  Notices may be given on behalf of any party by such party's attorneys.

(e)     Any paragraph and section headings used in this Agreement are for convenience only, and shall not affect the meaning or construction of this Agreement.  If one or more provisions of this Agreement (or the application thereof) shall be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect in any way the validity, legality or enforceability of such provision (or its application) in any other jurisdiction or of any other provision of this Agreement (or its application) in any jurisdiction.

(f)     By signing below, Borrower agrees and acknowledges that, under Maine law, no promise, contract, or agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of a debt for more than $250,000 may be enforced against Bank unless the promise, contract, or agreement (or some memorandum or note thereof) is in writing and signed by Bank.

(g)     Bank may at any time pledge all or any portion of its rights under the Loan Documents including any portion of the Notes to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341.  No such pledge or enforcement thereof shall release Bank from its obligations under any of the Loan Documents.

(h)     Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to Borrower or any guarantor, to grant to one or more banks or other financial institutions (each, an "Assignee"), and each Borrower and each guarantor agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Agreement and to any other documents, instruments and

38

agreements executed in connection herewith as Bank shall deem necessary to effect the foregoing.  In addition, at the request of Bank and any such Assignee, Borrowers shall issue one or more new promissory notes, as applicable, to any such Assignee and, if Bank has retained any of its rights and obligations hereunder following such assignment, to Bank, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by Bank prior to such assignment and shall reflect the amount of the respective commitments and loans held by such Assignee and Bank after giving effect to such assignment.  Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Bank in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Bank, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Bank hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by Bank pursuant to the assignment documentation between Bank and such Assignee, and Bank shall be released from its obligations hereunder and thereunder to a corresponding extent.  Bank may furnish any information concerning Borrowers in its possession from time to time to prospective Participants, provided that Bank shall require any such prospective Participant to agree in writing to maintain the confidentiality of such information.

(i)     Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to Borrower or any guarantor, to grant to one or more banks or other financial institutions (each, a "Participant") participating interests in Bank's obligation to lend hereunder and/or any or all of the loans held by Bank hereunder.  In the event of any such grant by Bank of a participating interest to a Participant, whether or not upon notice to Borrower, Bank shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Bank in connection with the Bank's rights and obligations hereunder.  Bank may furnish any information concerning Borrowers in its possession from time to time to prospective Participants, provided that Bank shall require any such prospective Participant to agree in writing to maintain the confidentiality of such information.

(j)     Upon receipt of an affidavit of an officer of Bank as to the loss, theft, destruction or mutilation of the Notes or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement note or other loan document in the same principal amount thereof and otherwise of like tenor.

(k)     All agreements between Borrower and Bank are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Bank for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Agreement shall be governed by

39

such new law as of its effective date.  In this regard, it is expressly agreed that it is the intent of Borrower and Bank in the execution, delivery and acceptance of this Agreement to contract in strict compliance with the laws of the State of Maine from time to time in effect.  If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any promissory note evidencing the  Loans at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever Bank should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance hereunder and not to the payment of interest.  This provision shall control every other provision of all agreements between Borrower and Bank.

(l)      This Agreement, together with the Notes and the other Loan Documents, are intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Agreement.   All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superseded by this Agreement, and no party is relying on any promise, agreement or understanding not set forth in this Agreement. This Agreement may not be amended or modified except by a written instrument describing such amendment or modification executed by Borrower and Bank.

(m)      All instruments executed and delivered in connection with the closing of this loan shall be in form and substance satisfactory to Bank and its counsel.  All other matters relating to the law shall be made to meet the satisfaction of such counsel.

(n)      If any payment hereunder or under any promissory note relating hereto becomes due on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment.

(o)      Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Bank or Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(p)      This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maine.  This Agreement shall take effect as a sealed instrument.

**[The next page is the signature page.]**

40

WITNESSETH:                          SURE WINNER FOODS


_____          By:_____
Name:                                Name:
                                     Title:


                                     KEYBANK NATIONAL ASSOCIATION


_____          By:_____
Name:                                Name:
                                     Title:

**SCHEDULES**

The following Schedules to the within Amended and Restated Loan and Security Agreement (All Assets) (Debtor in Possession Financing) are respectively described in the section indicated.  Those Schedules in which no information has been inserted shall be deemed to read "None".

## SCHEDULE "A"
**Borrower's Places of Business, Inventory Locations and Subsidiaries (Section 4)
Shareholders (Section 5(c))**

### Places of Business:

| Address | Property Located At Such Address |
|---------|----------------------------------|
| 2 Lehner Road, Saco, Maine | equipment, records and inventory |
| 102 Farrell Road, Syracuse, NY 13209 | equipment, records and inventory |

### Inventory Locations:

| Address | Property Located At Such Address |
|---------|----------------------------------|
| 2 Lehner Road, Saco, Maine | equipment, records and inventory |
| 102 Farrell Road, Syracuse, NY 13209 | equipment, records and inventory |

### Subsidiaries:

| Name: | Jurisdiction of Organization: | Address: | Ownership %: |
|-------|-------------------------------|----------|--------------|

None.

| Shareholder Names: | Ownership %: |
|--------------------|--------------|
| Mark R. Irving Living Trust u/a dated 3/19/2003 | 54.56% |
| Keith S. Benoit Revocable Trust of 2009 | 44.51% |
| Paul Godin | .93% |

## SCHEDULE "B"
### Other Encumbrances and Liens (Section 5(f)(i))

Northstar Recycling Company, Inc. - balers

Crown Credit Company – equipment leased from lessor

Budget Document Technology – printer and copier system

## SCHEDULE "C"
### Leases (Section 5(f)(ii))

| Lessor | Description of Property | Date of Lease and Term | Rental Payable |
|---|---|---|---|
| | | | |

See personal property leases on Schedule B above.

12668808_3.doc